## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS<br>2533 West 3rd Street, Suite 101<br>Los Angeles, California 90057 | Case No. |
| UNITED FARM WORKERS OF AMERICA<br>29700 Woodford-Tehachapi Road<br>P.O. Box 62<br>Keene, CA 93531 | **COMPLAINT** |
| CASA, INC.<br>8151 15th Avenue Hyattsville, MD 20528 | |
| MAKE THE ROAD NEW YORK<br>301 Grove Street<br>Brooklyn, NY 11237 | |
| *Plaintiffs*, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY<br>245 Murray Lane, SW Washington, DC 20528 | |
| KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, 245 Murray Lane, SW Washington, DC 20528 | |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, 5900 Capital Gateway Dr. Camp Springs, MD 20588-0009 | |
| KIKA SCOTT, in her official capacity as Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services, 5900 Capital Gateway Dr. Camp Springs, MD 20588-0009 | |

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, 500 12th St., SW,
Washington, DC 20536

TODD M. LYONS, in his official capacity
as Acting Director, U.S. Immigration and
Customs Enforcement, 500 12th St., SW,
Washington, DC 20536

U.S. CUSTOMS AND BORDER
PROTECTION, 1300 Pennsylvania Avenue,
NW, Washington, D.C. 20229

PETE R. FLORES, in his official capacity as
Acting Commissioner, U.S. Customs and
Border Protection, 1300 Pennsylvania
Avenue, NW, Washington, DC 20229

U.S. DEPARTMENT OF JUSTICE, 950
Pennsylvania Ave., NW,
Washington, DC 20530

PAMELA BONDI, in her official capacity as
Attorney General, 950 Pennsylvania Ave.,
NW, Washington, DC 20530

*Defendants.*

## INTRODUCTION

1.     This case challenges an interim final rule (IFR) through which Defendants purport

to impose a new, universal immigration registration regime. Under this new rule, millions of

noncitizens—including many who have already been screened by the federal government—must

register with the federal government within 30 days, submit fingerprints and other biometric

information, and carry proof of this registration at all times or face arrest and federal prosecution.

The IFR reverses the government's long-standing approach to registration—a limited registration

policy that has been in place since the end of World War II—in a manner that will cause

confusion, fear, and significant economic disruption. Defendants attempt to rush through these sweeping changes without any meaningful explanation for the change in policy and without the notice, public comment, and careful consideration that Congress requires to avoid exactly these types of harms.

2.      On March 12, 2025, Defendants issued the IFR to go into effect in 30 days, on April 11, 2025. The IFR creates new requirements for all noncitizens 14 years of age or older who remain in the United States for at least 30 days and not currently registered and fingerprinted under the existing scheme. The IFR indicates that *all* noncitizen children must re-register and be fingerprinted using this new process when they turn 14. The IFR likewise requires parents and legal guardians to register all unregistered children under the age of 14. *See* U.S. Citizenship & Immigration Servs., Alien Registration Form and Evidence of Registration, 90 Fed. Reg. 11793 (Mar. 12, 2025). Without the benefit of notice and comment, the IFR creates an incoherent, inconsistent, and confusing registration scheme that Defendants have not explained.

3.      This is a dramatic change in policy. For eighty years, the federal government has chosen not to impose a universal registration requirement. Instead, it has relied on existing immigration processes—visa and benefits applications, admission procedures, and removal proceedings—to screen noncitizens. The government has never before required registration as part of a campaign to prioritize the prosecution of misdemeanor immigration offenses and to encourage "self-deportation."  The current regulations reflect the federal government's longstanding determination that, outside the exigencies of wartime or an armed attack, any registration requirement is appropriately accomplished through established statutory and regulatory mechanisms for granting immigration status and other immigration benefits.

3

4.      Defendants seek to implement this scheme in just 11 days without providing adequate notice to those impacted or the public, without considering comments, and without engaging in reasoned decision-making.

5.      The IFR violates the procedural and substantive requirements of the Administrative Procedure Act ("APA"). Absent intervention by this Court, all noncitizens—as well as U.S. citizens wrongly suspected of being noncitizens—will be exposed to a new criminal enforcement regime and a "show me your papers" country, and without regard to the statutorily-mandated guardrails of the APA.

## PARTIES

6.      Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization headquartered in Los Angeles, California, with eight offices throughout California and a national policy office in Washington, D.C. Its mission is to ensure immigrant communities are fully integrated in society with full rights and access to resources. It is a member-based organization with approximately 50,000 active members. It provides education and legal services to members and non-members alike and engages in policy advocacy to further its mission.

7.      In 2012, CHIRLA launched its legal services program in response to community members seeking assistance applying for Deferred Action for Childhood Arrivals ("DACA"). It has since assisted thousands of individuals with family and humanitarian immigration benefits as well as removal defense cases. CHIRLA's programming also includes a hotline where individuals—including members, clients, and community members—can call with questions. CHIRLA's legal programs are funded through specific grants for affirmative legal services work, removal defense cases, and its Student Legal Services program.

8.      CHIRLA's membership includes U.S. citizens and noncitizens alike, many of whom belong to mixed-status families. CHIRLA educates its membership as well as its broader community through know-your-rights trainings, workshops, social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

9.      Plaintiff United Farmworkers of America ("UFW") was founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other leaders. UFW was created from the merger of workers' rights organizations to form one union. UFW's mission is to improve the lives, wages, and working conditions of agricultural workers and their families.

10.     To fulfill its mission, UFW engages in collective bargaining, worker education, advocacy, state and federal legislation, and public campaigns. UFW's values are integrity, "Sí se puede" attitude, dignity, and innovation. As a result of UFW's work, thousands of agricultural workers are protected under UFW contracts. UFW has also sponsored and advocated for legal reforms to protect all farm workers at the state and federal level, including related to overtime pay, heat safety, pesticides safety, COVID-19 protections, and other policies to protect farmworkers and advance their rights.

11.     As of March 2025, UFW has approximately 7,000 members. UFW members play an important role in deciding what activities UFW engages in as an organization. UFW membership comes with a variety of benefits. Dues-paying members receive protections obtained through collective bargaining in which UFW engages on their behalf. Members reach out to UFW seeking assistance, advocacy, advice, and information and to raise concerns that their communities are facing.

12.     Plaintiff Make the Road New York ("MRNY") is a nonprofit, membership-based community organization with over 28,000 members residing in New York City, Westchester County, and Long Island, and primarily in the boroughs of Queens, Brooklyn and Staten Island, that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY's membership includes U.S. citizens and noncitizens alike, many of whom belong to mixed-status families. MRNY's mission is to build the power of immigrant and working class communities to achieve dignity and justice. To fulfill its mission, MRNY engages in four core strategies: the provision of legal and survival services, transformative education, community organizing, and policy innovation. MRNY has five community centers in New York, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

13.     Plaintiff CASA, Inc. ("CASA") is a nonprofit membership organization headquartered in Langley Park, Maryland, with additional offices in Virginia, Pennsylvania, and Georgia. Its mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. It is a member-based organization with more than 173,000 lifetime members from across the United States. CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities. CASA's members are predominantly noncitizens in a variety of immigration statuses.

14.     Defendant Department of Homeland Security ("DHS") is a cabinet-level department of the U.S. federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

6

15.    Defendant Kristi Noem is Secretary of DHS. She is sued in her official capacity. Defendant Noem directs each of the component agencies within the DHS. In her official capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and she issued the IFR.

16.    Defendant USCIS is the sub-agency of DHS that administers registration forms and the collection of biometrics, including fingerprints.

17.    Defendant Kika Scott is the Senior Official Performing the Duties of USCIS Director. She is sued in her official capacity.

18.    Defendant ICE is a sub-agency of DHS responsible for enforcing immigration laws.

19.    Defendant Todd M. Lyons is the Acting Director of ICE. He is sued in his official capacity.

20.    Defendant CBP is a sub-agency of DHS responsible for enforcing immigration laws.

21.    Defendant Pete R. Flores is the Acting Commission of CBP. He is sued in his official capacity.

22.    Defendant Department of Justice ("DOJ") is a cabinet-level department of the U.S. federal government.

23.    Defendant Pamela Bondi is the Attorney General. She is sued in her official capacity. In her official capacity, she is tasked with enforcing federal criminal laws, including 8 U.S.C. §§ 1304(e) and 1306.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the laws of the United States, including but not limited to the APA, 5 U.S.C. § 551, *et seq*.

25.     The promulgation of the IFR is a "final agency action" and, therefore, subject to judicial review by this Court. 5 U.S.C. §§ 702, 704, 706.

26.     Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States sued in their official capacity, the action does not involve real property, and/or the majority of Defendants reside in this district, and/or a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### A.  Background on Noncitizen Registration

27.     Except for a brief period during World War II, the United States has never operated a universal noncitizen registration system as applicable to all noncitizens. In response to wartime fears of a "fifth column," the Smith Act of 1940, also known as the Alien Registration Act, set forth a scheme where all noncitizens seeking to enter the United States on a visa were required to register and be fingerprinted, and all other noncitizens 14 years of age or older were required to register and be fingerprinted at a local post office if they remained in the United States beyond 30 days. *See* Pub. L. 76-670, §§ 30, 31(a), 33(a), 36, 54 Stat. 670, 673-75. Parents and legal guardians were similarly required to register children under the age of 14. *See id.* § 31(b).

28.     The point of registration was not to catch those out of compliance with immigration law; instead, it was intended as an internal security measure during wartime to

better understand who was present in the country. Thus, to implement this system, federal officials went to great lengths to advise the public of this new obligation. Then-Attorney General Robert H. Jackson reassured noncitizens over national radio broadcast that those with "irregularity connected with their entrance" would "receive all consideration" for immigration relief if they registered.[1] The former Immigration and Naturalization Service ("INS") established the Alien Registration Division to administer the system and noncitizens could register for free at any one of 45,000 local post offices.[2] By January 1941, nearly 5 million noncitizens had registered and the Attorney General, as promised, exercised his discretion to suspend the deportation of thousands of unlawful entrants.[3]

29.    Almost immediately after the end of World War II, the INS began to dismantle the universal registration system. It eliminated the Alien Registration Division, canceled registration through post offices, and began shifting registration into its immigration functions.[4] The INS moved registration out of post offices to ports of entry and INS offices, and registration documents increasingly took the form of proof of immigration status instead of dedicated registration forms.[5] Early on, the INS exempted entire classes of noncitizens, including Canadians visiting for less than six months and certain laborers, from these registration

---

[1] *See* Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law and the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141, 157-58 (2014) [hereinafter *Myth of Comprehensive Registration*] (quoting Robert H. Jackson, U.S. Attorney Gen., Speech Over the Broadcasting Facilities of the Columbia Broadcasting System Station WJSV: Alien Registration and Democracy 3-4 (Dec. 21, 1940), https://tinyurl.com/e8y7w5c8).
[2] *Id.* at 158-59.
[3] *Id.* at 160 & n.98.
[4] *Id.* at 161-62; Nat'l Archives, *Alien Registration (AR-2) Forms*, https://tinyurl.com/5efpyb89 (last reviewed Sept. 6, 2024); U.S. Customs & Immigr. Servs., *Alien Registration Forms on Microfilm, 1940-1944* https://tinyurl.com/ckf3cyr9 (last reviewed/updated Jan. 24, 2025). For a period in the 1950s, post offices resumed providing change of address forms.
[5] *Id.* at 162 & n.109 (citing 11 Fed. Reg. 9982, 9982-83 (Sept. 11, 1946)).

9

requirements.[6] Without the wartime impetus to identify "disloyal" noncitizens, the INS

abandoned attempts to register immigrants without status.[7]

30.    Even after the passage of the Immigration and Nationality Act ("INA") of 1952,

which incorporated the registration requirements from the Smith Act and added a requirement to

carry any proof of registration, *see* Immigration and Nationality Act, Pub. L. No. 82-414, §§ 261-

64, 66 Stat. 163, 223-25 (1952), the INS did not establish a registration process for all

noncitizens.[8] The implementing regulations provided that, except for lawful permanent residents,

the only registration form would be the record of lawful admission and departure (Form I-94). 17

Fed. Reg. 11532, 11533 (Dec. 19, 1952). Moreover, over the next few years the INS expressly

exempted certain British and Canadian nonimmigrants and agricultural workers from

registration. 18 Fed. Reg. 3531, 3531 (June 19, 1953); 22 Fed. Reg. 4188, 4188-89 (June 14,

1957).

31.    Congress took no action to indicate any disagreement with INS's tailored

approach. To the contrary, in 1957 Congress granted the Attorney General the discretion to waive

the fingerprint requirement for any nonimmigrant. *See* Act of Sept. 11, 1957, Pub. L. No. 85-316,

§ 8, 71 Stat. 639, 641. By 1960, the INS had eliminated any reference to the old generic

registration form and post office system from the regulations.[9] Moreover, as the types of possible

---

[6] *Id.* at 162-63 & n.115-17 (citing 12 Fed. Reg. 5130, 5131 (July 31, 1947)).

[7] *Id.* at 162-64; *see also* Jonathan Weinberg, *Demanding Identity Papers*, 55 Washburn L.J. 197, 208 (2015) [hereinafter *Demanding Identity Papers*] (stating that beginning in 1950, "a noncitizen in the United States would not receive any evidence of registration absent a finding by the INS that he was legally entitled to be present in this country").

[8] *Myth of Comprehensive Registration* at 164-172; *Demanding Papers* at 210-11.

[9] *Demanding Identity Papers* at 208 n.80.

immigration status expanded, and with them new forms and new screening mechanisms, federal immigration authorities did not update the registration system.[10]

32.    At no point since the mid-1940s did the federal government implement a universal registration system applicable to all noncitizens.

33.    After the early registration effort, the only time the federal government has instituted even a limited registration requirement separate from the immigration process was in response to an armed attack. The last implementation of registration was a controversial program called the National Security Entry-Exit Registration System ("NSEERS"), imposed soon after the 9/11 attacks to require nationals from 25 predominantly Muslim and Middle Eastern countries to register. In 2011, the federal government ceased use of NSEERS after it found the program unnecessary and that it provided no increase to national security. In 2016, DHS rescinded the regulatory framework that authorized NSEERS because it proved ineffective and was "rendered obsolete" in light of more universally applicable security measures. 81 Fed. Reg. 94231 (Dec. 23, 2016).

34.    The INA still contains the registration provisions from the Smith Act of 1940, as amended by the INA in 1952 and 1957. *See* 8 U.S.C. §§ 1201(b), 1301-1306. Visa applicants are registered through the visa process. *See* 8 U.S.C. §§ 1301, 1201(b). For those not registered through the visa process, the INA continues include provisions for registration and fingerprinting of noncitizens over the age of 14 who remain at least 30 days, and similarly to require parents and legal guardians to register their children. *See id.* § 1302(a), (b). It further states that noncitizens 18 years of age or older must "at all times carry . . . any certificate of alien registration or alien registration receipt card to [them]." *Id.* § 1304(e). Failure to carry is a crime

---

[10] *Myth of Comprehensive Registration* at 169-71.

punishable by a fine and up to 30 days in jail. *Id.* Finally, the INA makes it a crime to "willfully

fail[]" to register or be fingerprinted and for a parent or legal guardian to similarly fail to register

their child, punishable by a fine and up to six months of imprisonment. *Id.* § 1306(a).

35.     Any noncitizen who is required to register must also notify DHS within ten days

of any change of address. *Id.* § 1305(a). Failure to do so is a crime punishable by a fine and up to

30 days in jail, *id.* § 1306(b), and is a ground of deportation, *id.* § 1227(a)(3)(A).

36.     Notwithstanding these provisions, the current regulations demonstrate the

immigration agencies' longstanding determination that any registration requirement is best

handled through the immigration process. As the agencies have for over half a century, the

regulations provide that registration and proof of registration is obtained through existing forms

for gaining admission and establishing immigration status. *See* 8 C.F.R. § 264.1(a), (b). The

regulations contain two lists: acceptable registration forms, *id.* § 264.1(a), and evidence of

registration, *id.* § 264.1(b). Many existing forms used to screen immigration benefits applicants

are not included on these lists.

37.     In addition to listing forms for registration and proof of registration, the current

regulations waive the fingerprint requirement for certain categories of nonimmigrants while they

maintain their nonimmigrant status, including all nonimmigrants who remain in the United States

for less than one year. 8 C.F.R. § 264.1(e); *see* 8 U.S.C. § 1302(c).[11]

38.     As has been the case for decades, the existing regulations do not include a

registration form or evidence of registration for a noncitizen who has entered without inspection

and is ineligible for any immigration benefit. Noncitizens who were ineligible to use one of the

---

[11] At various times in the 1990s the INS required nonimmigrants from certain countries to submit fingerprints at ports of entry as part of their applications for admission. *See* 56 Fed. Reg. 1566 (Jan. 16, 1991); 61 Fed. Reg. 46829 (Sept. 5, 1996); 63 Fed. Reg. 39109 (July 21, 1998).

designated registration forms were under no enforceable obligation to register or to carry any

proof of registration. *See* 8 U.S.C. § 1306(a) (punishing "*willful* failure to register") (emphasis

added); *United States v. Mendez-Lopez*, 528 F. Supp. 972, 973 (N.D. Okla. 1981).

**B. Defendants Attempt to Create a New Universal Registration Enforcement Regime in 30 Days**

39.    On the day of his inauguration, President Trump issued Executive Order 14159,

Protecting the American People Against Invasion (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 29,

2025) [hereinafter Jan. 20 Executive Order]. Through that order, President Trump instructed the

Secretary of Homeland Security, in coordination with the Attorney General and the Secretary of

State, to "(a) Immediately announce and publicize information about the legal obligation of all

previously unregistered aliens in the United States to comply with the requirements of [the

registration statutes]; (b) Ensure that all previously unregistered aliens in the United States

comply with the requirements of [the registration statutes]; and (c) Ensure that failure to comply

with the legal obligations of [the registration statutes] is treated as a civil and criminal

enforcement priority." 90 Fed. Reg. at 8444.

40.    On February 5, 2025, Attorney General Bondi issued a memorandum in which she

instructed that DOJ "shall use all available criminal statutes . . . to support the Department of

Homeland Security's immigration and removal initiatives." Memorandum from the Attorney

General re: General Policy Regarding Charging, Plea Negotiations, and Sentencing 3 (Feb. 5,

2025), https://tinyurl.com/ycxa3ua9 [hereinafter Bondi Memo]. Among the statutes prioritized by

the Attorney General for enforcement were 8 U.S.C. §§ 1304 and 1306. *Id.*

41.    On February 25, 2025, USCIS posted on its website notice that a new registration

form and process was forthcoming for individuals not counted as registered under the existing

regulations. On that same day, DHS announced the new requirement under the heading "DHS

Will Use Every Available Tool to Compel Illegal Aliens to Self-Deport." Press Release, DHS, Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy. Defendant Noem explained that noncitizens had a choice to register and self-deport or face criminal enforcement, stating that the government would help noncitizens who register "relocate right back to their home country."[12]

42.     On March 12, 2025, less than two months into the start of the Trump administration, Defendants published the eight-page IFR seeking to upend immigration registration. Defendants do so without explaining this change in policy – or even acknowledging the change. To the contrary, Defendants claim that the IFR "does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the Act." 90 Fed. Reg. at 11796.

43.     Defendants issued the IFR without a notice or any opportunity to comment, asserting that it "is a rule of agency organization, procedure, or practice ('procedural rule')," because it "does not alter the rights or interests of any party." 90 Fed. Reg. at 11796 (citing 5 U.S.C. § 553(b)(A)). The IFR invites comments on whether to impose a $30 biometrics fee. *Id.* Any comments are due by April 11, 2025. *Id.* at 11793. Absent court intervention, the IFR will go into effect on April 11, 2025, just 30 days from its publication. *Id.*

44.     Defendants sought an emergency exception to the Paperwork Reduction Act's requirement that the public be given notice and an opportunity to comment on all collections of information, *see* 44 U.S.C. §§ 3506(c)(2)(A), 3507(b). *See* 90 Fed. Reg. at 11799 (citing 8 C.F.R. § 1320.13). Despite longstanding abandonment of universal registration, Defendants' asserted

---

[12] Billal Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek, https://tinyurl.com/bdz9prye (Feb. 26, 2025) (quoting Secretary Noem interview).

"emergency" in the supporting statement to OMB for the G-325R was the need "to allow aliens to comply with the registration and fingerprinting requirements of the INA . . . and to enable the execution of" President Trump's January 20th Executive Order. OMB approved the request for emergency authorization for the collection of information for a period of six months. *See* 90 Fed. Reg. at 11799.

45.     Thus, the public and impacted individuals will not have had an opportunity to review and comment, and have those comments considered, for either the new registration form or the IFR itself before it goes into effect on April 11, 2025.

46.     Absent court intervention, Defendants will not be required to ever consider the comments they receive in response to the IFR or to finalize the rule.

47.     The IFR creates a new online general registration form, Form G-325R. *See* 90 Fed. Reg. at 11795.

48.     Form G-325R can only be submitted online through myUSCIS.gov. 90 Fed. Reg. at 11795. A noncitizen must first create a unique account through myUSCIS.gov for themself or for their child. *Id.*

49.     Form G-325R is *only* available in English, which renders it unusable by numerous noncitizens.

50.     The new Form G-325R collects a range of information including the noncitizen's contact information, mailing address, physical address, addresses for the past five years, details regarding the person's last entry, including their status at entry, detailed biographic information, information about the person's spouse and location of marriage, and details about the person's parents, including their current locations.

51.     Among the required questions on the form are: "Have you EVER committed a crime of any kind (even if you were not arrested, cited, charged with, or tried for that crime, or convicted)?" "Since entry, in what activities have you been engaged?" "In what activities do you intend to engage between now and your expected date of departure?"

52.     The new form collects information beyond what is specifically enumerated in the statute. *See* 8 U.S.C. § 1304(a).

53.     In addition to creating an entirely new form independent of any immigration process, the IFR creates a process for DHS to collect biometrics, including fingerprints, photographs, and signatures, at a USCIS Application Support Center ("ASC") upon submission of the Form G-325R. *See* 90 Fed. Reg. at 11795. USCIS will schedule an appointment at an ASC for noncitizens to submit their biometrics. *See id.*

54.     After the biometrics appointment, or, for children under 14 or Canadian nonimmigrants not required to be fingerprinted after the submission of the Form G-325R, USCIS will generate an online "Proof of Alien Registration." *See id.*

55.     The IFR outlines the criminal consequences that purportedly attach to these new obligations:

- Noncitizens not previously registered through the visa process and newly required to register and be fingerprinted under the IFR can be prosecuted if they fail to register or to be fingerprinted. *See* 90 Fed. Reg. at 11794 (citing 8 U.S.C. § 1306(a)).

- Noncitizens newly issued proof of registration and fingerprinted under the IFR who are 18 years of age or over can be prosecuted for failure to carry that proof of registration at all times. *See id.* (citing 8 U.S.C. § 1304(e)).

- Noncitizens newly required to register under the IFR can be prosecuted for failing to notify DHS within 10 days from any change of address. *See id.* (citing 8 U.S.C. § 1306(b)).

56.    Defendants intend to vigorously enforce these new criminal consequences. *See* Jan. 20 Executive Order; Bondi Memo at 3 (Feb. 5, 2025) (instructing that U.S. Attorneys' offices and other DOJ components "shall pursue charges relating to criminal immigration-related violations," including sections 1304 and 1306).

57.    With just 30 days' warning, the IFR abandons the eighty-year-old approach to registration and imposes a new universal registration scheme and attendant civil and criminal liabilities on an enormous number of people. According to Defendants' own estimates, between 2.2 million and 3.2 million people would be newly required to register. *See* 90 Fed. Reg. at 11797.

## C. The IFR Failed to Consider Substantial Impacts of the New Universal Registration Enforcement Regime

58.    By imposing a new universal registration regime in just 30 days through the IFR and bypassing the notice and comment requirement of the APA, Defendants failed to consider the wide-ranging impacts the rule will have on numerous communities.

59.    Millions of noncitizens—including 14- and 15-year-olds—must now navigate a new process that involves providing detailed information about themselves, their children, their families, and their personal activities; submitting their fingerprints and other biometric information at a federal building; and carrying proof of registration at all times.

60.    Those impacted include people who have already submitted detailed immigration forms and reasonably believe themselves to be "registered" already, people who do not speak English, people who do not have familiarity with federal immigration laws, people who do not

have reliable access to computers or the Internet, people with disabilities that preclude them from accessing the online form, and young teenagers. Parents and legal guardians of children newly required to register must weigh the consequences to their children of registration in the face of criminal penalties if they do not register them.

61.    The IFR fails to consider the impact of the new universal registration scheme on communities that rely on the revenue from the Canadian retirees who travel to the United States every winter and who will now be at risk of federal prosecution if they fail to register via the new process or fail to carry registration documents with them at all times. In fact, Canada recently issued a travel advisory to its citizens warning of the forthcoming registration requirements.

62.    The IFR does not address the impact of the new universal registration requirement on immigration attorneys who must advise their clients of this new requirement and related consequences. For example, as discussed below, CHIRLA's Legal Programs will be overwhelmed with the needs of members, current clients, and community members seeking legal advice and assistance with the new registration process. Even those members and clients who may be considered "registered" will need legal advice to make that determination, particularly those with pending applications or mixed-status households where there is greater ambiguity as to who will need to comply with the process set forth in the new IFR. The complexity and inconsistency in the rule, coupled with its nearly universal impact, has also posed huge challenges to MRNY's staff, who cannot confidently advise members on their need to register in group settings, such as committee meetings and workshops. This undermines MRNY's model of providing community education and know-your-rights presentations to members and their communities, since the registration requirement is nearly impossible to advise on in a group

setting. Given that MRNY has tens of thousands of members, MRNY's legal team cannot possibly advise all of them.

63.    The IFR fails to acknowledge or consider how the new universal registration scheme infringes on the rights of noncitizens required to register and the public.

64.    The IFR fails to consider or address the fact that the new registration requirement infringes on noncitizens' Fifth Amendment privilege against self-incrimination. *See Grosso v. United States*, 390 U.S. 62, 67-68 (1968). The IFR targets almost exclusively noncitizens who entered the United States "without inspection and admission or inspection and parole"—in other words, noncitizens who entered the United States in violation of the federal criminal statute 8 U.S.C. § 1325. 90 Fed. Reg. at 11797; *see id.* at 11793 (noting that 8 U.S.C. § 1302 excludes "visa holders"). In fact, the question that asks "Immigration status at last arrival" in Form G-325R provides a blank text box and only one pre-printed text option in the dropdown menu of answers: "EWI – Entry Without Inspection." Moreover, the form *requires* the submitter to state whether the person has "EVER committed a crime of any kind." Thus, a noncitizen who submits Form G-325R is implicating themselves in a crime.

65.    The IFR is an effort to authorize widespread criminal enforcement of this regulatory requirement and facilitate immigration enforcement against those who register.

66.    For many of those directly targeted, they must also make the choice presented by Defendant Noem: register and submit to deportation, frequently resulting in separation from family, community, and "all that makes life worth living," *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922); or fail to register and expose themselves to arrest and federal prosecution.

67.    The IFR will have a chilling effect on the public advocacy and organizing work of noncitizens, who will reasonably fear that they can be stopped at any time and asked for proof of

registration—increasing the risk of both criminal prosecution and deportation. For example, MRNY's most visible and active members, who regularly participate in MRNY's events, fear they could become targets for retaliatory enforcement, whether they register or not. MRNY members' fear has a direct impact on MRNY's advocacy work, which relies on attendance at in-person events, such as rallies, protests, and lobbying days, and sharing of individual stories. The disclosures of activities required on the G-325R form also causes a chilling effect, by requiring members to list advocacy efforts that may be seen as in opposition to current government policy.

68.    A universal registration requirement, including a mandate to carry proof of registration at all times, and a promise to enforce such requirement, impacts *all* U.S. residents, both citizens and noncitizens alike, who are now at heightened risk of being stopped and ordered to produce such proof.

69.    Widespread enforcement will lead to racial profiling and the mistaken targeting of U.S. citizens. Since January 21, 2025, across several states, U.S. citizens, especially of Hispanic descent and Native American backgrounds, have already been increasingly ensnared in immigration raids and detentions due to the Trump administration's aggressive enforcement policies.

70.    The aggressive implementation of the IFR will plainly result in increased harassment of U.S citizens.

**D.  The Rushed IFR and Lack of Notice and Comment Resulted in an Incoherent, Inconsistent, and Confusing Registration Scheme that Defendants Have Not Explained.**

71.    Defendants' failure to seek and consider public comments before implementing a change to an eighty-year-old policy with far-reaching consequences has produced an incoherent,

inconsistent, and impractical scheme—one that infringes on the rights of the people it seeks to regulate. Some examples are provided below.

72.    The IFR is unclear as to when a noncitizen must submit the new Form G-325R in order to comply with the new registry requirements. USCIS has already made Form G-325R available, *see* 90 Fed. Reg. at 11793, but the IFR does not go into effect until April 11, 2025, *see id.*. It is unclear whether noncitizens must register *before* the IFR even goes into effect in order to avoid arrest and prosecution, or if Defendants view the obligation to register within 30 days to begin to run only when the IFR goes into effect.

73.    The IFR fails to add existing commonly used immigration forms to the regulatory list of accepted registration and proof of registration documents. *See* 8 C.F.R. § 264.1(a), (b). Among the forms missing from the list are the applications for asylum (Form I-589), for Temporary Protected Status ("TPS") (Form I-821), and U and T nonimmigrant status (Forms I-918 and 914 for certain victims of crime and human trafficking).

74.    Each of these applications requires the submission of a multi-page form that collects detailed personal information and triggers USCIS to collect biometrics. Nevertheless, noncitizens who entered without inspection and have applied for asylum, TPS, U or T status are not considered registered, even if those applications are approved. Recipients of relief are only registered if they are eligible for and granted an Employment Authorization Document ("EAD").

75.    The IFR further fails to explain—or even address—the decision not to use these existing forms for purposes of registration. The IFR utterly ignores the impact it will have on these groups.

76.    As a result, under the IFR, noncitizens who have submitted multipage immigration applications and even fingerprints may still not be considered registered and are

therefore obligated to follow the new registration process. *See* 90 Fed. Reg. at 11795. In fact, the IFR only specifically mentions that asylum and TPS applicants are not registered, creating additional confusion for those who have applied for benefits not mentioned. Many individuals might reasonably *believe* that they are registered and, especially given the lack of notice, may not understand their new obligations under this rule. Moreover, by adding a new collection of information rather than incorporating existing forms, Defendants are collecting unnecessary and duplicative information from individuals who have already submitted themselves for screening. *Cf.* 44 U.S.C. § 3506(c)(3)(B).

77.    Similarly, Canadians are permitted to enter the United States as nonimmigrants for business or pleasure without obtaining a visa and are generally not issued a Form I-94 if they arrive by land. *See* 8 C.F.R. §§ 212.1(a)(1), 235.1(f)(1)(ii). The IFR requires, without explanation as to why, that these visitors must now also register if they stay more than 30 days, even though they have physically presented themselves for inspection at a port of entry and been screened by a CBP officer.

78.    The IFR creates confusion regarding how already registered noncitizens can provide proof of their registration. The IFR emphasizes the obligation to carry proof of registration "at all times" on penalty of prosecution. 90 Fed. Reg. at 11794 (citing 8 U.S.C. § 1304(e)). However, the IFR also states that noncitizens who have registered using a form listed in 8 C.F.R. § 264.1(a) *or* have evidence of registration listed in 8 C.F.R. § 264.1(b) "need not register again." *Id.* at 11796. The IFR does not address how noncitizens who are considered registered because they completed or possess one such form meet the carry requirement or otherwise avoid being stopped and arrested for failure to register.

22

79. The IFR is internally inconsistent regarding the obligation of children to register once they turn 14. The IFR states that noncitizens who have previously registered using a form listed in 8 C.F.R. § 264.1(a) or who have one of the forms of evidence of registration listed in 8 C.F.R. § 264.1(b) "need not register again." *Id.* But elsewhere, when describing the "affected population," the IFR asserts that all noncitizen children must register when they turn 14, "whether previously registered or not." *Id.* at 11797.

80. The IFR does not address whether noncitizens who were previously registered using one of the listed forms, but who were not fingerprinted, must go through the new registration process to provide fingerprints (or use some other mechanism to ensure the agency has their fingerprints). Fingerprinting is a separate obligation described in the IFR. *See, e.g. id*. at 11793 (citing 8 U.S.C. § 1302(a)). The IFR is unclear whether noncitizens who are considered registered must nevertheless also submit to the new registration process in order to be fingerprinted, given Defendants' stated commitment to enforce all aspects of the registration statute.

81. The IFR fails to consider how noncitizens who do not speak English or do not have reliable access to a computer and the Internet will be able to register. The IFR makes registration available only online and only in English. There is no option to obtain a printed Form G-325R or to submit that registration form by mail.

82. The IFR fails to provide sufficient notice to noncitizens of the new obligations imposed by the rule. Defendants have not widely publicized the IFR's new requirements other than the USCIS website, the Federal Register, and Defendant Noem's brief appearance on Fox News. An abrupt and significant policy change and attendant criminal penalties requires a plan to widely disseminate information about its requirements on platforms people targeted with

enforcement are likely to see. The IFR contains no information about how DHS intends to notify the impacted public about this sweeping new obligation.

83.    Thirty days is insufficient notice to those newly obligated to register and be fingerprinted.

84.    In addition, the IFR fails to grapple with the costs of requiring USCIS—an agency notoriously backlogged with existing applications—to administer millions of new biometrics appointments and processing. The OMB Supporting Statement for the G-325R estimates a cost to the government of $71,960,000 but the IFR does not discuss this cost or how the new requirements will impact other critical agency functions.

### E.  The IFR Will Irreparably Harm Plaintiffs[13]

85.    Many of CHIRLA's members will be newly required to register under the IFR and suffer harm as a result. Member "Luisa" is a 48-year-old domestic worker who has been in the U.S. for nearly 20 years, when she entered without inspection. She is the spouse of a CHIRLA client who has temporary protections, but she is not eligible for this form of protection herself and would have to register. Together they have two U.S. citizen children, 11 and 15 years old. Luisa is a very active CHIRLA member and a part of the Domestic Workers organizing group. During the COVID-19 pandemic, she was an essential worker who volunteered to clean classrooms in her own children's school, focusing on those for the youngest age groups. She advocates for better work conditions for her profession in Los Angeles, Sacramento and on the national level via the Domestic Workers Alliance. In particular, Luisa has worked to assist indigenous domestic workers, receiving training on how to preserve indigenous languages and

---

[13] Plaintiffs' members are identified by pseudonym.

act as an interpreter. She is fearful that she will be specifically targeted for enforcement because of her advocacy for undocumented workers.

86.    CHIRLA Member "Tiana" is a forty-two-year-old woman who came to the U.S. at the age of 15 with her family. In the United States, she initially worked as a seamstress to help the family out and was unable to complete her education. Tiana married a U.S. citizen who abused her and never helped her adjust her status. She is currently in the process of self-petitioning for protection under the Violence Against Women Act (VAWA). Form I-360, which is used for VAWA petitions is not included in the IFR so Tiana would be required to register. Tiana is a single parent of a U.S. citizen son who is in second grade and was eventually able to earn her G.E.D. She is terrified that registering could make her a target for immigration enforcement given the government's public statements that registration is intended for that purpose. This would prevent her from pursuing her VAWA petition and worse, could separate her from her son.

87.    "Ursela" is an 18-year-old CHIRLA member who lives in California. She entered the U.S. without inspection in 2023 as an unaccompanied minor when she was 17. She fled El Salvador with her mother after suffering years of severe physical abuse by her father, but they were separated on their journey. After making inquiries with the Salvadoran Consulate, she learned that her mother is officially listed as a missing person in Mexico. Ursela, who is not in removal proceedings, has filed for asylum but has not yet had biometrics taken; she is also applying for Special Immigrant Juvenile Status based on her parental circumstances. Despite pursuing these lawful pathways to permanent status, Ursela would be required to register pursuant to the IFR. She knows that the government wants to use the registration process to deport people, and that the government has already deported people even though they have

pending asylum applications. She fears she could be targeted for enforcement before her applications are approved and be deported to El Salvador, where she faces persecution.

88.    Plaintiff UFW's members would also be harmed by the IFR, both in terms of the potential consequences of registration, as well as the technological barriers it creates. The following UFW members would be newly required to register under the IFR.

89.    UFW member "Ana" is a 50-year-old indigenous farmworker from Oaxaca, she has dedicated 24 years to the strawberry and blueberry harvests in Oxnard, California. She is a single mother of six children, four U.S.-born citizens aged 16, 18, 20, and 22, and two undocumented children aged 32 and 30. Ana lost her husband to murder in 2010 and was left to provide for several children alone. She has been a UFW supporter since 2014, participating in general meetings, marches, and holiday activities. Ana speaks a thousand-year-old indigenous language, Mixteco Bajo, and has very little understanding of Spanish. She worries about the registration process because she is extremely unfamiliar with technology and has always needed assistance with online forms. Ana believes that it would be extremely challenging for her to access, navigate, and understand the registry given her limited understanding of Spanish and the Internet. She is concerned that she would make a mistake in the process that could be misconstrued as fraud and used against her. She worries about both immigration or criminal consequences of registering given that she is the sole provider of four children.

90.    UFW Member "Gloria" is a 49-year-old indigenous farmworker from Oaxaca who has dedicated the last six years to harvesting strawberries in Oxnard, California. Her native language is Mixteco Bajo and she speaks limited Spanish. She and her partner have six children. Gloria and two of her children have received labor-based deferred action ("DALE"). However, she has four undocumented children ages 16, 18, 21, and 23 who do not qualify for DALE.

Although Gloria has a temporary protection and is already registered, her undocumented children, including her minor 16-year-old son, would be subject to the IFR. She feels extremely vulnerable in her community due to her inability to speak fluent Spanish and navigate technology. She only owns a flip phone and cannot access the internet on her phone. She feels anxious for the safety of her undocumented teenage son because she will be responsible for registering him and she would be unable to assist him with the process. She is afraid her minor son would make a mistake on the registration form, or that he might lose or forget to carry proof of registration, which could expose him to criminal consequences.

91.    Many of MRNY's members will be newly required to register under the IFR and suffer irreparable harm as a result.

92.    Long-time MRNY member "Guvelia" is a 62-year-old grandmother and great-grandmother, and a noncitizen who lives in New York. She has been in the U.S. for more than 20 years and has applied for U nonimmigrant status by filing a Form I-918, which she did using a safe address, and recently provided biometrics as part of her application process. Guvelia has five children, two of whom are U.S. citizens and one of whom is a lawful permanent resident, ten U.S. citizen grandchildren, and one U.S. citizen great-grandchild. She is very low income, works as a nanny, and collects recycling on the street to make ends meet. She is eligible for U nonimmigrant status because she and two of her children were assaulted by a group of young men with sticks, rods, and fists outside of their apartment building in Brooklyn, NY and she assisted in the arrest and prosecution of one of the assailants. She recently filed this petition and, as a result, Guvelia does not yet have an EAD document related to it; she also does not have any other proof of registration to carry on her person if she is stopped and criminally prosecuted for failing to carry "registration" papers under the IFR. Guvelia has been an active MRNY member

since 2011, and she has regularly participated in MRNY's committee meetings, been a part of protests in New York City, and traveled to Washington, D.C. to advocate for her community. In addition to being fearful of registration in general, she is concerned that she would have to list her advocacy and related activities on behalf of undocumented immigrants on the G-325A form and that this would make her a target for enforcement.

93.    MRNY member "Michael" is a 27-year-old noncitizen who has lived in the U.S. since the age of eleven. He attended middle school, high school and college in New York City, graduating with bachelor's degrees in three different subjects. He lives with his mother and two siblings, all of whom are undocumented and, like him, do not have proof of registration. The United States is the only home that he knows, having lived here for the majority of his life.  Michael is concerned about racial profiling under the new registration regime, particularly against his mother and brother who are darker-skinned than he is. Michael has been an extremely active member of MRNY for over a decade, participating in trips to Albany, Washington DC, and elsewhere and joining protests in the streets of New York. He has also given press interviews and written letters in English and Spanish on key issues of importance to MRNY and MRNY members. He fears that registration would make him and his family members easy targets for retaliation.

94.    MRNY member "Alice" is a noncitizen who lives in New York City and who has lived in the U.S. for over 20 years. She has never applied for an affirmative immigration benefit and does not have any registration documents. Alice has been a victim of domestic violence and sought recourse through the court system. She is afraid that the new registration process will be used as a tool to intimidate and abuse people, particularly Latinos, because of their race and their immigration status. She fears that the registration requirement will also empower others, including employers and abusive partners, to intimidate individuals without status by threatening to report

them. Alice has been an extremely active member of MRNY's committees and participated in many MRNY actions and events, including protests and press events. She is concerned that the new registration process and rumors stemming from the process will prevent people like her from engaging in political speech and activism with organizations like MRNY.

95.     Many of CASA's members will be newly required to register under the IFR and suffer irreparable harm as a result.

96.     "YL" is a CASA member originally from Mexico who currently resides in Georgia. She entered the U.S. in 2016 without inspection and did not have any contact with immigration authorities.  She has never had a case in immigration court or applied for immigration relief.  YL has been active with CASA for the last two years, engaging in her local organizing committee, and participating in public demonstrations related to a variety of issues, including housing and climate justice. In support of these issues, she has engaged in lobbying activity with CASA at both the state and national level. Outside of CASA, she has engaged in political activity, including engaging voters to support candidates who champion immigrant communities though she cannot vote herself. YL is the mother of a 5-year-old son, who has a speech impediment and needs occupational and speech therapy. The IFR has caused her to become more afraid to speak out because she fears that it could expose her and her son to targeting by the federal government. With respect to the actual registration process, she doesn't feel like she would be able to complete it because she is not very good with technology, and wouldn't feel comfortable creating an account and completing the form online – especially because she has limited English proficiency, and the form is only available in English.

97.      "AC" is a CASA member originally from Mexico, currently residing in Pennsylvania.  She entered the U.S. without inspection and without contact with immigration

authorities in 2000. She has never been placed in removal proceedings or applied for any immigration benefit in the U.S. She has four U.S. citizen children, ages 9, 12, 13 and 23. She lives with her partner, who is the father of her youngest three children. She has been an outspoken advocate with CASA, exercising her First Amendment rights to speak out against immigration detention and other issues. AC regularly participates in organizing meetings and has engaged in public protests with CASA as well as lobbying efforts to persuade elected officials in Pennsylvania to support CASA priorities. As a CASA member leader, AC has traveled to Washington DC, to participate in national protests and lobby Congress, and given interviews to the media on issues she is passionate about. The IFR has caused her to feel panic about speaking out in public, however, because she fears that she could be targeted and arrested for her actions.

98.     "ALDC" is a CASA member originally from Honduras who currently resides in Virginia with her husband. She entered the United States without inspection and without contact with immigration authorities in 2006. ALDC has three United States citizen children, ages 12, 14 and 16. Her youngest child has complications from meningitis that requires constant medication with antibiotics and regular doctors' visits to ensure that the infection is under control. The meningitis is in his brain and he required surgery on it right after he was born, when he was only four months old. ALDC has been an active leader with CASA over the last three years, speaking out about issues that are important to her through CASA's organizing committees and through participation in public actions like marches and rallies. She decided to become a leader with CASA because she saw the need to take action to build community power and solidarity. The IFR makes her afraid to speak out because she feels like she might be targeted by the government for her participation. Additionally, she doesn't even know how she would complete the

registration requirement, since she doesn't read or understand English well and isn't good with computers, so she wouldn't feel able to complete the online registration form.

99.    The IFR will harm Plaintiff CHIRLA's organization itself. As an organization, CHIRLA's legal and advocacy programs, as well as its hotline, will be overrun with requests for information and needs for legal advice and assistance regarding the IFR's registration requirement. This will interfere with CHIRLA's core function of providing immigration legal services.

100.    CHIRLA receives a significant amount of its funding from grants and contracts that require specific deliverables of immigration legal services, including grants that cover services affirmative immigration benefits, removal defense, and college students. Some of the contracts are paid on a "per case" basis, while others are paid in cycles based on reporting requirements. However, advising and assisting CHIRLA members, existing clients, and other community members with registration will not qualify under these grants as deliverables as this process involves neither an affirmative immigration benefit nor assistance with removal proceedings. Failure to comply with current grant metrics and reporting may result in loss of the remaining funds under those grants and may jeopardize CHIRLA's ability to apply for future ones.

101.    For example, CHIRLA's grant for its Student Legal Services ("SLS") Program applies to college students at certain community and state colleges throughout California. Students can receive certain limited legal services such as DACA renewals or naturalizations, and in some cases, so can their family members.  Because of the success of this program and CHIRLA's years of advocacy for DACA recipients, CHIRLA is known in the community as a trusted source of information and advice for immigrant youth. Since the announcement of the

new registration process, SLS has already seen an increase in inquiries from former clients and

other students seeking assistance and advice. If the new rule goes into effect, CHIRLA staff and

resources will be diverted from providing advice and assistance with affirmative immigration

benefits covered by the grant to helping students and their family members navigate registration.

102.    If Defendants provided an opportunity for notice and consideration of comments

before implementation of any registration rule, Plaintiffs CHIRLA, UFW, MTRNY, and CASA

would submit comments raising the concerns of their organizations and their members.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2)(D))

103.    The Administrative Procedure Act, 5 U.S.C. § 553, requires that agencies provide

public notice of, and opportunity to comment on, legislative rules before their promulgation. *See*

5 U.S.C. §§ 553(b), (c).

104.    The IFR is a legislative rule within the meaning of the APA.

105.    Defendants issued the IFR without prior notice and an opportunity for comment

as required by the APA.

106.    The IFR is not a procedural rule because it alters the rights and interests of parties,

imposes new substantive obligations and criminal liability, and collects personal information not

required by the INA.

107.    Defendants' failure to provide for notice and comment violates 5 U.S.C. §§

553(b) and (c), 706(2)(D).

## SECOND CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

108.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.    Among other reasons, the IFR is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; failed to consider reasonable alternatives; entirely failed to consider important aspects of the problem; failed to take into account reliance interests; and offered explanations for their decision that run counter to the evidence before the agency.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue an order to stay or postpone the effective dates of the IFR under 5 U.S.C. § 705 and/or a preliminary injunction under Federal Rule of Civil Procedure 65 pending the Court's final adjudication of the claims herein;

2. Declare unlawful and set aside the IFR;

3. Enter an order vacating the IFR;

4. Enjoin Defendants and all those acting in active concert with them from enforcing or implementing the IFR;

5. Award Plaintiffs' counsel reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, and any other applicable statute or regulation; and

6. Award such other and further relief in favor of Plaintiffs and against Defendants that the Court may deem just, equitable, and proper.

Dated: March 31, 2025

Respectfully submitted,


/s/ Emma Winger
Emma Winger (DC Bar No. 90010721)
Michelle Lapointe (DC Bar No. 90032063)
   (admission pending)
Leslie K. Dellon (DC Bar No. 250316)
Chris Opila (DC Bar No. 90029724)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

Lynn Damiano Pearson*
Cassandra Charles*
Joanna Cuevas Ingram*
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Nicholas Espiritu*
National Immigration Law Center
3450 Wilshire Blvd. No. 108-62
Los Angeles, CA  90010
Tel: (213) 639-3900
Fax: (213) 639-3911
espiritu@nilc.org

Cody Wofsy (DDC Bar No. CA00103)
Stephen B. Kang (DDC Bar No. CA00090)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org
skang@aclu.org

Jennifer R. Coberly (DC Bar No.
90031302)*
   (admission pending)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org

Anthony Enriquez* (NY Bar No. 5211404)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Nicholas Katz*
CASA, Inc.
8151 15th Avenue
Hyattsville, MD 20783
Tel: (240) 491-5743
nkatz@wearecasa.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanrights.org

*Application for pro hac vice admission
forthcoming