## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, et al.,
              *Plaintiffs*

              v.                                    Case No. 1:25-cv-00943

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,
              *Defendants*.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705
OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 1

    A.   The Alien Registration Act of 1940 ................................................................ 2

    B.   The Narrowing of Noncitizen Registration Over the Decades ...................... 3

    C.   Defendants' New Registration Scheme ......................................................... 7

LEGAL STANDARD .................................................................................................. 10

ARGUMENT ............................................................................................................... 10

   I.   PLAINTIFFS ARE LIKELY TO SUCEEED ON THEIR CLAIM THAT THE IFR
VIOLATES THE APA ............................................................................................ 10

    A.   The IFR Is a Legislative Rule that Requires Notice and Comment Rulemaking ......... 10

      1. The IFR Represents a Substantive Value Judgment by Defendants to Change the
Manner and Purpose of Registration That Imposes Substantive Burdens ....................... 12

      2. The IFR Imposes New Criminal Liabilities ............................................... 14

      3. The IFR Impinges on Parties' Fifth Amendment Rights ............................. 16

      4. The IFR Will Have Such a Substantial Impact on The Public That Notice and
Comment is Necessary ................................................................................ 17

    B.   The IFR is Arbitrary and Capricious ........................................................... 19

      1. Defendants Fail to Acknowledge or Explain the Departure From Previous Practice .. 20

      2. Defendants Failed to Adequately Consider Impact on Affected Populations ............. 21

      3. Defendants Provide No Reasonable Explanation for the Purpose of the IFR ............. 23

      4. The IFR's Opaque and Inconsistent Requirements Are Arbitrary and Capricious ....... 24

      5. The IFR Fails to Adequately Consider Costs ............................................. 27

   II.   PLAINTIFFS WILL FACE IRREPARABLE HARM IN THE ABSENCE OF AN
INJUNCTION OR STAY .......................................................................................... 29

   III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR
PLAINTIFFS ......................................................................................................... 34

   IV.  NO BOND SHOULD BE REQUIRED UNDER RULE 65 ........................................... 36

CONCLUSION ............................................................................................................ 36

## TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. NLRB*, 57 F.4th 1023 (D.C. Cir. 2023) ................................................................11, 12

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ................... 19

*\*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987).................................................11, 12

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ......................... 20, 22

*\*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ............................................................11, 17

*Bus. Roundtable v. S.E.C.*, 647 F.3d 1144 (D.C. Cir. 2011)........................................................ 26

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
    513 F. Supp. 3d 154 (D.D.C. 2021) ...................................................................... 30, 33

*Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 174 F.3d 206 (D.C. Cir. 1999)......................... 18

*D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2000)..................................................... 10

*Dep't of Com. v. New York,* 588 U.S. 752 (2019)......................................................................... 24

*Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1 (D.C. Cir. 2011) ..............................................11, 14, 18

*Elrod v. Burns*, 427 U.S. 347 (1976).............................................................................................. 33

*Grace v. Barr,* 965 F.3d 883 (D.C. Cir. 2020) ............................................................................... 21

*Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426 (D.C. Cir. 1993) ................. 20

*Grosso v. United States*, 390 U.S. 62 (1968) ................................................................................. 16

*Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146 (D.D.C. 2021) ............................................... 32

*Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1 (D.D.C. 2022) ................................................... 35

*Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795 (D.C.Cir.1983)...................... 22

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)................................ 30, 34

*Leary v. United States*, 395 U.S. 6 (1969)...................................................................................... 16

*Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87 (D.C. Cir. 2012)........................................................... 35

*Marchetti v. United States*, 390 U.S. 39 (1968) ............................................................................ 16

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,*
    375 F.3d 1182 (D.C. Cir. 2004)........................................................................................ 24

*\*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ..........................................................11, 13, 17

*Michigan v. EPA*, 576 U.S. 743 (2015) ................................................................................... 20, 27

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)..................................................... 33

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*,
    463 U.S. 29 (1983).................................................................................................... 19, 22

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009) ...................................... 35

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .................................... 36

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    No. 1:25-CV-00333-ABA, __ F. Supp. 3d. __, 2025 WL 573764 (D. Md. Feb. 21, 2025) ....... 36

*Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932 (D.C. Cir. 1982) ................... 14

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    No. CV 25-239 (LLA), __ F. Supp. 3d. __, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ........... 36

*Ng Fung Ho v. White*, 259 U.S. 276 (1922) ............................................................................... 13

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 34

*Nw. Corp. v. FERC*, 884 F.3d 1176 (D.C. Cir. 2018) ............................................................... 26

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
    496 F. Supp. 3d 31 (D.D.C. 2020) .................................................................................. 34, 35

*Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1 (D.D.C. 1997) ...................... 35

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ..................................... 20

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ................. 10

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................. 34

*Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10 (D.D.C. 2021) ........................... 34

*Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7 (D.D.C. 2018) ............................ 31

*see Mann Constr., Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022) ...................................... 15

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ......................................................... 34

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ............................................ 36

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ......................................................................................... 19

*Sw. Airlines Co. v. FERC*, 926 F.3d 851 (D.C. Cir. 2019) ......................................................... 20

*Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) .................................... 35

*TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) .......................................................... 34

*UFW v. Solis*, 697 F. Supp. 2d 5 (D.D.C. 2010) ....................................................................... 22

*United States v. Bryan*, 339 U.S. 323 (1950) ............................................................................ 15

*United States v. Cain*, 583 F.3d 408 (6th Cir. 2009) ................................................................. 15

*United States v. Mendez-Lopez*, 528 F. Supp. 972 (N.D. Okla. 1981) ...................................... 15

*United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989) ................................................... 15, 17

*United States v. Spingola*, 464 F.2d 909 (7th Cir. 1972) .......................................................... 15

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) ................................ 24

*Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7 (2008) ............................................. 10

**Statutes**

5 U.S.C. § 553(b)(A) ....................................................................................................... 10

5 U.S.C. § 706(2)(A) ....................................................................................................... 19

8 U.S.C. § 1201(b) ............................................................................................................. 6

8 U.S.C. § 1227(a)(3)(A) ................................................................................................... 7

8 U.S.C. § 1301 ................................................................................................................. 6

8 U.S.C. § 1302 ........................................................................................................ 6, 7, 16

8 U.S.C. § 1304 ......................................................................................................... *passim*

8 U.S.C. § 1304(a) ........................................................................................................... 13

8 U.S.C. § 1304(e) ................................................................................................. 6, 15, 17

8 U.S.C. § 1305(a) ............................................................................................................. 6

8 U.S.C. § 1306 ...................................................................................................... 6, 8, 15

8 U.S.C. § 1306(a) ..................................................................................................... 6, 15

8 U.S.C. § 1306(b) ............................................................................................................. 7

8 U.S.C. § 1306(c) ........................................................................................................... 30

8 U.S.C. § 1325 ............................................................................................................... 32

8 U.S.C. § 1367 ............................................................................................................... 32

Act of Sept. 11, 1957, Pub. L. No. 85-316, 71 Stat. 639 ................................................. 5

Alien Registration Act of 1940, Pub. L. No. 76-670, 54 Stat. 670 ..................... 2, 4, 8, 9

Farm Labor Supply Appropriations Act of 1944, Pub. L. No. 78-229, 58 Stat. 11 (1944) ............ 4

Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952) .................. 5

**Regulations**

8 C.F.R. § 264.1(a) ............................................................................................... 7, 23, 25

8 C.F.R. § 264.1(b) ................................................................................................... 7, 25

8 C.F.R. § 264.1(e) ............................................................................................................. 7

12 Fed. Reg. 5130 (July 31, 1947) ................................................................................... 4

15 Fed. Reg. 579 (Feb. 2, 1950) ....................................................................................... 4

17 Fed. Reg. 11532 (Dec. 19, 1952) ................................................................................ 5

18 Fed. Reg. 3531 (June 19, 1953) ................................................................................... 5

22 Fed. Reg. 4188 (June 14, 1957) ................................................................................... 5

22 Fed. Reg. 9805 (Dec. 6, 1957) ..................................................................................... 5

25 Fed. Reg. 7180 (July 29, 1960) ................................................................................... 5

56 Fed. Reg. 1566 (Jan. 16, 1991) ........................................................................... 7

61 Fed. Reg. 46829 (Sept. 5, 1996) ......................................................................... 7

63 Fed. Reg. 39109 (July 21, 1998) ......................................................................... 7

81 Fed. Reg. 94231 (Dec. 23, 2016) ........................................................................ 6

*90 Fed. Reg. 11793 (Mar. 12, 2025) ............................................................. *passim*

**Other Authorities**

*Alien Registration (AR-2) Forms*, National Archives, https://tinyurl.com/5efpyb89 .................. 2

*Alien Registration to Justice Unit*, N.Y. Times (Jan. 2, 1943) ...................................... 4

An Open Letter to the Conference Committee on Intelligence Reform: Removal National ID
    Provisions from the Conference Report (Nov. 15, 2024), https://tinyurl.com/yakkm342 ........ 18

*Assistance by State and Local Police in Apprehending Illegal Aliens*, 20 Op. O.L.C. 26 (Feb. 5,
    1996), https://tinyurl.com/2k6ppk76 ...................................................... 15

Billal Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek
    (Feb. 26, 2025) ........................................................................... 9

Cato Institute, *If You Value Privacy, Resist Any Form of National ID Cards* (Nov. 28, 2018),
    https://tinyurl.com/4y86nmxu ............................................................. 18

Department of Justic, *U.S. Attorneys for Southwestern Border Districts Charge More than 840
    Illegal Aliens with Immigration-Related Crimes During the Third week in March as part of
    Operation Take Back America* (Mar. 24, 2025), https://tinyurl.com/4krbytt9 ................. 17

Exec. Order No. 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443
    (Jan. 20, 2025) ........................................................................ 8, 24

*Flexoline Index (Flex)*, U.S. National Archives, https://tinyurl.com/mv436xs2 ..................... 3

Form G-325R Biographic Information (Registration), OMB: 1615-0166,
    https://tinyurl.com/3txjv5an ........................................................... 9, 16

Global Affairs Canada, United States Travel Advice (Mar. 21, 2025),
    https://travel.gc.ca/destinations/united-states. ........................................ 28

Jonathan Weinberg, *Demanding Identity Papers*, 55 Washburn L.J. 197, 208 (2015) .................. 4

Mae M. Ngai, *The Strange Career of the Illegal Alien: Immigration Restriction and Deportation
    Policy in the United States, 1921-1965*, 21 Law & Hist. Rev. 69 (2003) ..................... 3

*Marco Rubio, Rick Scott Want Canadian 'Snowbirds' To Stay In Florida Longer*, WUSF (Sept.
    19, 2019), https://tinyurl.com/59f83ejc .................................................. 28

Memorandum from the Attorney General re: General Policy Regarding Charging, Plea
    Negotiations, and Sentencing (Feb. 5, 2025), https://tinyurl.com/25wr8sd5 ............... 8, 17

Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law and the Myth of
    Comprehensive Registration*, 48 U.C. Davis L. Rev. 141 (2014) ............................ 5

Nicole Foy, *More Americans Will Be Caught Up in Trump Immigration Raids*, ProPublica, Mar.
    18, 2025, 2:05 PM EST, https://tinyurl.com/7j8zkkwz ...................................... 18

*Policy Manual*, U.S. Citizenship and Immigration Services, https://tinyurl.com/5b5ta5sk ........... 2

Press Release, DHS, Secretary Noem Announces Agency Will Enforce Laws That Penalize
    Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy .................. 8, 17

Robert H. Jackson, U.S. Attorney Gen., Speech Over the Broadcasting Facilities of the Columbia
    Broadcasting System Station WJSV: Alien Registration and Democracy (Dec. 21,
    1940), *available at* https://tinyurl.com/5eyhcb4j ....................................................... 3

Sarah Grochowski, *'It will be a deterrent': Canadian snowbirds face new registration
    requirements going to the U.S.*, Vancouver Sun, Mar. 12, 2025, https://tinyurl.com/5n7sjxtj . 28

Supporting Statement for Biographic Information (Registration), OMB Control No.: 1615-NEW,
    https://tinyurl.com/2cs24kmp .................................................................................. 14

*USCIS Ombudsman Annual Report 2024* 28 (June 28, 2024), https://tinyurl.com/ybpreeka ....... 27

Pursuant to Local Civil Rule 65.1(d), Plaintiffs request that this motion be heard on an expedited basis to avoid the irreparable harm to Plaintiffs and the public if the Interim Final Rule takes effect on April 11, 2025.

## INTRODUCTION

This case challenges Defendants' rushed and arbitrary implementation of a universal noncitizen registration scheme that would require millions of noncitizens to register with the government and carry their papers at all times, on pain of federal criminal prosecution and incarceration. Defendants impose this scheme through an Interim Final Rule ("IFR") without prior notice and consideration of public comment, in violation of the Administrative Procedure Act ("APA"). Not since the 1940s has the United States implemented a system of universal noncitizen registration—an approach that arose out of wartime fears and sought to catalogue noncitizens, not remove them en masse. Defendants attempt to push through these sweeping changes without any meaningful explanation for the shift in policy and without the notice, public comment, and careful consideration that Congress requires to avoid exactly these types of harms.

Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), United Farm Workers of America ("UFW"), CASA, Inc. ("CASA") and Make the Road New York ("MRNY") are membership-based organizations of noncitizens and mixed status families who will be irreparably harmed if the IFR takes effect. Plaintiffs seek preliminary relief to avoid the irreparable harm that the IFR will cause.

## BACKGROUND

The United States has never adopted a universal noncitizen registration scheme for the purpose of facilitating mass deportation. During World War II, the federal government briefly maintained a national inventory of noncitizens. But with the end of the war, the federal

government progressively narrowed the scope of noncitizens subject to registration and, outside the exigencies of wartime or a terrorist attack, accomplished registration through established statutory and regulatory mechanisms for granting immigration status and other immigration benefits. Then, in March 2025, Defendants issued the IFR, newly imposing a universal registration and fingerprint requirement with the obligation to carry proof of registration at all times or face arrest and federal prosecution. *See* 90 Fed. Reg. 11793 (Mar. 12, 2025). Defendants' stated purpose for the IFR was not to recreate a national inventory but to facilitate mass detention and deportation.

### A.  The Alien Registration Act of 1940

In wartime 1940, reflecting national panic over foreign-born agents, Congress passed the Smith Act, also known as the Alien Registration Act. Pub. L. No. 76-670, 54 Stat. 670 (codified at 8 U.S.C. § 451) (repealed 1952). The Act required noncitizens (excluding officials of foreign governments and their families) who were present in the United States, 14 years or older, and who remained for 30 days or longer to register and be fingerprinted at a local post office. *See id.* §§ 31(b), 32(b), 33(a), 54 Stat. at 673-674. Registration records were issued and centralized by the newly created Alien Registration Division of the Immigration and Nationality Service (INS). *See Alien Registration (AR-2) Forms*, National Archives, https://tinyurl.com/5efpyb89 (describing role of Alien Registration Division). Upon registration, the noncitizen was issued form AR-3, a dedicated registration receipt that neither recorded nor conferred any immigration status or benefit. *See Policy Manual*, U.S. Citizenship and Immigration Services, https://tinyurl.com/5b5ta5sk (showing a copy of AR-3).

Then-Attorney General Robert H. Jackson stated the purpose of the Alien Registration Act as analogous to a "year-end inventory of assets [that] is a customary procedure of sound

business." Robert H. Jackson, U.S. Attorney Gen., Speech Over the Broadcasting Facilities of the

Columbia Broadcasting System Station WJSV: Alien Registration and Democracy 1 (Dec. 21,

1940) [hereinafter *Jackson Speech*], *available at* https://tinyurl.com/5eyhcb4j. He described

registration as "an inventory of those persons within [U.S.] borders who are . . . not American

citizens but . . . are American assets—precious human assets." *Id.* at 1. The law incentivized

registration by granting the Attorney General authority to suspend deportation for unlawful

entrants. *Id.* § 20(c), 54 Stat. at 672. The federal government encouraged noncitizens to register

over radio broadcasts, promising that there was "no desire to break up families or homes

needlessly" and that those who registered would "receive all consideration" for suspension of

deportation. *Jackson Speech* at 4. Ultimately, from 1941 through the late 1950s the federal

government suspended the deportation of thousands of noncitizens each year. Mae M. Ngai, *The

Strange Career of the Illegal Alien: Immigration Restriction and Deportation Policy in the

United States, 1921-1965*, 21 Law & Hist. Rev. 69, 105 (2003) (calculating 34,632 suspensions

of deportations reflected in INS reports from 1941 through 1960).

### B.  The Narrowing of Noncitizen Registration Over the Decades

Almost immediately after the initial registration drive the government began a decades-

long project of progressive narrowing of the universal registration requirement. In 1944, the INS

eliminated the bureaucracy needed to maintain universal registration by disbanding the Alien

Registration Division, ending post office registration, and shifting registration into its

immigration functions by conducting registration at ports of entry and INS offices. *See Flexoline

Index (Flex)*, U.S. National Archives, https://tinyurl.com/mv436xs2 (describing disbandment of

Alien Registration Division near the end of World War II and transfer of registration functions to

INS "alien files" created in relation to new arrivals, adjustments of status, or applications by non-

citizens); *Alien Registration to Justice Unit*, N.Y. Times (Jan. 2, 1943) (describing transfer of registration functions from post offices to INS).

Further reductions to the scope of the registration requirement occurred throughout the 1940s and 1950s in recognition of the need for streamlined labor and tourism processing. In 1944, Congress exempted Mexican agricultural workers, known as "braceros." *See* Farm Labor Supply Appropriations Act of 1944, § 5(g), Pub. L. No. 78-229, 58 Stat. 11, 15-16 (1944) (providing for issuance of an identification card "in lieu of all other documentary requirements, including the registration at time of entry or after entry required by the Alien Registration Act of 1940."). In 1947, the INS published a rule exempting Canadians who visited the United States for less than six months. *See* 12 Fed. Reg. 5130, 5131 (July 31, 1947). In 1950, the INS revoked the use of the AR-3, the registration form that all noncitizens could once receive, regardless of immigration status. 15 Fed. Reg. 579, 579 (Feb. 2, 1950). In its place, the INS designated as proxies for a registration document certain forms that were accessible only to noncitizens with immigration status, including the Form I-151 for lawful permanent residents and Form I-94 for nonimmigrants with a record of lawful entry. *Id.* at 579-580. Noncitizens without a record of lawful entry were thus functionally exempt from registration requirements because there existed no process by which to register. *See* Jonathan Weinberg, *Demanding Identity Papers*, 55 Washburn L.J. 197, 208 (2015) (stating that beginning in 1950, "a noncitizen in the United States would not receive any evidence of registration absent a finding by the INS that he was legally entitled to be present in this country").

After significant immigration reform in the 1950s, the INS had the opportunity to establish a universal registration and fingerprint process for noncitizens. It declined to do so. The passage of the Immigration and Nationality Act ("INA") of 1952 incorporated the registration

requirements from the Smith Act and added a requirement to carry any proof of registration. *See* Immigration and Nationality Act, Pub. L. No. 82-414, §§ 261-64, 66 Stat. 163, 223-25 (1952). But the implementing regulations provided that, except for lawful permanent residents, the only available registration form was the record of lawful admission and departure (Form I-94) and proof of registration remained proof of immigration status. *See* 17 Fed. Reg. 11532, 11533 (Dec. 19, 1952). Moreover, over the next few years the INS expressly exempted certain British and Canadian nonimmigrants and agricultural workers from registration. 18 Fed. Reg. 3531, 3531 (June 19, 1953); 22 Fed. Reg. 4188, 4188-89 (June 14, 1957).

In the decades following the enactment of the INA, Congress and the INS together dismantled much of the remaining registration and carry requirements. In 1957, Congress granted the Attorney General the discretion to waive the fingerprint requirement for any nonimmigrant. *See* Act of Sept. 11, 1957, Pub. L. No. 85-316, § 8, 71 Stat. 639, 641. In 1960, following the repeal of universal fingerprint requirements, the INS removed the carry requirement from the Code of Federal Regulations. *Compare* 25 Fed. Reg. 7180, 7181 (July 29, 1960) (no carry requirement), *with* 22 Fed. Reg. 9805, 9806 (Dec. 6, 1957) (requiring *"Carrying and possession of proof of alien registration*."). Over the years, as Congress created additional forms of immigration status, the INS continued its policy of streamlining registration requirements by adding some new immigration forms as proxies for a registration document. *See* Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law and the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141, 170 (2014). The agency never reauthorized a universal registration document accessible outside of immigration forms, despite multiple revisions to the regulations defining registration documents.

After the early registration effort, the only time the federal government has instituted even a limited registration requirement separate from the immigration process was in response to the attacks of September 11, 2001. The INS used notice-and-comment rulemaking to implement a controversial program called the National Security Entry-Exit Registration System ("NSEERS"), requiring nationals from 25 predominantly Muslim and Middle Eastern countries to register. *See* 81 Fed. Reg. 94231 (Dec. 23, 2016). In 2011, the federal government ceased use of NSEERS after finding the program unnecessary and that it provided no increase to national security. *See id.* at 94232. In 2016, the Department of Homeland Security rescinded the regulations authorizing NSEERS, because it proved ineffective and was "rendered obsolete" in light of more universally applicable, established security measures. *See id.* at 94232-33.

The INA still contains the registration provisions from the Smith Act of 1940, as amended by the INA in 1952 and 1957. *See* 8 U.S.C. §§ 1201(b), 1301-1306. Visa applicants are registered through the visa process. *See* 8 U.S.C. §§ 1301, 1201(b). For those not registered through the visa process, the INA includes provisions for registration and fingerprinting of all noncitizens over the age of 14 who remain at least 30 days, and similarly to require parents and legal guardians to register their children. *See id.* § 1302(a), (b). It further states that noncitizens 18 years of age or older must "at all times carry . . . any certificate of alien registration or alien registration receipt card to [them]." *Id.* § 1304(e). Failure to carry is a crime punishable by a fine or up to 30 days in jail. *Id.* Finally, the INA makes it a crime to "willfully fail[]" to register or be fingerprinted and for a parent or legal guardian to similarly fail to register their child, punishable by a fine or up to six months of imprisonment. *Id.* § 1306(a). Any noncitizen who is required to register must also notify DHS within ten days of any change of address. *Id.* § 1305(a). Failure to

do so is a crime punishable by a fine and up to 30 days in jail, *id.* § 1306(b), and is a ground of deportation, *id.* § 1227(a)(3)(A).

Notwithstanding these provisions, the existing regulations demonstrate the immigration agencies' longstanding determination that any registration requirement is effectively handled through the immigration process. As the agencies have recognized for nearly a century, the regulations provide that registration and proof of registration is obtained through existing forms for gaining admission and establishing immigration status. *See* 8 C.F.R. § 264.1(a), (b). The regulations contain two lists: acceptable registration forms, *id.* § 264.1(a), and evidence of registration, *id.* § 264.1(b). Many existing forms used to screen immigration benefits applicants are not included on these lists.

In addition to listing forms for registration and proof of registration, the current regulations waive the fingerprint requirement for certain categories of nonimmigrants while they maintain their nonimmigrant status, including all nonimmigrants who remain in the United States for less than one year. 8 C.F.R. § 264.1(e); *see* 8 U.S.C. § 1302(c).[1]

As has been the case since the 1940s, the existing regulations do not include a registration form or evidence of registration for a noncitizen who has entered without inspection and is ineligible for any immigration benefit.

### C.  Defendants' New Registration Scheme

Defendants have now suddenly reversed the federal government's eighty-year-old approach to registration, imposing universal registration with the attendant civil and criminal penalties for failure to register or carry proof of registration. They did so not in service of the

---

[1] At various times in the 1990s the INS required nonimmigrants from certain countries to submit fingerprints at ports of entry as part of their applications for admission. *See* 56 Fed. Reg. 1566 (Jan. 16, 1991); 61 Fed. Reg. 46829 (Sept. 5, 1996); 63 Fed. Reg. 39109 (July 21, 1998).

statute's purpose of creating a universal inventory of noncitizens, as stated by the implementing Attorney General in 1940, but instead for a newly adopted purpose to facilitate mass deportation and to criminalize the undocumented population.

On January 25, 2025, by executive order President Trump instructed the Secretary of Homeland Security, in coordination with the Attorney General and the Secretary of State, to "(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of [the registration statutes]; (b) Ensure that all previously unregistered aliens in the United States comply with the requirements of [the registration statutes]; and (c) Ensure that failure to comply with the legal obligations of [the registration statutes] is treated as a civil and criminal enforcement priority." Exec. Order No. 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443, 8444 (Jan. 20, 2025).

On February 5, 2025, the Attorney General mandated that DOJ "shall use all available criminal statutes . . . to support the Department of Homeland Security's immigration and removal initiatives[,]" including the criminal penalties for willful failure to register and to carry registration documents under the Alien Registration Act. Memorandum from the Attorney General re: General Policy Regarding Charging, Plea Negotiations, and Sentencing, at 3 (Feb. 5, 2025), https://tinyurl.com/25wr8sd5 (referencing 8 U.S.C. § 1304 and § 1306).

On February 25, 2025, DHS issued a press release announcing the new registration requirement under the heading "DHS Will Use Every Available Tool to Compel Illegal Aliens to Self-Deport." Press Release, DHS, Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy. Defendant Noem gave a televised interview explaining that a noncitizen's registration would

permit the government to "help them relocate right back to their home country." *See* Billal

Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek (Feb. 26,

2025), https://tinyurl.com/bdz9prye (quoting Secretary Noem interview).

On March 12, 2025, Defendants published the IFR in the Federal Register creating a new

online general registration form, Form G-325R. *See* 90 Fed. Reg. 11793, 11796. The form

mandates collection of information beyond what is specifically enumerated in the Alien

Registration Act, including, "Have you EVER committed a crime of any kind (even if you were

not arrested, cited, charged with, or tried for that crime, or convicted)?" *See* Form G-325R

Biographic Information (Registration), OMB: 1615-0166, https://tinyurl.com/3txjv5an

[hereinafter Form G-325R]. Defendants estimate that the IFR will attach new registration

requirements to between 2.2 million and 3.2 million people. 90 Fed. Reg. at 11797. The IFR

reiterates the executive order's mandate that failure to comply with the registration requirements

of the statute should be treated as "a civil and criminal enforcement priority." *Id*.

The IFR claims that it is exempt from notice and comment rulemaking because it is

merely a "rule of agency organization, procedure, or practice" that does not "alter the rights or

interests of parties . . . ." *Id.* at 11796. The IFR contains only limited discussion of the impacted

populations and fails to consider the effects of the new registration process on vulnerable

populations. It does not discuss whether Defendants considered adding existing, commonly

submitted documents, such as applications for asylum and other statutory forms of humanitarian

immigration relief, to the list of registration documents under the regulations. The IFR is

internally inconsistent as to whether certain categories of individuals are considered registered.

Finally, the IFR does not grapple with the substantial costs to the public and the government in

implementing the new registration scheme.

**LEGAL STANDARD**

A plaintiff seeking a preliminary injunction must make a "'clear showing' that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc*. 555 U.S. 7, 22 (2008)).

Under 5 U.S.C. § 705, courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." The same factors for issuance of a preliminary injunction apply to issuance of a stay pursuant to § 705. *D.C. v. U.S. Dep't of Agric*., 444 F. Supp. 3d 1, 15 (D.D.C. 2000) (and cases cited therein).

Plaintiffs have met the standard for a stay pursuant to 5 U.S.C. § 705 or, in the alternative, a preliminary injunction.

**ARGUMENT**

## I.   PLAINTIFFS ARE LIKELY TO SUCEEED ON THEIR CLAIM THAT THE IFR VIOLATES THE APA

### A.  The IFR Is a Legislative Rule that Requires Notice and Comment Rulemaking

Defendants assert that the IFR is a "procedural rule" under 5 U.S.C. § 553(b)(A) and therefore falls into that narrow exception to the notice and comment requirements of the APA. That is incorrect. The IFR represents a sea change in registration policy that significantly alters the rights and obligations of millions of people, and it is therefore plainly a legislative rule.

The APA's notice and comment requirements serve two essential purposes: "to reintroduce public participation and fairness" into agency rulemaking and "to assure that the

agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (cleaned up). Given Congress' emphasis on public participation in agency decision-making, "[t]he exception for procedural rules is narrowly construed." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). It "is intended for 'internal house-keeping measures organizing agency activities,'" *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (quoting *Bowen*, 834 F.2d at 1045), to afford agencies "latitude in organizing their internal operations," *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980).

"The critical feature of" a procedural rule is "that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *AFL-CIO*, 57 F.4th at 1034 (cleaned up). By contrast, a rule is legislative (and therefore subject to notice and comment) when it (i) "imposes substantive burdens"; (ii) "encodes a substantive value judgment"; (iii) "trenches on substantial private rights or interests"; or (iv) "otherwise alters the rights or interests of parties." *Id.* at 1034-1035 (cleaned up). Moreover, a rule is not procedural if it "affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 6 (D.C. Cir. 2011).

The IFR is a legislative rule for at least four reasons. First, the IFR makes a substantive value judgment by changing the federal government's longstanding policy regarding the appropriate manner and purpose of registration that imposes significant, new burdens on millions of noncitizens. Second, the IFR exposes individuals to new criminal liabilities. Third, the IFR trenches on the Fifth Amendment rights of individuals newly targeted for registration. Finally, the IFR impacts the public to such a degree that notice-and-comment rulemaking is necessary.

11

Because the IFR is plainly not an "internal house-keeping measure[]," Defendants violated the APA when they failed to consider public input before implementing their new policy. *See AFL-CIO*, 57 F.4th at 1034 (D.C. Cir. 2023) (quoting *Bowen*, 834 F.2d at 1045).

      *1.  The IFR Represents a Substantive Value Judgment by Defendants to Change the Manner and Purpose of Registration That Imposes Substantive Burdens*

The IFR represents a substantive value judgment by the agencies about the purpose of registration and the best method to accomplish this new purpose. The IFR abandons a decades-old narrow registration policy that, outside the exigencies of wartime or a terrorist attack, any registration requirement is appropriately accomplished through the immigration process. Defendants have chosen to enact this new registration policy to further a new goal—to pursue widespread immigration enforcement and impose new criminal penalties on the undocumented. As a result of this sweeping change in policy, millions of noncitizens must navigate a new process that involves providing detailed information about themselves, their children, their families, and their personal activities, submitting their fingerprints and other biometric information at a federal building, and carrying proof of registration at all times. Contrary to the IFR's conclusory assertion that it "does not impose any new . . . obligations separate from the obligations already contained in the [INA]," *see* 90 Fed. Reg. at 11796, it is evident from the face of the rule that it imposes new registration requirements. *See id.* at 11797 (noting that the "[a]ffected population" "impacted by this rule" are millions of noncitizens who are newly obligated to submit a new registration form); *id.* (noting that the IFR would "result in more aliens needing to maintain evidence of registration in the mode prescribed by DHS"); *see also id.* at 11795 (noting that under the existing scheme many noncitizens "lack a designated registration form").

Moreover, the IFR collects more information than what is specified by statute. *See* 8 U.S.C. § 1304(a) (calling for "(1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien"). In addition to the information listed in the statute, the G-325R gathers information regarding uncharged criminal activity; aliases; date and place of birth; country of citizenship or nationality; telephone numbers and email addresses; five years of physical address history; sex, ethnicity, and race; height, weight, eye color, and hair color; marital status, date of marriage, and place of marriage; spouse's legal name, date of birth, and place of birth; and parents' names, dates of birth, places of birth, and places of residence. *See* Form G-325R. As for the biometric interview, it gathers a noncitizen's photograph and signature in addition to the statutorily required fingerprints. 90 Fed. Reg. at 11795.

Those impacted include people who have already submitted detailed immigration forms and reasonably believe themselves to already be "registered," people who do not speak English, people who do not have familiarity with federal immigration laws, people who do not have reliable access to computers or the Internet, people with disabilities that preclude them from accessing the online form, and young teenagers. Moreover, the new policy pursues a new goal of mass deportation and so will cause many to make the choice presented by Defendant Noem: register and submit to deportation, frequently resulting in separation from family, community, and "all that makes life worth living," *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922); or fail to register and expose themselves to arrest and federal prosecution.

The IFR thus amounts to a "substantive change in existing . . . policy" rather than a procedural rule. *Mendoza*, 754 F.3d at 1021; *see Nat'l Ass'n of Home Health Agencies v.*

13

*Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982) (finding a rule changing a sixteen-year-old policy that imposes new burdens not to be procedural). This change in policy imposes new obligations and burdens the privacy interests of those newly required to submit detailed personal information and biometrics to the federal government. *See Elec. Priv. Info. Ctr.,* 653 F.3d at 6 (finding a security screening method that resulted in a greater invasion of "personal privacy" constituted a "new substantive burden"). It also will cost those required to register an estimated $118 million or more in wage-loss. *See* 90 Fed. Reg. at 11799 (combining cost estimates for completion of Form G-325R and collection of biometrics); *cf. Schweiker*, 690 F.2d at 949 (deeming a policy change legislative for imposing $10 million to $30 million in transfer costs). And it will cost the government approximately $72 million. *See* Supporting Statement for Biographic Information (Registration), OMB Control No.: 1615-NEW, https://tinyurl.com/2cs24kmp (click on Statement A, G-325R-001_NEW_EMGCY_SPTSTMT.v2.docx). Defendants also estimate that completing the G-325R and fulfilling the biometrics requirement will require a total of more than 2.5 million hours (using Defendants' estimates of the impacted population). 90 Fed. Reg. at 11799. This is a significant new burden for impacted noncitizens and their attorneys even on the face of the IFR, not considering additional factors such as language and technological barriers. The IFR was required to consider public comment before it adopted a new registration policy that, by its own terms, imposes new burdens on millions of immigrants.

### 2.  *The IFR Imposes New Criminal Liabilities*

The IFR exposes noncitizens to new criminal liabilities and as such it adds new substantive burdens and alters the rights and interests of parties. As has been the case for more than half a century, the existing regulations do not include a registration form or evidence of registration for a noncitizen who has entered without inspection and is ineligible for any

immigration benefit. *See* 90 Fed. Reg. at 11795 (noting this group "lack a designated registration

form"). Without a universal registration system, noncitizens who were ineligible to use any of the

designated registration forms were under no enforceable obligation to register or to carry any

proof of registration. *See* 8 U.S.C. § 1306(a) (making it a crime to "*willfully* fail[] or refuse[]" to

register) (emphasis added); *United States v. Mendez-Lopez*, 528 F. Supp. 972, 973 (N.D. Okla.

1981) (dismissing criminal failure to carry proof of registration card for noncitizen not able to

register); *see also United States v. Spingola*, 464 F.2d 909, 911 (7th Cir. 1972) ("Genuine

impossibility is a proper defense to a crime of omission."); *cf. United States v. Bryan*, 339 U.S.

323, 330 (1950) ("Ordinarily, one charged with contempt of court for failure to comply with a

court order makes a complete defense by proving that he is unable to comply").[2] As a result of

the IFR, millions of noncitizens are exposed to new criminal penalties arising from the

registration scheme. *See* 90 Fed. Reg. at 11794 (citing 8 U.S.C. §§ 1306, 1304(e)); *id.* at 11795

(describing "failure to comply" with the registration requirements "as a civil and criminal

enforcement priority").

      Rules that impose criminal sanctions "should be held to the strict letter of the APA."

*United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989). When a rule "puts new criminal

liability on the acts or omissions of regulated persons, it is quintessentially legislative . . . ."

*United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009); *see Mann Constr., Inc. v. United States*,

27 F.4th 1138, 1143 (6th Cir. 2022) (finding a new IRS submission requirement had "all

---

[2] Defendants have acknowledged that noncitizens who are not registered do not have an
obligation to carry proof of registration. *See* 90 Fed. Reg. at 11797 (observing that the new
registration system would "result in more aliens needing to maintain evidence of registration");
*Assistance by State and Local Police in Apprehending Illegal Aliens*, 20 Op. O.L.C. 26, 36 n.6
(Feb. 5, 1996), https://tinyurl.com/2k6ppk76 ("The requirements of 8 U.S.C. § 1304(e) [the carry
statute] apply only to aliens who have been registered and issued a registration receipt card.").

characteristics of [a] legislative rule[]" where it imposed "new duties" to provide information "and failure to comply [came] with the risk of penalties and criminal sanctions"). Notice and comment was therefore required.

### 3. The IFR Impinges on Parties' Fifth Amendment Rights

The IFR interferes with the Fifth Amendment privilege against self-incrimination for those newly required to register. *See Grosso v. United States*, 390 U.S. 62, 68 (1968) (holding that regulatory requirement to produce records "directed almost exclusively to individuals inherently suspect of criminal activities" may violate the Fifth Amendment). The IFR targets almost exclusively noncitizens who entered the United States "without inspection and admission or inspection and parole"—in other words, noncitizens who entered the United States in violation of the federal criminal statute at 8 U.S.C. § 1325. 90 Fed. Reg. at 11797; *see id.* at 11793 (noting that 8 U.S.C. § 1302 excludes "visa holders"). In fact, the question that asks "Immigration status at last arrival" in Form G-325R provides a blank text box and only one pre-printed text option in the dropdown menu of answers: "EWI – Entry Without Inspection." Escobar Decl. ¶ 24. Moreover, the form requires the submitter to state whether the person has "EVER committed a crime of any kind." *See* Form G-325R at 7. Unlike applications for immigration benefits, submitting the G-325R is mandatory under penalty of criminal prosecution. Thus, a noncitizen who submits Form G-325R is providing, at a minimum, "a significant 'link in the chain' of evidence tending to establish his guilt." *Marchetti v. United States*, 390 U.S. 39, 48 (1968).

There is "ample reason to fear" that such a link would lead to prosecution. *Leary v. United States*, 395 U.S. 6, 17 (1969). Defendants have made clear that a central goal of the registration scheme is to force people to admit crimes and then prosecute them. *See* Memorandum from the Attorney General re: General Policy Regarding Charging, Plea

Negotiations, and Sentencing 3 (Feb. 5, 2025), https://www.justice.gov/ag/media/1388541/dl; *see also* Press Release, DHS, Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy. Defendants have prioritized the prosecution of illegal entry in particular and they have executed on that promise, DOJ, *U.S. Attorneys for Southwestern Border Districts Charge More than 840 Illegal Aliens with Immigration-Related Crimes During the Third week in March as part of Operation Take Back America* (Mar. 24, 2025), https://tinyurl.com/4krbytt9.

Where a rule "trenches on substantial private rights," as does the IFR, it is not procedural. *Mendoza*, 754 F.3d at 1023 (quoting *Batterton,* 648 F.2d at 708); *see also Picciotto*, 875 F.2d at 346.

> ### 4.  The IFR Will Have Such a Substantial Impact on The Public That Notice and Comment is Necessary

Even according to Defendants, the IFR will have an enormous impact. The IFR states that between 2.2 million and 3.2 million noncitizens will be newly required to register, submit to fingerprinting, and carry proof of registration at all times. 90 Fed. Reg. at 11797. Nevertheless this significantly understates the impact of the new rule. Parents and legal guardians who must register for their children, immigration attorneys who must help their clients navigate this new regime, and businesses that benefit from international tourism will all feel the effects of the rule.

Perhaps most significantly, for the first time ever, Defendants seek to impose a universal obligation on all noncitizens over 18 to carry proof of registration through this rule. *See* 90 Fed. Reg. 11794 (citing the requirement at 8 U.S.C. § 1304(e)); *id.* at 11795 (stating the intent to enforce that requirement); *id.* at 11797 (stating that new universal registration comes with a new obligation to carry proof of registration). Defendants have never implemented universal registration (last used in the 1940s) with a universal obligation to carry proof of registration

(added to the statute in the 1950s). Doing so exposes everyone in the country (not just noncitizens) to the increased risk of being stopped and asked to provide proof of registration—in particular, those more likely to be targeted because of their race, the neighborhood they live in, or the language that they speak. *See* Nicole Foy, *More Americans Will Be Caught Up in Trump Immigration Raids*, ProPublica, Mar. 18, 2025, 2:05 PM EST, https://tinyurl.com/7j8zkkwz; *see also* Fontaine Decl. ¶ 37 (describing risk of racial profiling of MRNY members under IFR).

A universal registration and carry requirement implicates concerns expressed across the political spectrum in the contentious debates over the creation of a national ID. *See* Cato Institute, *If You Value Privacy, Resist Any Form of National ID Cards* (Nov. 28, 2018), https://tinyurl.com/4y86nmxu; An Open Letter to the Conference Committee on Intelligence Reform: Removal National ID Provisions from the Conference Report (Nov. 15, 2024), https://tinyurl.com/yakkm342 (signed by ACLU, Gun Owners of America, Republican Liberty Caucus, and Unitarian Universalist Association of Congregations, among others).

The public is entitled to raise these concerns and propose alternatives before such a dramatic change in policy goes into effect. *See  Elec. Priv. Info. Ctr.*, 653 F.3d at 6 (finding a rule not procedural when it "affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking"); *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 174 F.3d 206, 212 (D.C. Cir. 1999) (holding rule to be substantive where it involved "the safety practices of thousands of employers" such that "[t]he value of ensuring that the [agency] is well-informed and responsive to public comments before it adopts a policy is therefore considerable"); *see also* Fontaine Decl. ¶ 38 (MRNY would have commented on IFR if those comments would have been considered prior to implementation); Escobar Decl. ¶ 23 (same for CASA); Strater Decl. ¶ 17 (same for UFW); Salas Decl. ¶ 14 (CHIRLA is commenting on IFR,

wishes for its comments to be considered, and would have submitted a more robust comment were the agency required to consider it).

* * *

The IFR is procedurally invalid for four independent reasons, any one of which is sufficient to establish that Defendants violated the notice and comment requirements of the APA. This error alone is enough to justify a stay of the IFR and injunctive relief. *See Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur of the rule.") (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 199 (D.C. Cir. 1993)).

### B.  The IFR is Arbitrary and Capricious

Defendants' failure to engage in notice-and-comment procedures is enough to block implementation of the IFR. But their justifications for the IFR are also arbitrary and capricious, providing an independent basis to enjoin or stay it. These problems are, of course, linked: Part of the purpose of notice-and-comment procedures is to require agencies to elicit a broad range of views on the subject and consider important aspects of the situation they might not otherwise. While the problems addressed below should have been obvious to the agency, it is little wonder that this artificially rushed IFR process yielded a woefully inadequate rationale for the new rule.

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is arbitrary and capricious

19

when it "entirely fails to consider an important aspect of the problem." *Id.* When an agency

decides to "shift [its] policy" or "depart from its typical manner of administering a program," a

full and rational explanation becomes especially important. *Sw. Airlines Co. v. FERC,* 926 F.3d

851, 856 (D.C. Cir. 2019) (quoting *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d

426, 433 (D.C. Cir. 1993) (alterations omitted). Agencies must also "pay[ ] attention to the

advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753

(2015) (emphasis in original). The IFR is arbitrary and capricious because it implements an

abrupt and sweeping universal noncitizen registration requirement without considering multiple

important aspects of the issue.

> 1. *Defendants Fail to Acknowledge or Explain the Departure From Previous Practice*

Defendants do not acknowledge that the IFR is a dramatic and unexplained departure

from previous practice. "A central principle of administrative law is that, when an agency

decides to depart from decades-long past practices and official policies, the agency must at a

minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse*

*Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017); *see also Physicians for Soc.*

*Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) ("Reasoned decision-making requires that

when departing from precedents or practices, an agency must offer a reason to distinguish them

or explain its apparent rejection of their approach.") (citation omitted). As discussed above, there

has been no system of universal noncitizen registration since the 1940s. And when it did exist

historically, it was a system that prioritized accounting, not deportation and criminal

enforcement. Defendants' glib assertions in the IFR that the rule imposes no new obligations

stand in stark contrast to reality—millions of people will be newly required to register and for the

first time, the government intends to prioritize criminal enforcement for failure to register and

20

carry registration papers. The government also explicitly seeks to use information gleaned from

registration as a direct deportation tool, a wholesale departure from prior practice. Defendants'

failure to acknowledge and explain the departure from past practice alone renders the IFR

arbitrary and capricious. *See Grace v. Barr,* 965 F.3d 883, 903 (D.C. Cir. 2020) (holding that

change to USCIS policy on legal standard applicable to credible fear interviews was arbitrary

and capricious where it was unacknowledged and unexplained, and affirming district court order

"on that basis alone.").

## 2.   *Defendants Failed to Adequately Consider Impact on Affected Populations*

The IFR fails to consider the wide-ranging implications of enforcing a universal

registration and proof of registration carry requirement for the first time. Defendants' own

estimate of the affected population—between 2.2 and 3.2 million individuals—underscores the

wide-ranging impact of the rule. *See* 90 Fed. Reg. at 11797. Despite this, the IFR's "Affected

Population" section merely lists out the categories of noncitizens it believes the IFR will

impact—those who are present in the United States without inspection and admission or parole

who have not filed a registration form or possess evidence of registration under the existing

regulations, Canadian visitors who entered at land ports of entry and did not receive a Form I-94

or other evidence of registration, noncitizens who newly turn 14, and possible unknown future

groups. *See id.* But it does not consider important aspects of the problem, including: the

consequences of the new universal registration regime for millions of noncitizens across these

differently situated groups; the ability of the impacted population to access the new registration

system; and how Defendants' stated intent to prioritize enforcement of the criminal provisions of

the registration statute will impact these populations and the effectiveness of the registration

scheme. 90 Fed. Reg at 11797. Defendants also fail to acknowledge the IFR's serious Fifth

Amendment self-incrimination issues. *See* Section I.A.3, *supra*. The IFR's lack of consideration of these important problems render it arbitrary and capricious. *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

The IFR also does not consider the new registration's impact on particular vulnerable groups, including teenagers ages 14 and older, individuals without access to the Internet, the elderly, those with limited literacy, and limited English proficient individuals. *See* Decl. of Elizabeth Strater ¶¶ 19-22 (describing UFW members with limited formal education, limited access to and familiarity with the Internet, and language barriers); Decl. of Angelica Salas ¶ 24 (describing an eighteen-year-old member who arrived in the United States as an unaccompanied minor required to register under the IFR).[3] Defendants did not discuss any alternatives to the online-only registration system through the USCIS website that might help to address the needs of some of these affected populations. Defendants' failure to consider the adequacy of the system they are setting up to operationalize a policy of this scale—which carries criminal consequences for noncompliance—is arbitrary and capricious. *See State Farm*, 463 U.S. at 43; *see also UFW v. Solis*, 697 F. Supp. 2d 5, 10 (D.D.C. 2010) ("[A]n agency's failure to consider alternatives or to provide an explanation for rejecting those alternatives can render its ultimate decision arbitrary and capricious.") (citing *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C.Cir.1983)).

The IFR also fails to grapple with the consequences of the new registration system for significant categories of noncitizens who have already submitted extensive immigration paperwork to the government—including applicants for asylum, U visas (for victims of certain crimes), T visas (for survivors of trafficking), protection under the Violence Against Women Act

---

[3] Plaintiffs' members are identified by pseudonym.

("VAWA"), Special Immigrant Juvenile ("SIJS") status, temporary protected status ("TPS"), and Deferred Action for Childhood Arrivals ("DACA")—but are nonetheless not considered "registered." *See* 90 Fed. Reg. at 11794-95 (listing categories of registration documents under 8 C.F.R. §§ 264.1(a) and (b)); Decl. of Sienna Fontaine ¶¶ 24, 28 (describing members who have applied for U nonimmigrant status and DACA); Salas Decl. ¶¶ 25-26 (describing member who is the process of self-petitioning under VAWA). Indeed, even those who have been *granted* asylum, DACA, or TPS (but have not received an employment authorization document) are not considered "registered" under the regulations. *See* 90 Fed. Reg. at 11794-95.

The IFR does not address what considerations Defendants weighed—if any—when declining to add commonly submitted immigration forms like the applications outlined above to the list of registration documents while simultaneously mandating an entirely new registration system through the G-325R. Noncitizens who have already submitted extensive immigration-related paperwork to the government through these forms must now navigate the new G-325R process—a process Defendants have directly stated is meant to facilitate deportation, not a process tied to immigration relief—to be considered "registered," otherwise they risk prosecution for failure to register. Moreover, because none of the forms for the immigration benefits listed above (asylum, T and U visas, VAWA, SIJS, DACA, TPS) count as "evidence of registration," noncitizens who submitted such forms can be prosecuted criminally for failure to carry registration documents. Defendants articulate no explanation for this, much less a rational one.

### 3.   *Defendants Provide No Reasonable Explanation for the Purpose of the IFR*

Moreover, the IFR is misleading as to its purpose. In the "Basis and Purpose of the IFR" section, Defendants assert that the creation of the new registration form G-325R "may improve registration outcomes for certain groups" of noncitizens who previously had no method of

registering. 90 Fed. Reg. at 11795, 11797. Beyond this conclusory statement, the IFR does not explain why Defendants think more people will register, particularly given the IFR's reference to Executive Order 14159, which directs the DHS Secretary and the AG to "prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence." *Id.* at 11795; 90 Fed. Reg. at 8444; *see United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562–63 (D.C. Cir. 2010) ("[Courts] do not defer to the agency's conclusory or unsupported suppositions.") (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,* 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

The IFR's benign characterization of the purpose of the new universal registration process to "improve registration outcomes" and to "fill a gap in registration," 90 Fed. Reg. at 11795, belies its true rationale that Defendant Noem has stated publicly: to encourage self-deportation and prioritize criminal prosecution of noncitizens. The IFR vaguely points to improvement in law enforcement outcomes resulting from the new registration system, *see id.* at 11797, but obscures the enforcement rationale that plainly motivates it. The requirement that an agency must offer reasonable explanations for its actions "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York,* 588 U.S. 752, 785 (2019) (A court is "not required to exhibit a naiveté from which ordinary citizens are free.") (quotation omitted).

### 4.  The IFR's Opaque and Inconsistent Requirements Are Arbitrary and Capricious

The rushed process that produced the IFR highlights additional flaws with the rule that underscore its arbitrary and capricious nature. The IFR is completely opaque as to the obligations for certain categories of individuals. For example, while a form I-485 (application to adjust to permanent resident) is a registration form, not all individuals who have completed such a form

24

have been fingerprinted. Fontaine Decl. ¶ 32 (describing members who have submitted an I-485 but for whom it is unclear whether they have been fingerprinted). While the IFR purports to impose no further registration requirement on noncitizens who have "previously registered consistent with 8 CFR 264.1(a)," 90 Fed. Reg. at 11796, it is far from clear whether an individual who has completed a Form I-485 but who has not been fingerprinted is protected from criminal prosecution under the new universal registration scheme. Similarly, an individual who has been served with a Notice to Appear ("NTA") in immigration court has "evidence of registration" under 8 C.F.R. § 264.1(b). But not all who have NTAs have been fingerprinted, and the IFR's suggestion that they need not do anything else to be considered "registered" is in tension with the fingerprinting requirement. *See* Fontaine Decl. ¶ 32 (noting that not all MRNY members who have received NTAs were fingerprinted in the process).

The IFR is unclear as to when a noncitizen must submit the new Form G-325R in order to comply with the new registry requirements. USCIS has already made Form G-325R available, *see* 90 Fed. Reg. at 11793, but the IFR does not go into effect until April 11, 2025. *See id.* It is unclear whether noncitizens must register *before* the IFR even goes into effect in order to avoid arrest and prosecution, or if Defendants view the obligation to register within 30 days to begin to run only when the IFR goes into effect.

The IFR is also internally inconsistent as to the obligations of noncitizens who have turned 14 but who were previously considered registered because they entered through the visa process. It states that noncitizens who have previously registered using a form listed in 8 C.F.R. § 264.1(a) or who have one of the forms of evidence of registration listed in 8 C.F.R. § 264.1(b) "need not register again." 90 Fed. Reg. at 11796. But elsewhere, when describing the "affected population," the IFR asserts that all noncitizen children must register when they turn 14,

"whether previously registered or not." *Id.* at 11797. Given these serious inconsistencies and lack of clarity on the new universal registration scheme's requirements, the IFR is arbitrary and capricious. *Bus. Roundtable v. S.E.C.*, 647 F.3d 1144, 1153 (D.C. Cir. 2011) (internally inconsistent agency rule is arbitrary); *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018) ("The arbitrary and capricious standard requires that an agency's decision be reasonable and reasonably explained.").

Nor does the IFR adequately explain how an individual can comply with the mandatory proof of registration carry requirement or whether Defendants considered any alternatives to the proof of registration produced by the new system. The IFR states that individuals who register using the G325-R can print out a .PDF document from their USCIS account after completing the new registration process. 90 Fed. Reg. at 11795. Defendants do not explain whether an electronic version—such as a screenshot of the USCIS confirmation on an individual's phone—would be considered sufficient. And for those who are already considered "registered" by virtue of having filled out or been issued a form from the prior list, are they expected to carry paper copies of their documents, such as an I-94 (which is generally issued only electronically and must be accessed through CBP's website)— folded into their wallet? Would a photograph on their phone be enough? For those not issued one of the designated "evidence of registration" documents, must they carry a copy of the registration form, such as the I-485? Is a USCIS receipt sufficient? Nothing in the IFR indicates that Defendants considered these important aspects of the problem, rendering it arbitrary and capricious.

Furthermore, given the complexities of immigration law and immigration status, it will be difficult for many individuals to even know if they are considered registered. It is not always possible for individuals who were released at the Southern border to know important details such

as the posture of their release (i.e., whether it was pursuant to parole) and whether they were issued NTAs. *See* Fontaine Decl. ¶ 32. To seek clarity about their status, individuals often must file a FOIA request to seek records about their immigration case, a time-consuming and multi-step process that requires assistance from groups like MRNY. *Id.* This is an additional burden that Defendants should have considered as part of the IFR's registration scheme but failed to even acknowledge.

### 5.  *The IFR Fails to Adequately Consider Costs*

The IFR does not adequately consider the costs to the public and USCIS of imposing this new universal registration requirement. The IFR contains virtually no analysis of the economic impact of the new registration requirement, including the cost to USCIS of absorbing new biometrics appointments or how those new appointments will affect a notoriously backlogged agency. *See USCIS Ombudsman Annual Report 2024* 28 (June 28, 2024), https://tinyurl.com/ybpreeka (noting "limited resources and significant existing and new workloads," that require USCIS to "continuously grapple[ ] with difficult decisions regarding which immigration benefits adjudications to prioritize"). The IFR notes only that "DHS will incur additional costs due to the added activities from the collection of biometrics given the impacted population of [noncitizens] do not pay fees for registration or biometrics." 90 Fed. Reg. at 11797. Defendants' own analysis finds a cost to the government of nearly $72 million to administer biometrics pursuant to the IFR and a cost to the public of more than $118 million in complying with its requirements. A reasoned explanation would weigh the costs of the new universal registration process against the benefits, including the likely impact on other USCIS functions. *See Michigan*, 576 U.S. at 753 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the

disadvantages of agency decisions. It also reflects the reality that too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems.") (citation and quotation marks omitted). Defendants fail to provide that explanation here.

The IFR's consideration of costs is lacking in other areas as well. For example, it does not consider the economic impact of imposing these new requirements on Canadian "snowbirds" who spend the winter months in the United States—including on the U.S. communities that host them. *See* Sarah Grochowski, *'It will be a deterrent': Canadian snowbirds face new registration requirements going to the U.S.*, Vancouver Sun, Mar. 12, 2025, https://tinyurl.com/5n7sjxtj; *Marco Rubio, Rick Scott Want Canadian 'Snowbirds' To Stay In Florida Longer*, WUSF (Sept. 19, 2019), https://tinyurl.com/59f83ejc (describing bill proposed by then-Sen. Marco Rubio to allow Canadian visitors over age 50 to stay in the United States up to eight months and quoting Rubio press release characterizing the bill as a "huge boost to our state's economy"). Indeed, in response to the IFR, the Canadian government's foreign affairs agency, Global Affairs Canada, issued a travel advisory to its citizens on March 21 warning that "[f]ailure to comply with the registration requirement could result in penalties, fines, and misdemeanor prosecution." Global Affairs Canada, United States Travel Advice (Mar. 21, 2025), https://travel.gc.ca/destinations/united-states.

\* \* \*

Because Defendants fail to consider multiple important aspects of the problem and to adequately explain their choices for this shift in policy, the IFR is arbitrary and capricious in violation of the APA.

## II.     PLAINTIFFS WILL FACE IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION OR STAY

Plaintiffs will be irreparably harmed if the IFR takes effect. Defendants' rushed and incoherent process of rolling out the IFR and its failure to consider multiple important factors compounds harm to Plaintiffs' members. For some members registration will be extremely difficult or impossible because they lack access to the Internet, have low levels of literacy, or cannot speak English. The IFR exposes them to criminal penalties and immigration enforcement as the result of their failure to register or errors in their registration. For other members who have already submitted applications for statutorily available immigration relief that do not count as registration documents under the IFR, registration makes it likely that they will be targeted for immigration enforcement and prevented from pursuing the immigration protections for which they are eligible. This is so because Defendants have explained the IFR's purpose is to prioritize removal from the United States. Other members will be forced to admit to an irregular manner of entry in violation of their Fifth Amendment right against self-incrimination, an indisputably irreparable harm. And for members who have engaged in advocacy and organizing, the IFR chills their protected speech and increases the likelihood that they will be retaliated against for their advocacy. Finally, the harm to CHIRLA as an organization is also irreparable because the need to respond to members' and clients' inquiries about their obligations under the IFR will cause it to divert resources from its core business activities of providing legal services to individuals seeking affirmative immigration benefits.

To establish irreparable harm, plaintiffs must show "(1) that the harm is 'certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm' and (2) that the harm is 'beyond remediation.'" *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 175

(D.D.C. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (cleaned up). Plaintiffs' members have submitted substantial evidence that the IFR will cause them irreparable harm.

Many of Plaintiff UFW's members, who are farm workers and would be required to register under the IFR, have difficulty accessing the technology required to comply the registration process, are elderly, have low levels of formal education, or face linguistic barriers to registration—a process only available online and in English. *See* Strater Decl. ¶ 19-21 (describing UFW member David, a 69-year-old farm worker in Washington State with a sixth grade education, who is unfamiliar with navigating the Internet, and would be required to register under the IFR, and UFW member Ana, a 50-year-old blueberry and strawberry harvester who is unfamiliar with technology, speaks the indigenous language Mixteco Bajo, has very little understanding of Spanish or English, and would be required to register under the IFR); *see also* Escobar Decl. ¶¶ 13, 17, 19 (identifying CASA members who would struggle to access English-only form online); Fontaine Decl. ¶ 36 (explaining many MRNY members lack stable addresses, are unable to access technology, and/or do not speak English). The IFR will irreparably harm Plaintiff members because their inability to navigate the registration process will leave them subject to arrest and criminal penalties under Defendants' stated criminal enforcement priorities. *See* 90 Fed. Reg. at 11795. Even for those who can access the registration form, errors alone can be a basis for arrest and prosecution. *See* 8 U.S.C. § 1306(c) (making it a crime to submit registration application "containing statements known by him to be false"). Given Defendants' promise to aggressively enforce the registration laws, the risk of irreparable harm from arrest and detention is high. *See Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 31 (D.D.C.

2018) (noting that "deprivations of physical liberty are the sort of actual and imminent injuries that constitute irreparable harm").

The harms are similarly irreparable for individuals who have submitted applications to the government that do not suffice to fulfill registration obligations under the IFR or who are in the process of seeking immigration relief. This is especially true in light of Defendants' stated intent to use registration as a means to arrest and deport people. For example, CHIRLA member Ursela, an 18-year-old who entered the United States from El Salvador as an unaccompanied minor, has applied for asylum and is seeking Special Immigrant Juvenile Status ("SIJS") based on physical abuse and the loss of her mother. *See* Salas Dec ¶ 24. Because an asylum application (Form I-589) is not a registration document or evidence of registration under the regulations, and because she has not yet received an Employment Authorization Document ("EAD"), Ursela will be required to undergo the new registration process that she fears will make her a target for deportation to El Salvador, where she faces persecution. *Id.* Similarly, MRNY member Guvelia, a 62-year-old grandmother, has submitted an application for U nonimmigrant status after she and two of her children were assaulted by men outside of their home and she assisted in the prosecution. *See* Fontaine Decl. ¶ 24. Guvelia too would be required to register because the U application is not designated as a registration form under the IFR, and she fears immigration enforcement will separate her from her U.S. citizen children and grandchildren. *Id.; see also* Salas Decl. ¶ 25 (describing CHIRLA member Tiana in the process of self-petitioning for protection under the VAWA who must register).

Registering will place these individuals in the direct crosshairs of immigration authorities and prevent them from pursuing congressionally authorized immigration relief for which they are eligible, while not registering will subject them to criminal penalties. *See Huisha-*

31

*Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *aff'd in part, rev'd in part, and remanded*, 27 F.4th 718 (D.C. Cir. 2022) (finding expulsion without opportunity to apply for relief to be irreparable harm and collecting similar cases). Congress created strict confidentiality provisions for VAWA, T, and U visa applications to ensure that abusers and other perpetrators of crime would not use the immigration system against their victims. *See* 8 U.S.C. § 1367. By contrast, the IFR is completely silent on any privacy and confidentiality protections associated with the registration requirement. Unlike § 1367(b)(2), which requires that any disclosure to law enforcement officials "be used solely for a legitimate law enforcement purpose in a manner that protects the confidentiality of such information," the IFR states that DHS may share the information collected by the G-325R for law enforcement purposes and contains no such confidentiality guarantees. *See* 90 Fed. Reg. at 11797 ("The IFR is also expected to improve DHS law enforcement efficacy, because law enforcement personnel would have access to more comprehensive registration data."). This highlights the substantial and immediate risk that the IFR creates for Plaintiffs' members who have applied for these forms of immigration relief for survivors.

In addition, the IFR will irreparably injure Plaintiffs' members who will be forced to reveal that they entered the United States without inspection, in violation of 8 U.S.C. § 1325, a federal criminal misdemeanor. This compelled admission violates these members' Fifth Amendment right against self-incrimination. *See* Section I.A.3, *supra*. Moreover, CASA and MRNY members fear that the new registration process, which requires them to report their organizing and advocacy work, will cause immigration authorities to target them based on their First Amendment protected activities. *See* Escobar Decl. ¶ 16 (describing member JC who fears that his years as an outspoken public activist will make him a target for retaliation if he

registers); *id.* ¶¶ 13-19 (describing advocate members and their fears of the impacts of

registration); Fontaine Decl. ¶ 26 (describing MRNY member Michael who has spoken out in the

press, engaged in protests, and written advocacy letters on immigrant rights and his fears of

retaliation for these activities if he registers); *id.* ¶¶ 24-28, 35 (describing active members and

their fears that their advocacy will make them targets for retaliation if they register). "[T]he loss

of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes

irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

Finally, Plaintiff CHIRLA faces irreparable harm as an organization because the IFR will

force it to divert resources from its core business activities of providing immigration legal

services. CHIRLA's legal services program assists individuals in seeking immigration benefits

and protections, such Deferred Action for Childhood Arrivals ("DACA"), permanent residence

and citizenship, family-based petitions, SIJS petitions, Military Parole in Place, and U visas, and

removal defense. Salas Decl. ¶ 7. Many of those clients will need to register because their

application forms do not count as registration forms under the IFR. Salas Decl. ¶¶ 18-19. In

addition, CHIRLA's assistance hotline will be overwhelmed by calls about the IFR, particularly

given how confusing the IFR is about who is required to register and which submitted

applications are sufficient to meet registration obligations. *Id.* ¶¶ 17-18. The dual need to

respond to higher hotline volume about the IFR and the increased legal assistance needs arising

out of it will impact CHIRLA's core legal work and compliance with existing grants and

deliverables and cause staff to divert time to address the impact of the IFR's registration

mandates. *Id.* ¶ 19. This harm to CHIRLA is irreparable. *See Cath. Legal Immigr. Network*, 513

F. Supp. 3d at 176 (finding irreparable harm where immigration court fee rule would cause

"damage to their core missions—providing free or low-cost representation to persons needing counsel in removal proceedings"); *Nw. Immigrant Rts. Project v. U.S.Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 80 (D.D.C. 2020), *appeal dismissed voluntarily*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021) (irreparable harm established by USCIS regulation that would have immediate impact on legal services' organizations' ability to serve their clients if it took effect).

In sum, the IFR will cause irreparable harm to Plaintiffs and their members.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR PLAINTIFFS

Finally, the balance of equities also strongly favors a stay or an injunction. "'Where, as here, 'the Government is the opposing party,' the last two factors 'merge . . . .'" *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009). That makes sense, as the government can have no legitimate interest in unlawful agency action. Thus plaintiffs' "likelihood of success on the merits 'is a strong indicator that a preliminary injunction would serve the public interest' because '[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *Shawnee Tribe*, 984 F.3d at 102 (quoting *League of Women Voters*, 838 F.3d at 12).

That principle fully applies to agency action that either violates notice-and-comment procedures or is arbitrary and capricious—and certainly to action, like the IFR, that violates both APA standards. "[I]t has been well established in this Circuit that '[t]he public interest is served when administrative agencies comply with their obligations under the APA.'" *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 35 (D.D.C. 2021) (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)) (collecting cases); *see, e.g., Ramirez*, 568 F. Supp at 34 (arbitrary and capricious); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (same);

*Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1, 27 (D.D.C. 2022), *vacated as moot,* 2023 WL

5921335 (D.C. Cir. Sept. 7, 2023) (same and collecting cases); *N. Mariana Islands v. United*

*States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative

agencies comply with their obligations under the APA.") (notice and comment); *Patriot, Inc. v.*

*U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("the public interest is best

served by having federal agencies comply with the requirements of federal law, particularly the

notice and comment requirements of the APA . . ."). After all, the APA's requirements of advance

notice and opportunity for public input, and of reasoned decisionmaking, are "generally

presumed to serve the public interest." *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 95 (D.C. Cir.

2012).

      A stay or injunction would particularly serve the public interest here given the

longstanding agency policy disrupted by the agency's abrupt IFR. Plaintiffs here "seek to

preserve the status quo" that has prevailed in this country since the mid-20th century. *Texas*

*Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014). Given that longstanding

status quo, the balance of equities favors "a preliminary injunction that serves only to preserve

the relative positions of the parties until a trial on the merits can be held." *Id.* (internal quotation

marks omitted). By contrast, there is no reason that the government needs to implement this new

system immediately—particularly if it may later be found unlawful and blocked, leaving those

currently subject to the novel and unclear registration system in potential legal limbo or worse.

"That type of on-and-off administration of the immigration laws . . . would engender uncertainty,

confusion, and unfairness for those subject to the Rule." *Nw. Immigrant Rts. Project*, 496 F.

Supp. 3d at 82. The more orderly process is the one required by the APA: advance notice,

opportunity to comment, and reasoned consideration.

#### IV.    NO BOND SHOULD BE REQUIRED UNDER RULE 65

The court should not require a bond under Federal Rule of Civil Procedure 65(c). The "courts in this Circuit have found the Rule vests broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal quotation marks, citation, and alterations omitted). "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), __F. Supp. 3d. __, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)) *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, __F. Supp. 3d. __, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting nominal bond of zero dollars where bound sought would "forestall access to judicial review"). Plaintiffs are nonprofit organizations whose members are predominantly working class immigrants. Requiring them to post a bond would effectively deny Plaintiffs their right to judicial review of the IFR and undermine the public' interest in having these claims heard. Plaintiffs request that the Court exercise its discretion not to require one here.

#### CONCLUSION

Plaintiffs respectfully request that the Court grant a stay under 5 U.S.C. § 705 to postpone the effective date of the IFR until the resolution of this case, or in the alternative, a preliminary injunction under Rule 65.

Dated: March 31, 2025

Respectfully submitted,


Lynn Damiano Pearson*
Cassandra Charles*
Joanna Cuevas Ingram*
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Nicholas Espíritu*
National Immigration Law Center
3450 Wilshire Blvd. No. 108-62
Los Angeles, CA  90010
Tel: (213) 639-3900
Fax: (213) 639-3911
espiritu@nilc.org

Jennifer R. Coberly (DC Bar No. 90031302)*
    (admission pending)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org

Nicholas Katz*
CASA, Inc.
8151 15th Avenue
Hyattsville, MD 20783
Tel: (240) 491-5743
nkatz@wearecasa.org

*Pro hac vice motion forthcoming

/s/ Emma Winger
Emma Winger (DC Bar No. 90010721)
Michelle Lapointe (DC Bar No. 90032063)
    (admission pending)
Leslie K. Dellon (DC Bar No. 250316)
Chris Opila (DC Bar No. 90029724)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

Cody Wofsy (DDC Bar No. CA00103)
Stephen B. Kang (DDC Bar No. CA00090)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org
skang@aclu.org

Anthony Enriquez* (NY Bar No. 5211404)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanights.org