**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, et al.,
                    *Plaintiffs*

                    v.                                          Case No. 1:25-cv-00943

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,
                              *Defendants*.


**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN**
**FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OF EFFECTIVE**
**DATES UNDER 5 U.S.C. §705 OR, IN THE ALTERNATIVE, PRELIMINARY**
**INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I.       PLAINTIFFS HAVE STANDING AND WILL SUFFER IRREPARABLE HARM
FROM THE IFR ............................................................................................................. 2

        A.      Plaintiffs Have Associational Standing Based on Irreparable Injury to Their
Members ..................................................................................................................... 2

        B.      Plaintiff CHIRLA Has Organizational Standing and Will Suffer Irreparable
Harm… ...................................................................................................................... 5

        C.      Plaintiffs Are Within the Zone of Interests of the Relevant Statute ........................ 7

    II.      THE IFR REQUIRED NOTICE AND COMMENT ...................................................... 9

    III.    THE IFR IS ARBITRARY AND CAPRICIOUS ....................................................... 14

    IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR
PLAINTIFFS AND NO BOND SHOULD BE REQUIRED UNDER RULE 65 ................. 18

CONCLUSION ................................................................................................................. 19

## TABLE OF AUTHORITIES

### **Cases**

*AFL-CIO v. NLRB*, 57 F.4th 1023 (D.C. Cir. 2023)..................................................... 15

*AILA v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ........................................................... 4

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987)..................................... 15

*Am. Tunaboat Ass'n v. Ross,* 391 F. Supp. 3d 98 (D.D.C. 2019) ................................ 3

*Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219 (D.C. Cir. 2024)............... 2, 3

*Ariz. All. for Retired Ams. v. Mayers,* 117 F.4th 1165 (9th Cir. 2024) ...................... 6

*Bryan v. United States*, 524 U.S. 184 (1998) ............................................................. 13

*Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020)..................11, 19

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154 (D.D.C. 2021) ......................................................................................................... 8

*Cherokee Nation v. U.S. Dep't of Interior*, 643 F. Supp. 3d 90 (D.D.C. 2022)............ 5

*City of Clarksville v. Fed. Energy Reg. Comm'n,* 888 F.3d 477 (D.C. Cir. 2018)........... 3

*Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388 (1987) ...................................................... 10

*Costa v. Bazron,* 464 F. Supp. 3d 132 (D.D.C. 2020) ................................................. 5

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) ......................... 3

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)...................................................... 13

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)........................ 10

*FDA v. All. for Hippocratic Med.,* 602 U.S. 367 (2024).............................................. 6, 7

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) ............................................... 22

*Grosso v. United States*, 390 U.S. 62 (1968) ............................................................. 18

*Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982) ......................................... 6, 7, 8

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ........................... 2, 3

*INS v. Legalization Assistance Proj. of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301 (1993)...........11

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274 (1986)................................................................................................................. 4

*James V. Hurson Assocs. v. Glickman*, 229 F.3d 277 (D.C. Cir. 2000)........................ 14

*JEM Broad Co., Inc. v. FCC*, 22 F.3d 320 (D.C. Cir. 1994) ....................................... 15

*Kowalski v. Tesmer*, 543 U.S. 125 (2004)................................................................... 4

*La Clinica de la Raza v. Trump*, 706 F. Supp. 3d 903 (N.D. Cal. 2020)...................11

*Lamoille Valley R.R. Co. v. I.C.C.*, 711 F.2d 295 (D.C. Cir. 1983).............................. 16

*Local 777 Dem. Union Org. Comm. v. Nat'l Labor Relations Bd.*, 603 F.2d 862

(D.C. Cir. 1978) ............................................................................................................ 20

*Lone Mountain Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161 (D.C. Cir. 2013) .................... 20

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ..................................................................... 9

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ....... 9

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) .................................................................. 10

*Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. Dist. of Columbia*, 62 F.4th 567 (D.C. Cir. 2023) ....................................................................................................... 4

*Michigan v. E.P.A.*, 576 U.S. 743 (2015) .................................................................................. 22

*Moran Mar. Assocs. v. U.S. Coast Guard*, 526 F. Supp. 335 (D.D.C. 1981) ............................... 21

*Nat'l Sec. Couns. v. CIA*, 931 F. Supp. 2d 77 (D.D.C. 2013) ...................................................... 15

*National Credit Union Administration v. First National Bank & Trust Company.*, 522 U.S. 479 (1998) ...................................................................................................................................... 11

*Neighborhood TV Co. v. FCC*, 742 F.2d 629 (D.C. Cir. 1984) ..................................................... 15

*New Jersey v. U.S. Env't Prot. Agency*, 626 F.2d 1038 (D.C. Cir. 1980) ..................................... 19

*Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31 (D.D.C. 2020) ............................................................................................................................ 7

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) .................................................................. 10

*Pacific Shrimp Co. v. United States*, 375 F. Supp. 1036 (W.D. Wash. 1974) ............................. 21

*Pub. Citizen v. Dep't of State*, 276 F.3d 634 (D.C. Cir. 2002) ...................................................... 15

*Ranger v. FCC*, 294 F.2d 240 (D.C. Cir. 1961 ........................................................................... 16

*Save Jobs USA v. Dep't of Homeland Sec.,* 942 F.3d 504 (D.C. Cir. 2019) .................................. 2

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017) ..................................................................... 4

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ........................................................ 24

*United Food & Com. Workers Union, Loc. No. 227 v. U. S. Dep't of Agric.*, Civil Action No. 20-2045 (TJK), 2021 WL 12312897 (D.D.C. Aug. 20, 2021 ............................................................ 9

*United States v. Bryan*, 339 U.S. 323 (1950) ............................................................................. 14

*United States v. Claudio-Becerra*, No. PO 08-2305, 2008 WL 11451346 (D.N.M. Aug. 28, 2008) ...................................................................................................... 13

*United States v. Mendez-Lopez*, 528 F. Supp. 972 (N.D. Okla. 1981) ........................................ 14

*Warshauer v. Chao*, Civil Action File No. 4:06-CV-0103, 2008 WL 2622799 (N.D. Ga. May 7, 2008) ...................................................................................................................................... 21

*Wash. Tour Guides Ass'n v. Nat'l Park Serv.*, 808 F. Supp. 877 (D.D.C. 1992) .......................... 21

**Statutes**

5 U.S.C. § 553(b)(A) .................................................................................................................. 19

5 U.S.C. § 705 ................................................................................................................ 24

8 U.S.C. § 1301 .............................................................................................................. 20

8 U.S.C. § 1302 .............................................................................................................. 20

8 U.S.C. § 1303 .............................................................................................................. 20

8 U.S.C. § 1304 ........................................................................................................ 12, 20

8 U.S.C. § 1305 .............................................................................................................. 20

8 U.S.C. § 1306 ........................................................................................................ 13, 20

8 U.S.C. § 1325 .............................................................................................................. 17

**Regulations**

17 Fed. Reg. 9989-01 (Nov. 6, 1952) ............................................................................ 17

25 Fed. Reg. 10495 (Nov. 2, 1960) ................................................................................ 16

26 Fed. Reg. 3455 (Apr. 22, 1961) ................................................................................. 16

30 Fed. Reg. 13862 (Nov. 2, 1965) ................................................................................ 16

35 Fed. Reg. 12268 (July 31, 1970) ............................................................................... 16

36 Fed. Reg. 16646 (Aug. 25, 1971) .............................................................................. 16

39 Fed. Reg. 10885 (Mar. 22, 1974) .............................................................................. 16

58 Fed. Reg. 31000 (May 28, 1993) ............................................................................... 17

67 Fed. Reg. 40581-01 (June 13, 2002) ......................................................................... 17

78 Fed. Reg. 18457-01 (Mar. 27, 2013) ........................................................................ 16

81 Fed. Reg. 91646-01 (Dec. 19, 2016) ......................................................................... 17

82 Fed. Reg. 94231-01 (Dec. 23, 2016) ......................................................................... 16

*90 Fed. Reg.11793 (Mar. 12, 2025) ...................................................................... passim

**<u>Treatises</u>**

13A Fed. Prac. & Proc. Juris. § 3531.9.5 (3d ed.) .......................................................... 4

**<u>Other Authorities</u>**

Billal Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek
(Feb. 26, 2025) ........................................................................................................... 12

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025) ......................................... 17

Memorandum from the Attorney General re: General Policy Regarding Charging, Plea
Negotiations, and Sentencing, at 3 (Feb. 5, 2025) .................................................... 12

Off. of Pub. Affs., U.S. Dep't of Just., *U.S. Attorneys for Southwestern Border Districts Charge
More than 960 Illegal Aliens with Immigration-Related Crimes During the Fourth week in
March as part of Operation Take Back America* (Apr. 1, 2025),
https://tinyurl.com/vja5wpmz .................................................................................... 17

Press Release, Dep't of Homeland Sec., *Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally* (Feb. 25, 2025), https://tinyurl.com/mrex6hhy 12

Suzanne Gamboa & Nicole Acevedo, *Trump immigration raids snag U.S. citizens, including Native Americans, raising racial profiling fears*, NBC News (Jan. 28, 2025, 3:26 PM), https://tinyurl.com/2c7zrxhh ................................................................................................ 18

## INTRODUCTION

The central issue in this case is whether Defendants may implement a new scheme that would require *for the first time* millions of noncitizens to register with the government with an entirely new form, submit biometrics, and carry their papers at all times, without complying with the basic procedural requirements of the Administrative Procedure Act ("APA"): notice, consideration of public comments, and reasoned decisionmaking. Defendants urge the Court to relieve them of these essential obligations by misrepresenting the nature and impact of the interim final rule ("IFR") and asking the Court to ignore Defendants' own statements regarding its purpose.

Defendants' response is notable for what they do not dispute. They do not dispute that the plaintiff organizations' members have standing, which is enough to dispose of their threshold arguments. They do not dispute that the federal government has *never* previously implemented a universal noncitizen registration and carry requirement. They do not dispute the federal government's longstanding policy that, outside the exigencies of wartime or an armed attack, any registration requirement is appropriately accomplished through established statutory and regulatory mechanisms for granting immigration status and other immigration benefits.

Because the IFR is a legislative rule issued without notice and comment, because it constitutes arbitrary and capricious rulemaking, and because it will irreparably harm Plaintiffs' members and organizational Plaintiff CHIRLA, the Court should stay the effective date of the IFR or, in the alternative, enter a preliminary injunction.

**ARGUMENT**

## I.    PLAINTIFFS HAVE STANDING AND WILL SUFFER IRREPARABLE HARM FROM THE IFR

Defendants spill a great deal of ink attacking organizational standing, but only one of the organizations in this case, Coalition for Humane Immigrant Rights ("CHIRLA"), even asserts such standing. Plaintiffs' primary basis for standing is associational standing. And on that issue, Defendants have remarkably little to say. Their effort to change the subject makes sense, as Plaintiffs' members obviously have standing, and there is no barrier to associational standing here.

### A.    Plaintiffs Have Associational Standing Based on Irreparable Injury to Their Members

CHIRLA, United Farm Workers of America ("UFW"), CASA, and Make the Road New York ("MRNY") ("Plaintiffs") have each shown that their "(a)members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024) (same). While Defendants initially lay out this standard, they fail to apply it. Indeed, Defendants do not contest any of the three prongs of that analysis.

First, Plaintiffs are membership-based organizations that have each shown that at least one identified member has standing in their own right. *Save Jobs USA v. Dep't of Homeland Sec.*, 942 F.3d 504, 508 (D.C. Cir. 2019). The IFR compels each of the members identified with particularity in Plaintiffs' declarations to submit Form G-325R, provide biometrics, and carry proof of this registration as proscribed by the IFR at all times or face arrest and federal prosecution. *See* Fontaine Decl., ¶¶ 23-28; Salas Decl., ¶¶ 23-27; Strater Decl., ¶¶ 18-22; Escobar Decl., ¶¶ 12-19. As directly regulated parties, these members have clear standing. *See*

2

*Am. Tunaboat Ass'n v. Ross,* 391 F. Supp. 3d 98, 108 (D.D.C. 2019) (citing *City of Clarksville v. Fed. Energy Reg. Comm'n,* 888 F.3d 477, 482 (D.C. Cir. 2018)) ("This imposition of new regulatory obligations, in and of itself, is sufficient to establish standing.").

Second, the rights and interests CHIRLA, UFW, MRNY and CASA seek to protect in bringing the litigation on behalf of their membership are germane to their organizational interests. *Hunt,* 432 U.S. at 343; *Vilsack*, 111 F.4th at 1225. Enjoining the IFR and protecting noncitizens from the harms that arise from Defendants' new universal noncitizen registration scheme is connected to CHIRLA, UFW, MRNY and CASA's missions to build the power of working-class immigrant communities to improve their lives, achieve dignity and justice, and protect the rights of their members, including through the provision of community education, civic engagement, social and legal services. Salas Decl. ¶¶ 2-4; Strater Decl. ¶¶ 5-6; Fontaine Decl. ¶¶ 3-4; Escobar Decl. ¶¶ 8-9.

Finally, the claims asserted in this case under the APA raise pure questions of law and the relief Plaintiffs seek is invalidation of agency action; neither require the individual participation of Plaintiffs' members. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) ("Member participation is not required where a 'suit raises a pure question of law'") (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274, 287–88 (1986)).

Rather than engage with Plaintiffs' clear associational standing, Defendants change the subject by addressing third-party standing. But that is a separate doctrine inapplicable to membership standing. Defendants' statement that Plaintiffs have not identified individuals "who

cannot protect their own interest" is therefore beside the point. Defs.' Opp. at 11.[1] *Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. Dist. of Columbia*, 62 F.4th 567, 572-73 (D.C. Cir. 2023) (finding associational standing but reaching third party standing because none of the members had standing to raise certain claims), *see* 13A Fed. Prac. & Proc. Juris. § 3531.9.5 (3d ed.) ("Organizations often are allowed to borrow freely the standing that could be established by individual members, without satisfying the elaborate calculus frequently required to justify third-party standing in other areas.").

Defendants suggest that the injuries to UFW's members who cannot use the IFR's online only, English language registration process are not traceable to the IFR because UFW's members' technological challenges and spoken language pre-date the IFR. Defs.' Opp. at 13-15. Even if that were true, it would not defeat standing, because it addresses only a subset of injuries of Plaintiffs' members, and does nothing to negate the fact that were it not for the promulgation of the IFR and G-325R, Plaintiffs' members would not suffer the particular, concrete harms of being forced to complete the G-325R, submit biometrics, and carry "registration" papers proscribed by the IFR in the first instance. In any event, the IFR is what implements a new registration system that is inaccessible to people who do not have easy access to the Internet or computers and to people not fluent in English, not the statute. "But for" the IFR, these members would not be required to register through a system they cannot access. *See Cherokee Nation v. U.S. Dep't of Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022). Defendants suggest to the contrary

---

[1] Defendants' citations (at 11) to *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017), *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) and *AILA v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000), are inapposite. *Morales-Santana* addressed individual third party standing of a father on behalf of his son, not membership-based or associational standing; *Kowalski* and *AILA* addressed the rights of attorneys to represent the third-party interests of their clients. Although Plaintiff associations may provide some legal services, Plaintiffs do not seek to assert third-party standing on behalf of any clients.

4

that these injuries "flow . . . from the statute," but that just assumes their version of the *merits* of

what the regulation does. For standing purposes, the Court must assume that Plaintiffs will

prevail on the merits. *Costa v. Bazron,* 464 F. Supp. 3d 132, 152 (D.D.C. 2020) (courts must

assume the merits of plaintiff's claim in assessing standing).

      Finally, the injuries that Plaintiffs' members will suffer are plainly irreparable. *See* Pls.'

Mem. at 29-33. Defendants do not argue otherwise.

    B. <u>Plaintiff CHIRLA Has Organizational Standing and Will Suffer Irreparable Harm</u>

      Because all the organizations have clear associational standing, the Court need go no

further to reach the merits. The Court may also ignore most of Defendants' organizational

standing arguments, as they are largely aimed at Plaintiffs—CASA, MRNY, and UFW—who

assert no such standing in this case. In any event, the one plaintiff who asserts organizational

standing—CHIRLA—has shown that the organization itself has suffered concrete injury caused

by the IFR.

      Defendants mischaracterize the facts of Plaintiff CHIRLA's organizational standing claim

and misapply them to the Supreme Court's recent holding in *FDA v. All. for Hippocratic Med.,*

602 U.S. 367 (2024).[2] There, the plaintiff was an advocacy organization that claimed it was

forced to divert resources to oppose the FDA's approval of an abortion-inducing medication,

mifepristone. The Court held that organizations "cannot manufacture" standing "simply by

expending money to gather information and advocate against the defendant's action." *Id.* at

394.  However, the Court carefully distinguished between expenditures on advocacy and those

on direct services programs like in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 368 (1982),

---

[2] Defendants also wrongly rely on a Ninth Circuit case that was recently vacated for review *en banc*. *See Ariz. All. for Retired Ams. v. Mayers,* 117 F.4th 1165 (9th Cir. 2024), *vacated*, --- F.4th --- , No. 22-16490, 2025 WL 843314 (Mar. 18, 2025) (Mem.).

where "[c]ritically," the plaintiff "not only was an issue-advocacy organization, but also operated a housing counseling service." *All. for Hippocratic Med.,* 602 U.S. at 395. *Alliance* thus reaffirmed *Havens'* holding that plaintiffs have standing if they can show that defendants' actions interfered with their "core business activities." *Id.* (citing *Havens*, 455 U.S. at 379).

That is precisely what CHIRLA has shown. CHIRLA's Legal Programs are part of its "core business activities" for which it receives grant funding to pay its staff and other expenses associated with the provision of legal services, which include affirmative immigration benefits and representation in removal proceedings. Salas Decl. ¶¶ 7, 11, 19. These grants require compliance with certain requirements and metrics in order to receive payments. *Id.* ¶ 19. Some of the grants are paid on a "per case" basis; none specifically cover legal assistance with registration. *Id*. Because of its ethical duties, CHIRLA will have to focus staff resources on reviewing current client cases and assisting them in complying with the IFR, all within the existing structure of per case funding. For example, CHIRLA has already identified over a hundred clients, including around 60 U visa cases, who will not be considered registered under the IFR. *Id.* ¶ 18. Due to the complexity of determining whether a client is registered, particularly with respect to the manner of entry at the border, staff may be required to submit Freedom of Information Act "FOIA" requests for other clients, another substantial drain on resources. *Id.* And using those resources on existing cases will prevent CHIRLA from undertaking the number of new cases it otherwise would have pursuant to its grant requirements. *Id.* ¶¶ 17-19. Thus, the IFR squarely impacts CHIRLA's core business objectives.[3]

---

[3] This showing aligns with what courts found sufficient to confer standing in *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 48 (D.D.C. 2020), ("*NWIRP*") and *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 170-71 (D.D.C. 2021) ("*CLINIC*"). Defendants' attempt to distinguish these cases (Defs'

However, Defendants are wrong to assert that CHIRLA has only alleged harm from the IFR related to its representation of existing legal clients. CHIRLA explains that it will also need to divert resources to address a spike in hotline calls and new student inquiries.  Salas Decl. ¶¶ 17, 20. Moreover, CHIRLA's legal services grants *require* it to take on new cases and the IFR will harm them by preventing them from doing so. Salas Decl. ¶ 19. Plaintiff CHIRLA will be harmed because the reduction in new cases threatens noncompliance with its grant obligations, resulting in non-payment of disbursements, ineligibility for future grants, or both. *Id.* ¶¶ 11, 19. The IFR's interference with Plaintiff CHIRLA's core business activities, including its provision of immigration legal services, and the concomitant economic harm from diverting grant funding from them, squarely places its standing claim within *Havens* and its progeny. These harms are irreparable. *See* Pls.' Mem. at 33.

C.  <u>Plaintiffs Are Within the Zone of Interests of the Relevant Statute</u>

Defendants relatedly claim that the plaintiffs fall outside the statute's zone of interests. But, again, their arguments appear to be focused entirely on *organizational* standing. Defs.' Opp. 11 (addressing "the alleged effect of the IFR on their expenditures and legal practices"). Defendants do not argue that Plaintiffs' members fall outside the zone of interests of the statute; nor could they—those individuals are plainly and directly regulated by the Immigration and Nationality Act ("INA"). Nor do they suggest that where an organization satisfies membership standing, and its members are within the zone of interests, the organization must *also* be within

---

Opp. at 9 n.2) is flawed. On *CLINIC*, Defendants conflate that case's discussion of the zone of interests (addressed below) with Article III standing. The Court found standing due to, *inter alia*, the nonprofit legal service organization plaintiff's diversion of resources to assist clients with work arising out of the new immigration court fees. As to *NWIRP*, Defendants' attempt to distinguish again assumes the merits and vaguely suggests Plaintiffs' factual showing here is speculation—which for the reasons explained here and in Plaintiffs' memorandum in support of its motion, it is not.

the zone of interests. *Cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (looking to members' interests when analyzing the zone of interests); *United Food & Com. Workers Union, Loc. No. 227 v. U. S. Dep't of Agric.*, Civil Action No. 20-2045 (TJK), 2021 WL 12312897, at *5 (D.D.C. Aug. 20, 2021) (same). Thus, the Court may likewise bypass this entire issue because associational standing is clear here.

Even as to CHIRLA—the only organization asserting harm to its organizational interest—the zone-of-interests argument falls flat. The zone-of-interests test "is not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). A plaintiff passes the test if it "arguably" falls within the interests protected by the underlying statute, and "the benefit of any doubt goes to the plaintiff." *Id.* As such, "a plaintiff falls outside the group to whom Congress granted a cause of action only when its interests 'are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014) (quoting *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399 (1987)).

CHIRLA easily satisfies this low bar. It provides legal services to noncitizens as part of its organizational mandate, including assistance with asylum, "U" visas, and protections under Special Immigrant Juvenile Status ("SIJS") and the Violence Against Women Act ("VAWA"). Salas Decl. ¶ 7. CHIRLA has submitted evidence that the IFR will cause a significant and immediate drain on organizational resources. *See id.* ¶¶ 15-21. Courts have found similar injuries sufficient to surpass the zone-of-interests test. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019) (organizations providing assistance to asylum seekers came within the zone of interests of the INA); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018)

(same). That makes sense, as the INA explicitly contemplates referral to nongovernmental groups like CHIRLA for legal advice on *inter alia*, the asylum process, removal proceedings, and U visas. *See O.A.*, 404 F. Supp. 3d at 144-45 (recounting requirements in 8 U.S.C. §§ 1158(d)(4), 1184(p)(3)(A), 1228(b)(4)(B), 1362, to ensure noncitizens' access to counsel in these processes. But even without this explicit statutory connection to CHIRLA's work, CHIRLA easily meets the low bar to show it is within the zone of interests of the INA.

Defendants' cases are inapposite. In particular, Defendants point to *INS v. Legalization Assistance Proj. of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers) ("*LAP*"), a non-precedential case that reflects the views of a single Justice on an application for interim relief on a different statute and conflicts with later Supreme Court decisions. *See Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 43-44 (D.D.C. 2020) (noting inconsistency with *National Credit Union Administration v. First National Bank & Trust Company.*, 522 U.S. 479, 492 (1998)). Notably, this Court and other district courts have consistently rejected the very arguments Defendants advance here—distinguishing *LAP*. *See, e.g., id.* at 43 (rejecting same arguments based on *LAP*); *La Clinica de la Raza v. Trump*, 706 F. Supp. 3d 903, 923 (N.D. Cal. 2020) (rejecting government's reliance on *LAP*).

## II.    THE IFR REQUIRED NOTICE AND COMMENT

Defendants defend their decision to forego notice and comment by retreating to the cursory justification provided in the IFR itself—that the rule merely "add[s] another method" for registration. Defs.' Opp. at 16 (citing 90 Fed. Reg. at 11796). In so arguing they discount that by creating a new universal registration form separate from the immigration process they are enacting a new registration policy to further a new goal—widespread immigration enforcement and the imposition of criminal penalties on millions of undocumented people. These "alleged policies" are not beyond the scope of the IFR, *id.* at 18—they are Defendants' own proffered

justification for the rule. *See* Press Release, Dep't of Homeland Sec., Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy (announcing DHS's intent to "track" noncitizens and "compel[] mass self-deportation" ); Billal Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek (Feb. 26, 2025), https://tinyurl.com/bdz9prye (quoting Secretary Noem explaining that noncitizens can register to "avoid criminal charges and fines" and DHS "will help them relocate right back to their home country"); *see also* Memorandum from the Attorney General re: General Policy Regarding Charging, Plea Negotiations, and Sentencing, at 3 (Feb. 5, 2025), https://tinyurl.com/25wr8sd5 (prioritizing the prosecution of 8 U.S.C. §§ 1304, 1306 and other criminal immigration statutes). It is not appropriate to "ignore . . . the explanation [Defendants have] given." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). This change in policy reflects a substantive value judgment that renders the IFR legislative.[4]

Defendants maintain that the new universal registration form does not expose noncitizens to new criminal liabilities because Defendants could "still choose to prosecute" them for failing to register even absent a mechanism to do so. Defs.' Opp. at 19. The notion that this new registration scheme does not as a practical matter expose millions of people to criminal liability blinkers reality. A conviction under 8 U.S.C. § 1306(a) requires a "willful" failure. In other words, the "[d]efendant must have knowledge of his duty to apply for registration and be fingerprinted . . . and must have deliberately failed or refused to apply for registration and be fingerprinted before he can be convicted of this crime." *United States v. Claudio-Becerra*, No. PO 08-2305, 2008 WL 11451346, at *3 (D.N.M. Aug. 28, 2008) (dismissing complaint under §

---

[4] Moreover, Defendants ignore the fact that Form G-325R collects a wide variety of information beyond what is specifically enumerated in the statute, including uncharged criminal conduct— which itself is a substantive value judgment. *See* Pls.' Mem. at 13.

1306(a) for failure to allege willfulness); *see Bryan v. United States*, 524 U.S. 184, 191–92 (1998) ("As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.") (cleaned up)). It is hard to see how the government could establish even a prima facie case of a willful failure to register when registration is impossible. But even if the government could survive a motion to dismiss or for directed verdict, impossibility is a "complete defense." *United States v. Bryan*, 339 U.S. 323, 330 (1950). Regardless, Defendants do not dispute that the universal registration requirement exposes noncitizens to a new obligation to carry proof of registration at all times, 90 Fed. Reg. at 11796 & n.7, with a new criminal consequence for failure to do so. *See United States v. Mendez-Lopez*, 528 F. Supp. 972, 973 (N.D. Okla. 1981) (dismissing criminal failure to carry proof of registration card for noncitizen not able to register).

By establishing a universal method for registration where none existed previously, the IFR significantly expands the number of noncitizens who must register and carry proof of registration or face criminal liability to millions of individuals and establishes what information noncitizens must provide to register. On this ground alone Defendants' cases are inapposite. None of the procedural rules in cases cited by Defendants altered who was subject to agency regulation and liability. Instead, each rule impacted: (a) the means for already-regulated parties to voluntarily approach the agency seeking a benefit, *see James V. Hurson Assocs. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000) (eliminating face-to-face appointments as a way to obtain agency rulings on food label applications); *JEM Broad Co., Inc. v. FCC*, 22 F.3d 320, 327 (D.C. Cir. 1994) (barring amendment of deficient radio license applications after a 30-day window);

*Neighborhood TV Co. v. FCC*, 742 F.2d 629, 637-38 (D.C. Cir. 1984) (pausing opposed

television channel license applications during rulemaking); *Nat'l Sec. Couns. v. CIA*, 931 F.

Supp. 2d 77, 107 (D.D.C. 2013) (imposing processing fees for seeking declassification of

records); (b) internal agency processes, *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 641 (D.C.

Cir. 2002) (determining the cutoff date for purposes of agency search for records under FOIA);

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1050-51 (D.C. Cir. 1987) (setting the frequency and

focus of internal review process); *Neighborhood TV Co.*, 742 F.2d at 637-38 (processing

television channel applications in tiers rather than first-in, first out); and (c) agency deadlines and

timelines, *see AFL-CIO v. NLRB*, 57 F.4th 1023,  1043-44 (D.C. Cir. 2023) (changing timing for

resolving disputes before the agency in the union election process); *id.* at 1045-46 (creating a 20-

day presumptive waiting period before an election is held after the agency orders it ); *Lamoille

Valley R.R. Co. v. I.C.C.*, 711 F.2d 295, 327-28 (D.C. Cir. 1983) (setting a filing deadline for

participation in agency proceedings); *Ranger v. FCC*, 294 F.2d 240, 244 (D.C. Cir. 1961)

(same).[5]

---

[5] The nine exceptions to notice-and-comment rulemaking under the Alien Registration Act cited
by the government are not "similar" to the IFR here. Defs.' Opp. at 17 n.3. In each, the
government removed burdens on regulated parties instead of adding them as the IFR does. One
eliminated a registration program. *See* 82 Fed. Reg. 94231-01, 94233 (Dec. 23, 2016) (removing
obligation to register under NSEERS program). Another dropped a registration requirement. *See*
26 Fed. Reg. 3455 (Apr. 22, 1961) (waiving fingerprints). Four required the government to
recognize a form it had already issued to a non-citizen as "registration," alleviating a burden to
independently register. *See* 39 Fed. Reg. 10885 (Mar. 22, 1974) (I-221S); 35 Fed. Reg. 12268
(July 31, 1970) (I-485A); 30 Fed. Reg. 13862 (Nov. 2, 1965) (I-90 and I-102); 25 Fed. Reg.
10495 (Nov. 2, 1960) (I-590). And three dealt with copying an existing registration document,
digitizing it, and automating its issuance. *See* 36 Fed. Reg. 16646 (Aug. 25, 1971) (permitting a
non-citizen's attorney to keep a copy of a client's I-94 form for information purposes, obviating
the need for official records requests); 78 Fed. Reg. 18457-01 (Mar. 27, 2013) (changing the
government's process for issuing the pre-existing I-94 form from paper to electronic); 81 Fed.
Reg. 91646-01 (Dec. 19, 2016) (automating the issuance of the I-94 form). But the government
has consistently used notice-and-comment rulemaking when it imposes a new burden on

Defendants' only response to the reality that the IFR interferes with the Fifth Amendment privilege against self-incrimination is to disavow any responsibility for the "contents of the G-325R" and to suggest that the IFR does not "require any alien to complete the G-325R if they do not wish to." Defs.' Opp. at 19. This strains credulity. While the IFR may not "dictate" the contents of the form, it is the IFR that makes the G-325R a *registration* document. And by making the G-325R a registration document, it is the IFR that attaches the criminal penalties for failure to submit it. To suggest that, under the IFR, noncitizens are simply free not to register belies Defendants' promises, repeated in their opposition, to "ensure that failure to comply with the legal obligations of [the registration statutes] is treated as a civil and criminal enforcement priority." *Id.* at 2 (quoting Exec. Order No. 14159, 90 Fed. Reg. 8443, 8444 (Jan. 29, 2025)). It is remarkable that Defendants would characterize Plaintiffs' fears of criminal enforcement—including the enforcement of 8 U.S.C. § 1325—as "largely speculative," *id.* at 20, while simultaneously broadcasting proof that those fears are well-founded. *See* Off. of Pub. Affs., U.S. Dep't of Just., *U.S. Attorneys for Southwestern Border Districts Charge More than 960 Illegal Aliens with Immigration-Related Crimes During the Fourth week in March as part of Operation Take Back America* (Apr. 1, 2025), https://tinyurl.com/vja5wpmz. Defendants cannot use the threat of criminal prosecution for failure to register to compel noncitizens to implicate themselves in a different crime. *See Grosso v. United States*, 390 U.S. 62, 68 (1968) (dismissing

---

noncitizens. Examples include requiring new in-person registration and monitoring procedures under the NSEERS program, *see* 67 Fed. Reg. 40581-01, 40583-84 (June 13, 2002); requiring lawful permanent residents to obtain the new Form I-551 green card as their exclusive registration document, *see* 58 Fed. Reg. 31000, 31000 (May 28, 1993) ("The proposed rule would . . . reduce the confusing array of card types  . . . [and] would provide all lawful permanent resident aliens with one document"); and requiring noncitizens to report to a government office to obtain a registration document under the newly enacted INA, *see* 17 Fed. Reg. 9989-01, 10051-52 (Nov. 6, 1952) (listing how and where noncitizens could register and what documents constituted evidence of registration under "substantive" provisions of the proposed rule).

willful failure to pay excise tax where compliance would implicate defendant in illegal gambling).

Finally, Defendants dismiss the far-reaching consequences of a universal carry requirement by asserting that they come solely from the registration statute and not the rule. Defs.' Opp. at 20. But the IFR itself acknowledges that expanding "registration obligations would also result in more aliens needing to maintain evidence of registration in the mode prescribed by DHS." 90 Fed. Reg at 11797. It is, at best, naïve of Defendants to suggest that such an expansion will not impact U.S. citizens or that a rise in racial profiling is speculative. *See* Defs.' Opp. at 20. Experience shows otherwise. *See* Suzanne Gamboa & Nicole Acevedo, *Trump immigration raids snag U.S. citizens, including Native Americans, raising racial profiling fears*, NBC News (Jan. 28, 2025, 3:26 PM), https://tinyurl.com/2c7zrxhh.

It is of little help that the IFR permits comments, *see* Defs.' Opp. at 20, because the rule will go into effect on April 11 without any consideration of those comments. 90 Fed. Reg. at 11793. If permitted to proceed under the exception at 5 U.S.C. § 553(b)(A), Defendants would be free to entirely ignore those comments. As a result, many interested parties, include CASA and UFW, have not submitted comments in the short 30-day window. Strater Decl. ¶ 17; Escobar Decl. ¶ 23. "Moreover, offering the public the opportunity to comment after the fact is not a substitute" to pre-enforcement notice-and-comment. *Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 58 (citing *New Jersey v. U.S. Env't Prot. Agency*, 626 F.2d 1038, 1049–50 (D.C. Cir. 1980)).

## III.    THE IFR IS ARBITRARY AND CAPRICIOUS

In their attempt to claim that the IFR is not a departure from prior practice, Defendants continue to suggest it involves nothing more than a benign introduction of a new registration form. Defs.' Opp. at 21-22. For the reasons outlined above, this characterization ignores the

14

IFR's broad scope and impact on millions of people newly required to register. And it obscures the IFR's "Basis and Purpose" apparent from the face of the regulation—to implement an executive order's mandate to prioritize criminal and civil enforcement for failure to comply with registration requirements. *See* 90 Fed. Reg at 11795. Accordingly, far from being "outside the scope of the IFR," *see* Defs.' Opp. at 23, the issue of "how DHS uses registration information" is directly relevant to whether the IFR is a departure from previous practice. Understood within the history, development, and prior use of registration requirements—which never sought to impose universal registration to prioritize mass removal and criminalization—the IFR is plainly a departure the APA requires the Defendants to acknowledge and explain. *See* Pls.' Mem. at 1-9 (describing history of registration statute and regulations); *Lone Mountain Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("As we have long held, an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored . . . Failing to supply such analysis renders the agency's action arbitrary and capricious.") (quotation omitted).

Defendants' insistence that "DHS cannot be estopped from fulfilling its duty to enforce the law" is a red herring. Defs.' Opp. at 24. Defendants' failure to promulgate a universal mechanism for noncitizens to register and comply with 8 U.S.C. §§ 1301-1306 since the mid-20th century may not bar them from doing so. But it does obligate them to "at minimum acknowledge the change [in the IFR] and offered a reasoned explanation" for it. Pls.' Mem. 20; *see also Local 777 Dem. Union Org. Comm. v. Nat'l Labor Relations Bd.*, 603 F.2d 862, 882 (D.C. Cir. 1978) (vacating agency action as arbitrary and capricious for "announc[ing] no principled reason" for reversing a longstanding policy that no employer-employee relationship exists between a cab

lessor and cab lessee regardless of "whether or not it would be proper actually to work estoppel against the government).[6]

Defendants' additional arguments in defense of the reasonableness of the IFR are unavailing. They assert that the IFR sufficiently considered the impact on noncitizens because it noted "the time [for noncitizens] to become familiar with the steps and process to become compliant with the registration requirement, register, and maintain evidence of registration." Defs.' Opp. at 24 (citing 90 Fed. Reg. at 11797, which in turn describes the burden as "some marginal amount of time"). But this statement in the IFR, along with a vague reference to varying travel times to a USCIS office, a possible future imposition of a biometrics fee on the noncitizens themselves, and an estimate of $118 million in lost wages annually for individuals subject to the registration requirement, 90 Fed. Reg. at 11799, represent the entirety of the consideration of impact on noncitizens. Indeed, Defendants do not dispute that the IFR fails to consider the specific impact on vulnerable groups such as teenagers, those with limited English proficiency, the elderly, and those without access to the Internet. Nor do Defendants deny that the IFR did not consider the Fifth Amendment self-incrimination issues the IFR creates. They merely assert again that how DHS uses registration information is "outside the scope of the IFR," while

---

[6] Moreover, Defendants cited caselaw about estoppel is inapposite: it addresses non-enforcement of existing law and regulations, not failure to offer a reasoned explanation for promulgating a new rule needed to enforce a law after not doing so for over eighty years. *See Warshauer v. Chao*, Civil Action File No. 4:06-CV-0103, 2008 WL 2622799, at *31 (N.D. Ga. May 7, 2008) (statute and implementing regulations requiring employers who made payments or loans to unions or union officials to file reports with the agency despite not engaging in persuader activity); *Wash. Tour Guides Ass'n v. Nat'l Park Serv.*, 808 F. Supp. 877, 881-882 (D.D.C. 1992) (regulations prohibiting vending and solicitation of sightseeing business in national parks without a permit); *Moran Mar. Assocs. v. U.S. Coast Guard*, 526 F. Supp. 335, 341-42 (D.D.C. 1981) (statute and implementing regulations prohibiting the operation of certain vessels without a pilot); *Pacific Shrimp Co. v. United States*, 375 F. Supp. 1036, 1041-42 (W.D. Wash. 1974) (statute subjecting vessels to inspection).

at the same time noting that the IFR "expressly takes into consideration law enforcement use" of information obtained through the registration process. Defs.' Opp. at 25. These are important factors that the agency was required to weigh as part of reasoned decisionmaking. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) (arbitrary and capricious not to consider "serious consequences" of policy).

Defendants similarly claim that the IFR considers costs to the government, but the only reference to those costs is the statement in the IFR that "DHS will incur additional costs due to the added activities from the collection of biometrics given the impacted population of aliens do not pay fees for registration or biometrics." 90 Fed. Reg. at 11797. The actual costs to DHS of implementing the IFR—approximately $72 million annually—are buried in the Office of Management and Budget ("OMB") "Supporting Statement" relating to the G-325R but mentioned nowhere in the IFR itself and certainly not given reasoned consideration. *See* Supporting Statement for Biographic Information (Registration), OMB Control No.: 1615-NEW, https://tinyurl.com/2cs24kmp (click on Statement A, G-325R-001_NEW_EMGCY_SPTSTMT.v2.docx). Most importantly, Defendants do not weigh those considerable costs as required under the APA, including the impact on other critical USCIS services. *See Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.") (emphasis in original).[7]

Defendants' further defenses of the IFR are unavailing. They do not consider why individuals who have already submitted applications for relief such as T visas, U visas, SIJS,

---

[7] Defendants also do not dispute that the IFR fails to consider other costs, including lost tourism revenue from deterrence of Canadian visitors now required to register as a result of the IFR.

protection under the Violence Against Women Act, DACA, or TPS should be required to go through the G-325R registration process—a form that, unlike those used to apply for protection and relief, has no conceivable ameliorative benefit. *See* Defs.' Opp at 25-26 (repeating IFR's statement that the registration provides a new form for those individuals to be considered registered but failing to provide a reasoned explanation for why those forms could not simply be added to the existing list of registration documents). Nor do Defendants attempt to resolve the additional flaws with the rule that render it arbitrary and capricious, such as the limbo experienced by people who have completed forms considered evidence of registration but who have not been fingerprinted. Instead, Defendants misapprehend Plaintiffs' argument, ignoring the specific examples Plaintiffs provided (such as those who have received notices to appear but were not fingerprinted, leaving their registration status uncertain, *see* Pls. Mem. at 24-25), and suggesting that the issue is resolved for people who *are* exempted from fingerprinting, such as Canadians and minors under 14. *See* Defs.' Opp. at 26.

Finally, Defendants do not attempt to square the IFR's contradictory instructions for teenagers who already registered but now purportedly must register again once they turn fourteen with the statement in the IFR that those who have previously registered or have evidence of registration "need not register again." 90 Fed. Reg. at 11796. Nor do Defendants seek to clarify the IFR's confusion about when the obligation to register attaches, given that they have launched the G-325R but the effective date of the rule is not until April 11. *See* Pls.' Mem. at 25.

This is not reasoned decisionmaking, and the IFR is arbitrary and capricious.

## IV.     THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS AND NO BOND SHOULD BE REQUIRED UNDER RULE 65

For the reasons detailed above and in Plaintiffs' memorandum in support of its motion for a stay or preliminary injunction, the IFR violates the APA's notice and comment requirements

and is arbitrary and capricious. Plaintiffs' likelihood of success on these claims underscores that

a stay or preliminary injunction would serve the public interest. *See Shawnee Tribe v. Mnuchin*,

984 F.3d 94, 102-103 (D.C. Cir. 2021). This is particularly so where delaying implementation of

the rule would preserve the status quo that has existed since shortly after World War II.

Finally, the Court should exercise its discretion not to require posting of bond (or impose

nominal bond of $1). The out-of-circuit cases Defendants cite in support of their request for bond

are damages cases that have no relevance to this APA case where no party is requesting money

damages. And a stay or injunction means the government will not incur the costs of rolling out a

new system that is likely unlawful.

## CONCLUSION

For the foregoing reasons, and as set forth in Plaintiffs' opening brief, this Court should

grant Plaintiffs' motion for a stay of effective dates under 5 U.S.C. § 705 of the APA or, in the

alternative, a preliminary injunction.


Dated: April 7, 2025                              Respectfully submitted,

                                                  */s/ Michelle Lapointe*

Lynn Damiano Pearson*                             Michelle Lapointe (DC Bar No. 90032063)*
Cassandra Charles**                                   (admission pending)
Joanna Cuevas Ingram*                             Emma Winger (DC Bar No. 90010721)
National Immigration Law Center                   Leslie K. Dellon (DC Bar No. 250316)
P.O. Box 34573                                    Chris Opila (DC Bar No. 90029724)
Washington, D.C.  20043                           American Immigration Council
Tel: (213) 639-3900                               PMB2026
Fax: (213) 639-3911                               2001 L Street, NW, Suite 500
damianopearson@nilc.org                           Washington, DC 20036
charles@nilc.org                                  Tel: (202) 507-7645
cuevasingram@nilc.org                             ewinger@immcouncil.org
                                                  mlapointe@immcouncil.org
                                                  ldellon@immcouncil.org
                                                  copila@immcouncil.org

19

Nicholas Espiritu**
National Immigration Law Center
3450 Wilshire Blvd. No. 108-62
Los Angeles, CA  90010
Tel: (213) 639-3900
Fax: (213) 639-3911
espiritu@nilc.org

Jennifer R. Coberly (DC Bar No. 90031302)*
   (admission pending)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org

Nicholas Katz**
CASA, Inc.
8151 15th Avenue
Hyattsville, MD 20783
Tel: (240) 491-5743
nkatz@wearecasa.org

Cody Wofsy (DDC Bar No. CA00103)
Stephen B. Kang (DDC Bar No. CA00090)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org
skang@aclu.org

Anthony Enriquez* (NY Bar No. 5211404)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanights.org

*Admitted pro hac vice*

**Pro hac vice motion forthcoming*