UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * * * *     )
COALITION FOR HUMANE IMMIGRANT      )     Civil Action
RIGHTS, et al.,                     )     No. 25-00943
                                    )
            Plaintiffs,             )
                                    )
   vs.                              )
                                    )
U.S. DEPARTMENT OF HOMELAND         )     Washington, D.C.
SECURITY, et al.,                   )     April 8, 2025
                                    )     10:03 a.m.
            Defendants.             )
                                    )
* * * * * * * * * * * * * * * *     )


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE TREVOR N. McFADDEN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:     EMMA C. WINGER, ESQ.
                        LESLIE K. DELLON, ESQ.
                        MICHELLE LAPOINTE, ESQ.
                        AMERICAN IMMIGRATION COUNCIL
                        2001 L Street, Northwest
                        Suite 500
                        Washington, D.C. 20036

                        CODY WOFSY, ESQ.
                        AMERICAN CIVIL LIBERTIES UNION
                        425 California Street
                        Seventh Floor
                        San Francisco, California 94104

                        JENNIFER COBERLY, ESQ.
                        AMERICAN IMMIGRATION LAWYERS
                          ASSOCIATION
                        1331 G Street
                        Suite 300
                        Washington, D.C. 20005

APPEARANCES, CONT'D:

FOR THE PLAINTIFFS:     ANTHONY ENRIQUEZ, ESQ.
                        ROBERT F. KENNEDY HUMAN RIGHTS
                        88 Pine Street
                        Suite 801
                        New York, New York 10005


FOR THE DEFENDANTS:     KARTIK N. VENGUSWAMY, ESQ.
                        U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
                        601 D Street, Northwest
                        Washington, D.C. 20579


REPORTED BY:            LISA EDWARDS, RDR, CRR
                        Official Court Reporter
                        United States District Court for the
                          District of Columbia
                        333 Constitution Avenue, Northwest
                        Room 6706
                        Washington, D.C. 20001
                        (202) 354-3269

THE COURTROOM DEPUTY:  This is Civil Action 25-943, Coalition for Humane Immigrant Rights, et al., versus U.S. Department of Homeland Security, et al.

Counsel, please come forward to identify yourselves for the record, starting with the Plaintiff.

MS. WINGER:  Good morning, your Honor.  Emma Winger on behalf of the Plaintiff.

THE COURT:  Good morning, Ms. Winger.

MR. VENGUSWAMY:  Good morning, your Honor.  Karlik Venguswamy from the U.S. Attorney's Office on behalf of the Defendants.

THE COURT:  Good morning, Mr. Venguswamy.

All right.  We're here for a motion hearing on the Plaintiffs' motion for preliminary injunction.

Ms. Winger, I'll hear from you.

MS. WINGER:  Good morning, your Honor.  Emma Winger on behalf of the Plaintiffs.

This case is about what process Defendants must follow and what decision-making they must engage in before they radically alter how non-citizen registration operates in this country.

The Defendants do not dispute that the federal government has never operated a universal registration and carry requirement.  Across 14 different presidential administrations, the government has adopted a tailored

approach to registration.  Except in the context of war or armed invasion, armed assault, registration has operated through existing immigration processes.

Defendants attempt to categorize the IFR as a benign measure that merely adds one other method of registration.

But frankly, that's just not true.  It ignores the fact expressly recognized in the IFR and consistent with longstanding policy that millions of people previously had no mechanism to register and therefore no enforceable obligation to register or carry proof of registration at all times.

Defendants' effort to expand registration in this way is clearly not an internal housekeeping measure that justifies avoiding notice and comment, and it has likewise been done in a manner that is arbitrary and capricious.  For those reasons, Plaintiffs are likely to succeed on the merits.

If I may, I'll turn to the notice and comment argument first.

THE COURT:  I'll tell you, frankly, I thought the government primarily focused on standing.  And as I look at it, it feels to me like that's probably the area that I'm least comfortable with on your argument.  So it might be useful to focus there.

MS. WINGER:  On standing?

THE COURT:  Yes.

MS. WINGER:  Yes.  Of course.

Your Honor, we have plainly established associational standing here.  Our Plaintiffs through their declarations have identified with particularity multiple members who are subject to registration and who will suffer a harm as a result.  The members themselves therefore have standing.

And then we meet the second two prongs of the *Hunt* test, both that the goal of this lawsuit to stop the IFR and protect their members is germane to the missions of each of our associational Plaintiffs and that there's no need for individual participation here.  We have purely legal claims.  We're not seeking individualized damages.

THE COURT:  Ms. Winger, so associational standing, first, I mean, we get a fair number of associational standing cases in this courthouse.  And my recollection is that they usually come with affidavits from the members.  Is it appropriate for me to rely on what I take to be hearsay from pseudonymous members to determine associational standing?

MS. WINGER:  Yes, your Honor.  As the pseudonymity --

THE COURT:  Sit down, please, ma'am.  Thank you.

MS. WINGER:  The issue of pseudonymity -- and maybe I'll take those two separately.  But as to pseudonymity, the declarations here specify in detail the way in which each of these members satisfies the requirements individually for standing.  And so the failure to give a proper name doesn't undermine our ability to again identify members.

We have submitted sworn declarations.  The Defendants here have not challenged the accuracy of those declarations.  They haven't disputed that our individual members here have standing.  And at least certainly at this stage of the case, those detailed declarations, sworn declarations, meet the basic elements for associational standing here.

THE COURT:  Yes.  I guess I'm focused on the hearsay point.  Is it appropriate for me to rely on hearsay to determine standing?

MS. WINGER:  At this stage of the game, your Honor, yes.  You know, I think it is.  These are -- this is reliable evidence.  The Court can weigh it.  And based on it, based on again the fact that the declarants have personal knowledge of the details of these particular members, that in and of itself is sufficient here to find standing in this case.

THE COURT:  I thought -- looking through the

briefing, I felt like one of the things you focus on -- and it certainly struck me -- was the form requiring aliens to state not only whether they have a criminal history, but whether basically they've ever done anything wrong.

MS. WINGER:  Yes.  Yes.

THE COURT:  Am I right in thinking that's a primary focus, kind of trigger of this potential Fifth Amendment exposure?  Is that what you see as one of the primary problems or one of the primary hooks for your members to have standing?

MS. WINGER:  That's right, your Honor.

Well, I mean, our primary -- I guess as an initial matter, our primary hook for standing is that they are now required to go through a process that previously they didn't have and weren't required to do.  So that's one level of standing.

An additional level of injury here is the Fifth Amendment concerns that they are being asked directly and required in fact by the form to confess to uncharged criminal conduct, that the form itself implicates them because it is primarily targeted at people who entered without inspection; in other words, who violated 8 USC 1325. That is an additional injury.

The form also asks them to describe all of their activities in the country, which for many of these members,

they have been vocal, active advocates for CASA, for Make the Road New York.  They would be -- they are under the terms of the form required to --

THE COURT:  I'm sorry.  Are you saying the form would require them to say whether or not they've gone to protests?

MS. WINGER:  Your Honor, the question on the form -- and there's no instruction, but the question on the form specifically says -- I can read it here:  Since entry, in what activities have you been engaged?

And for many of these members, including, for example, Michael at Make the Road, he has been for ten years an active member of Make the Road.  It is a part of his activities.  And unless the government says otherwise, he's been told to report on those activities.

THE COURT:  And so your understanding and your guidance to your members would be, You've got to say everything that you're a member of, like a member of this church, a member of that bowling league, a member of this organization?  Is that the legal guidance that you'd be giving your clients based on this form?

MS. WINGER:  Well, I guess what I would say, your Honor, is that 1306(c) makes it a crime to commit -- to provide false information.  And for respondents who are wishing to be careful and not -- the form itself indicates

that they need to produce -- to list at least all of the -- what you might call material activities, key activities. Here, you know, what my legal advice might be would depend on the particular circumstances of the person. But the form speaks for itself, at least in terms of the breadth of -- the information it's seeking to collect.

THE COURT: Give me just one moment.

Understood. So your position is kind of out of an abundance of caution, your clients would need to indicate that they're members of CHIRLA or something?

MS. WINGER: I'm not even sure it's an abundance of caution. But my position is that that is the sort of information that the form asks for. Yes.

THE COURT: And going back to the Fifth Amendment point, have any of your pseudonymous members actually admitted to committing crimes with which they would still face liability -- for which they would still face liability at that point?

MS. WINGER: Within the time --

THE COURT: The statute of limitations.

MS. WINGER: The statute of limitations? Some of these members are newly -- new entrants. For example, Ursula, I believe, who is this 18-year-old member, who entered at 17 and is applying for asylum and special juvenile status --

THE COURT:  So you think she would face criminal liability for entering as a juvenile?

MS. WINGER:  She might.  Yes, your Honor.

THE COURT:  It looked like -- I mean, the bulk of them, you'd agree with me, entered decades ago, it seems like, and would not face criminal liability for illegal entry.  Do you agree with that?

MS. WINGER:  A number of them, yes, have been here for a period of time.  That is true.

THE COURT:  And I didn't see any other crimes that your pseudonymous members said they would have to divulge under this form.  Do you agree with that?

MS. WINGER:  I agree with that.  Yes, your Honor.

THE COURT:  If I was to look at -- obviously, your clients have listed a number of pseudonymous individuals. Do you have a couple that I should be focused on in particular?  I mean, maybe Ursula.  Anybody else you thought is really kind of your strongest examples for standing?

MS. WINGER:  For harm?

THE COURT:  Yes, ma'am.

MS. WINGER:  Yeah.  Absolutely.  Well, let me -- there are two -- give me one second.

So two members of UFW, United Farm Workers, David and Ana, both describe insurmountable obstacles to even accessing the registration process because of language

barriers and inability to access technology.

The registration process the Defendants are implementing here is an online-only, English language-only process. If they don't do it, they're subject to criminal penalties. If they do do it and they make a mistake, they're still subject to criminal penalties.

Those people also have a cognizable injury, your Honor.

There are in addition members like Ursula, but also Guvelia and Tiana, who are pursuing statutorily authorized benefits, applications, who are now required to go through an additional registration fingerprinting and carry requirement, a process that Defendants have expressly said is for the purpose of pursuing mass deportation, a process also that doesn't have the statutory protections, for example, that the VAWA statute has in terms of the use of information.

So these people who have -- are eligible for relief have to go through an additional process that exposes them to removal and also potential use of their private information in a way that the VAWA application, for example, does not.

And that's --

THE COURT: Ms. Winger, is your point there VAWA -- if you make statements under VAWA, it cannot be used

for deportation proceedings?

MS. WINGER:  Well, there are stricter privacy limitations by statute than what's included in this registration process.

THE COURT:  I take it there's no privacy limitations in this one.  Is that correct?

MS. WINGER:  There's a broader grant of use by -- for sort of any federal -- by any federal agency.  I'm sorry.  I don't have the exact statute here.  But it does not -- it is not the same in scope as the protections that are provided under VAWA.

THE COURT:  Okay.  I wanted to go back to your primary injury for your members, which is just kind of completing the form.  I mean, it looks to me like there's certainly some prior case law that would be supportive to you on that.  But I also thought *TransUnion* was a bit of a sea change or certainly a raising of the bar, anyway, for what would count as standing in cases like this and suggested that we need to look to the common law if there is not some sort of monetary or physical harm that, you know, filling out a form -- isn't filling out a form a bit like the congressionally created standing at *TransUnion* that the Supreme Court said is insufficient?

MS. WINGER:  No, your Honor.

Here, our members have to submit a form.  Again, a

new requirement.  They submit a form.  They provide fingerprints, biometrics.  They have to travel to a federal office.  And then they also have to carry on their person at all times proof of registration, all at the risk of federal prosecution.

This is not a *de minimis* harm.  This is a real, tangible harm that is distinct and new and an appreciable burden on all of these members here.

THE COURT:  Okay.  So it sounds like it's that combination together that would get you over the *TransUnion* hump?

MS. WINGER:  Yes.  This is not about just a form, your Honor.  Absolutely.

THE COURT:  Okay.  And am I correct in understanding under the current system, you only need to register if you have a legal immigration status?  Is that correct?

MS. WINGER:  The mechanism that has existed up until this point is that registration operated through the immigration processes.  The agency delegated certain immigration forms.  That was the way -- that was the only way to register.  And so people that were eligible for those particular pathways could register and those that weren't could not and could not be forced to do things that are impossible.

They might be subject to removal and to civil consequences.  We don't dispute that.  But they weren't subject to this criminal registration scheme that's now been expanded to them.

THE COURT:  Got it.  Okay.

Anything else you wanted to say on standing for the individual members before we chat about the organizational standing?

MS. WINGER:  No, your Honor.  I think the record is strong as to our individual members.

THE COURT:  So on the actual Plaintiffs here, several of them have testified that they're going to have to divert their resources and labor to meet the increased demand from their members.

How has this impacted your clients' other activities?

MS. WINGER:  Absolutely.  And again, because we feel like we have a strong associational standing here, your Honor need not address this.

But if you choose to, CHIRLA here is our only Plaintiff that's asserting organizational standing.  And as they articulate in their declaration, this registration requirement, which in Defendants' own terms impacts two to three million people, has already resulted in a drastic increase in -- that has impacted both their hotlines, but

also their existing clients.

They've already begun the process of reviewing hundreds of existing clients for when there's an obligation to register, a process that involves FOIA, work that will -- and in addition, their program providing the legal services to students is also likely to result in an increase in inquiries in assistance and advice, all as a result of this IFR, all compelled by their existing programs, their existing work, which will make it more difficult for them to take on new cases, new immigration legal services cases, and therefore harm their core business function, and also threaten their grant funding because they can't meet the grant deliverables, the per-case deliverables that are required under those grants.

Of course, the loss of funding is the classic injury.

THE COURT:  So I guess I was a little confused by that, because I thought this was going to drive more business to CHIRLA so they'd be getting more cases.

MS. WINGER:  So right.  As they explain, because registration does not provide an immigration benefit, it's not the kind of legal services that their grants fund. Their grants fund particular immigration benefit legal services.

So the funding doesn't cover this new kind of

work, even though it's essential to their holistic representation of their clients.  So while it will lead to more work, including more complicated representation of their existing clients, it will prevent them from taking on the new kinds of cases that, you know, for lack of a better word bring in the money.

THE COURT:  And why isn't this kind of the self-harm that the Circuit has advised against in organizational standing circumstances, that the Circuit has warned against in other cases?  Why can't CHIRLA say, Our mission is to handle these kind of traditional cases.  Yes, there's this new thing out there, but that's not what we're getting funding for and that's not what we're focused on?

MS. WINGER:  Two responses.  One is of course that their mission is not narrowly focused just on providing particular statutorily authorized forms of relief.  Part of their mission is to represent their existing clients.

The registration process is going to impact those clients on their other applications for relief.  As discussed, your Honor, this application asks people to provide quite a bit of personal information, information that may overlap with their other forms of relief, may impact that form of relief.  Serving existing clients is part of their existing obligations.  And as a result, all of those cases will take more time, which will limit their

capacity to take on new cases.

Their existing programs, for example, their hotline, their student legal services programs, are designed and intended to respond to inquiries that come in through there and inquiries from the student population.  It's part of the purpose of each of those programs.  And choosing to exclude what is frankly going to have a huge impact on almost all of the people that CHIRLA contacts would in and of itself be a harm to these programs.  It diminishes their value, their purpose.

THE COURT:  Maybe you can help me think through this.  As you know, I mean, organizational standing is a pretty tricky exercise.  And Judge Millett has kind of warned that this Circuit's standing may well be drifting from Article III foundations.

It looked to me like the Circuit has been pretty careful about limiting organizational standing to circumstances where some sort of government rule basically prevents the organization from completing its mission.  Like in the *PETA* case, I think you no longer are able to get information from this government agency that the *PETA* had relied on.

It doesn't feel to me like we're in that category here.  It feels to me like this is just, you know, organizations looking to further their mission and that the

government's -- a change in a government program means there's going to be more or slightly different opportunities for the organization to further that mission.

But I don't see the government preventing your clients from carrying out their mission in the way that you saw in *PETA* and the way that it seems to me that the Circuit has limited organizational standing to at this point.

Am I wrong about that?  How should I be thinking through this?

MS. WINGER:  Your Honor, we would disagree that the standard is quite -- is as high as your Honor has articulated it.  And we cite -- this Court has not held that *Alliance for Hippocratic Oath* has overruled Circuit precedent in this Circuit.

And we cite cases such as *Clinic* and *Northwest Immigrant Rights Project*, where courts within this district have found standing based on again facts very similar to here.

But I would also point out --

THE COURT:  What's the best one?  I mean, what do you feel like is your case that's closest to what we've got here?

MS. WINGER:  I think both *Clinic* and *Northwest Immigrant Rights* both involve harm to core legal services programs.

THE COURT:  Okay.  Those were the two DDC cases?

MS. WINGER:  That's right.

But I would also say, your Honor, we are talking about loss of grant funding.  And dollar amounts are clearly standing, clearly sufficient for standing, even separate and aside from harm to core business functions.

The last thing I will just reiterate, we have associational standing here.  If your Honor has concerns about receiving pseudonymous individual member declarations after your Honor considers this, we can explore that with our Plaintiffs.

We don't think that's necessary.  We think the detailed declarations here are sufficient reliable evidence that the Defendants have not disputed to support associational standing.  And if your Honor finds associational standing, there's no need of course to address organizational standing.

THE COURT:  Sure.

One of the things I was trying to think through here, you know, we're on a PI posture.  I typically think of standing as being a relatively low burden.  Irreparable harm is a much higher burden.

It felt to me, though, that in the organizational context, maybe there's actually not much difference, that if you can show organizational standing under the case law it's

kind of -- you've also shown irreparable harm.  Is that how you read the case law?

MS. WINGER:  That's how I read the case law, too. Yes, your Honor.  Harm to a core business function of an organizational plaintiff is irreparable harm.

THE COURT:  Okay.  Anything else, Ms. Winger?

MS. WINGER:  No, your Honor.  Not at this time. Thank you.

THE COURT:  Thank you.

Mr. Venguswamy?

MR. VENGUSWAMY:  Yes, your Honor.

Good morning, your Honor.

THE COURT:  Good morning, sir.

MR. VENGUSWAMY:  Your Honor, Karlik Venguswamy on behalf of the United States and the federal Defendants.

Your Honor, this case, Plaintiffs are trying to characterize this as a significant change, as a new requirement, as causing substantive harm.

But I think, your Honor, we need to start looking at the actual statute that underpins everything that's going on in this case.  And there is two specific sections.  One is 8 USC Section 1325, which makes it a federal offense to enter the country without, you know, appearing at a port of entry or otherwise complying with the registration requirements.

And so what we have here is a specific subset of aliens who have not complied with the registration -- the proper immigration process.  They have entered the country without complying with 8 USC 1325.

So already we're looking at not just every alien in the United States; it's the ones who have not complied with this rule -- sorry -- the statute and are already here without that.

Second, you've got the set of sections, which is 8 USC Sections 1301 to 1306, which set forth the registration requirements and the carrying requirements.  And there, let me just start by noting Plaintiff said that Defendants do not contest or I think do not oppose the idea that there has never been a universal registration requirement.

Your Honor, when the registration requirement was enacted, there was a universal registration requirement. The statute was passed from the beginning as a universal registration requirement.  It has slowly been reduced as DHS and other agencies responsible with enforcing those statutes have found other ways to work around it.  But it's certainly not the case that there has never been a universal registration requirement.

THE COURT:  I'll tell you, my impression here from the briefing is that at least much of your registration requirement, this IFR, seems pretty clearly to be envisioned

by the statute.

But it also seems to me that, as Plaintiffs say, this is basically -- the government has not been enforcing the statute for quite some time.  And maybe it should have been, and maybe you're doing the right thing.  But this is a pretty big switcheroo from what's been happening, and that the case law and the APA would require something more than what you've done to implement this rule.

Why aren't they right about that?

MR. VENGUSWAMY:  Respectfully, your Honor, they're not right about that because of the fact that the APA -- that this rule is, in fact, a procedural rule.

You're absolutely right, your Honor:  The government has not been enforcing particular sections of the registration requirement.  And as you say, maybe it should have been.

But the case law is clear that the prior lack of enforcement cannot estop the government from now trying to enforce it.

THE COURT:  And I don't think they're saying that you can't; or at least I'm not.  I'm wondering, aren't there hoops that you have to jump through, notice and comment, explanation for why this is necessary, what have you, that that has not happened here?

MR. VENGUSWAMY:  Your Honor, I think if this were

a different rule that was seeking to expand the burden upon any individual immigrant or seeking to change the substantive nature of the aliens' rights or their responsibilities with respect to the immigration laws, your Honor, I think that would be a different case.

Here, what we have is you have a statute that says you have to register.  You have a statute that says you have to carry proof of registration.  And then you have a CFR which up until now has listed 11 different ways in which you can comply with that.

There are 11 -- I think 11 or 12 forms in -- I think it's 8 CFR 241, your Honor, that are set forth as, Here are the ways in which the department or the agencies have said you can comply with Sections 1301 to 1306.

All the IFR is doing is it's adding one more form to that.  And Plaintiffs are in their reply sort of -- they dismiss the ability of the agencies to do that.  But the footnote that we set forth -- I think it's Footnote 3 on Page 17 of our opposition -- you know, there are countless instances in the past where the agencies have changed forms or added forms as a purely procedural rule.  But the addition of the form does not itself create any criminal liability.  It does not create any burden.

All that's happening here is, here's one more way with which an alien can comply with Section 1305, 1306 and

1325.

THE COURT:  But I mean, aren't Plaintiffs correct that until this point most illegal aliens could not comply with the statute and therefore were not required to comply with the statute or didn't face criminal liability for it, and now that they will?

MR. VENGUSWAMY:  No, your Honor.  I think under a clear reading of the statutory -- the statutes applicable in this case, every illegal alien should have reported to a port of entry, asked for an NTA and registered with the port of entry at that case.

Yes, that requires them to go to a port of entry and register.  But that's what Section 1325 already requires of them.  So --

THE COURT:  So is it your perspective that all of these members already face criminal liability for failure to go to a port of entry and get an NTA?

MR. VENGUSWAMY:  Your Honor, I believe they all face -- leaving aside the statute-of-limitations question, your Honor, which you raised earlier, I think they all face criminal liability for entering the country without inspection under --

THE COURT:  Sure.

MR. VENGUSWAMY:  -- 1325.

THE COURT:  But there's an ongoing violation.

MR. VENGUSWAMY:  Yes.  Under 1302, there is an ongoing continual requirement to carry your -- to be registered and carry your registration.  And I think they all face that, independent of the existence of the IFR and the form here, the G-325.

THE COURT:  Are you aware of any prosecutions for that?

MR. VENGUSWAMY:  I'm not, your Honor.  But again, the fact that the government has not in the past enforced this statute does not estop the government from attempting to do so now.

THE COURT:  But I mean, again, that's not what -- we're not talking about you enforcing the -- well, we're not talking about you enforcing the criminal provision of the statute here.  But I think under your theory, there's no -- there's nothing to stop you from right now bringing criminal enforcement against any illegal aliens for failure to carry registration.  And yet you're not doing that.  Right?

MR. VENGUSWAMY:  Your Honor, I believe that there is no -- under the statute, Section 1302, there is nothing stopping the government from pursuing statutory claims against any illegal alien who is not registered, because that is a separate violation of the code.

The fact that the government is not doing so now, I think, has a combination to do with years of policy, which

the government is attempting to address in this IFR, as well as it's an information issue again, which the government is attempting to address through this IFR.

But at heart, at core, what we're looking at here is the government is simply attempting to enforce an already-existing, extant provision of the code, which has been around since 1940-something, I think.

THE COURT: And what's your best case for this proposition that, you know, because we're enforcing a statute that we just have failed to enforce -- and now I'm kind of switching gears back to the IFR, to be clear -- but because we're just enforcing this notice provision that Congress always wanted us to enforce, this is just a procedural rule that need not go through notice and comment?

MR. VENGUSWAMY: Yes, your Honor. I think the -- bear with me just one second, your Honor. I apologize.

Your Honor, I think the *AFL-CIO* case is particularly instructive in this instance because that specifically dealt with rules of agency organization and procedure as compared to substantive rights. And in that case, they specifically -- both in that case and in the *James V. Herson versus Glickman* case, your Honor, as the Court pointed out, as the D.C. Circuit pointed out, merely -- you know, the fact that this agency is making a decision about its procedural efficiency doesn't somehow

convert the decision into affecting substantive rights. What we're looking at here is a way in which the agency is attempting to be procedurally efficient in its attempts to enforce Section 1302 and Section 1325.

So the analogy that comes to mind, your Honor, is a previous administration might choose to focus its efforts on certain violent crimes and not on certain substance -- you know, drug crimes.  A subsequent administration may change its mind on that.

But they haven't decriminalized anything.  The statute still says the substance is illegal.  You just -- different administrations have different things that they're focusing on.

THE COURT:  Sure.  But I mean, that feels pretty clearly -- is it *Chenery* grounds? -- on prosecutorial discretion.

But here, we're talking about the APA and the requirement for notice and comment rulemaking.

MR. VENGUSWAMY:  Yes.  Again, your Honor, if the IFR created a new form of liability, if failure to fulfill -- a failure to file this form, G-325, if that were somehow itself a cause -- a source of liability or an enforceable claim on an individual, your Honor, I think then we could -- we would be in -- solidly in the notice and comment section of the APA.

But as we pointed out in our brief, you don't have to fill out the G-325. There is no requirement on any individual that they fill out this form.

This is just one more way in which an individual can comply with Section 1302. They can go to a port of entry. They can fill out one of the other 11 options that are set forth in the CFR.

The failure to fill this form out does not itself open the door to any additional liability or claim or anything else. It's just one more tool that an alien has to follow the statutory requirements.

THE COURT: I understand.

So what would be the consequences for one of the Plaintiffs' members if they refused to fill out the question about "Tell me all the bad things you've ever done"? What if they kind of invoked Fifth Amendment privileges there?

MR. VENGUSWAMY: Your Honor, that's a good question.

I think there's -- I think if they failed to answer the question, "Tell me all of the bad things you've ever done," your Honor, I think there's case law specifically in the IRS context that indicates that you could invoke a privilege in that way.

But the failure -- the desire to invoke a privilege does not excuse the failure to comply with other

statutory requirements.

So in the IRS context, for example, drug dealers still have to report their income.  They can be careful about how they say it, but they still have to pay taxes on it, in much of the same way you still have to comply with the statutory requirement that you register and that you carry registration around.

There may be, your Honor -- and there's -- I think there's a separate question about the way in which you could comply with that and still have your Fifth Amendment right preserved.  I think there's -- in *United States versus Sullivan*, which is an older case from 1927, a taxpayer used the Fifth Amendment to basically say that he did not have to file his taxes.  The Supreme Court roundly rejected that proposition.

On the other hand, in *Garner versus United States*, a little bit more recently, they found that a voluntary disclosure of incriminating evidence on a form waived the privilege.

So I think there's some ground there and, you know, I think it's important to remember that this form is also -- it's pending under the Paperwork Reduction Act, you know.  The agency is still figuring out exactly how to -- the exact questions to put on this form.

But I will say that there are several other

instances where the same question was basically asked.  As far as I know, those forms are not -- have not been contested.  For example, the I-485, which is the application to register permanent residence, has a yes/no checkbox question:  Have you ever entered the United States without being inspected?

Similarly, the I-821, which is for temporary protected status, asks the same questions with respect to address and current activities and mode of entry to the United States.  Those are all already-existing forms that aliens can and do fill out.  As far as I know, those have not been contested or they've not been sort of raised in this context.

THE COURT:  And would you agree with me that, other than -- maybe it sounds like Ursula -- none of Plaintiffs' members actually face Fifth Amendment liability at least based on what we have in front of us for illegal entry from decades ago?

MR. VENGUSWAMY:  Your Honor, to the best of my reading, that appears to be the case.

I would -- I want to hedge a little bit because I'm not in a position to sort of offer Fifth Amendment immunity to anyone at this point.  But based upon my reading, it certainly appears that everyone other than Ursula is outside of the sort of 1325 rule.  There is a 1302

issue, but that's a separate ongoing requirement under registration.  That's what we're trying to address here in this IFR.

THE COURT:  And do you happen to know, do juveniles face 1325 liability?

MR. VENGUSWAMY:  I don't, your Honor.  I can go back and ask the agency.  I don't have that off the top of my head.

THE COURT:  So why don't the members have standing by virtue of being subject to the new regulatory obligations, which would then give the Plaintiffs associational standing?

MR. VENGUSWAMY:  Your Honor, for associational standing, the members themselves have to have standing.  And for an individual to have standing, they have to show that they're facing a harm that is directly attributable to the agency.

In this case, the harm that they're facing is attributable to 8 USC 1302.  That harm to the extent it exists is a failure to follow the United States Code that they are already facing.  The only thing that this form does is it gives them one more way in which they can not face that harm.

So there's no new harm associated with this form or the failure to fill this form out, because they're

already facing a harm under Section 1302.  So there is no harm that these individual members are facing as a result of the IFR, and therefore there is no associational standing because the individual members are not facing any harm --

THE COURT:  Your briefing --

MR. VENGUSWAMY:  -- or new harm, I should say.

THE COURT:  -- talks about third-party standing.

I think it looks to me like Plaintiffs are correct that that's not the right framework here and that we should actually be thinking about associational standing, which has its own intricate test.

Do you agree with me on that?

MR. VENGUSWAMY:  Your Honor, I think we wanted to make sure that we were overly cautious in addressing every possible way in which a Plaintiff might attempt to raise standing in this instance.  I think third-party standing is one more avenue in which I could see one of the named Plaintiffs in this case attempting to get around the fact that they do not have associational standing or organizational standing.  But I think the associational standing is the more conclusive analysis in this case.  I think that deals, I think, more appropriately and more conclusively with the issues of this case.

THE COURT:  And so just to kind of tease out something that I think you've already said, the government's

position is this does not institute a new carry requirement, that the members must now carry proof of registration, that they already face that, that they faced that two months ago, and this just gives them a new thing they could carry if they wish.

Am I correct on that?

MR. VENGUSWAMY:  Yes, your Honor.  The -- they could have just as easily gone to a port of entry, asked for a notice to appear, which these already are listed under the CFR as one of the ways that they could comply with Section 1302.  So they're already facing the carry requirement, the registration requirement.  This is just one more document that is an option for them.

THE COURT:  Wouldn't you agree with me, though, that G-325R is asking for some things that are not required by statute?  And, if so, why doesn't that make this a legislative rule?

MR. VENGUSWAMY:  Your Honor, the fact that it's asking for some additional documents outside of maybe what's the first few -- your Honor, if you'd bear with me, I've got my stuff at the table.

So, your Honor, as far as what the form asks for, I think there's two answers there.  One is under Section 1304(a), which sets forth what the forms can contain.  It asks for -- this is under the statute -- so 1304(a), the

date and place of entry, activity in which he has been and intends to be engaged.  So "What activities are you engaged in?" is statutorily considered already as an appropriate question.

Then the length of time he expects to remain; police and criminal record, if any, of such alien; and then the catch-all, "such additional matters as may be prescribed."  That's under the discretion of the secretary and the attorney general.

So the mere fact that it isn't one of the four enumerated categories of information under Section 1304(a) doesn't automatically push this outside of the scope of a procedural rule.

And then second, your Honor --

THE COURT:  What would make it a procedural rule?

MR. VENGUSWAMY:  What would make it -- I think it is a procedure.

THE COURT:  I'm sorry; more than a procedural rule?

MR. VENGUSWAMY:  Your Honor, I think if it was attempting maybe to again elicit information that would create some new burden or elicit some information that was creating a new form of liability or exposure to liability that's not already encompassed with Sections 1302 and 1304, again, your Honor, that might be a different question that

we're not facing in this case.

This form, it's really just attempting to provide an illegal alien -- an unregistered alien with one more way of complying with the statute.

And as far as the information, again, your Honor, there are other DHS forms, the I-821, which asks almost the exact same questions as already in the G-325.

If anything, your Honor, I think the additional questions here again go to the Paperwork Reduction Act. These are questions that maybe would be on separate form that, once you fill out this form, then you get the other form.  It's a Paperwork Reduction Act question, not an APA question.

THE COURT:  Your briefing really focuses on standing.  Am I correct in thinking that your arguments on standing would also go to irreparable harm?

MR. VENGUSWAMY:  Absolutely, your Honor.  If they don't have standing, then they -- one way in which they don't have standing in this case is they don't have irreparable harm.  I think there's also -- you know, the individual members don't have standing and there's a traceability issue.

But certainly I think there is no irreparable harm in this case because the form and the IFR aren't putting any harm or burden on them that doesn't -- that they're not

already facing through the statutes.

THE COURT:  And do you read the organizational standing cases the same way Ms. Winger and I do, that basically if CHIRLA can show organizational standing, they've also shown irreparable harm?  Or do you see that irreparable harm as being a second, higher burden that CHIRLA has to meet?

MR. VENGUSWAMY:  Your Honor, I think if they're able to show the organizational standing with respect to the effect on CHIRLA, I think that would go a long way towards the irreparable harm prong of the preliminary injunction.  I think they still face the success on the merits, which is a different question.

But leaving aside the fact that I disagree that they can show an organizational harm, I do believe, your Honor, as you say, if they could show organizational harm, I think that would at least get you most of the way towards the irreparable harm prong of the PI.

THE COURT:  Okay.

MR. VENGUSWAMY:  Is there anything else, your Honor?

THE COURT:  Nothing from me.  Thanks.

Ms. Winger, I'll give you the last word.

MS. WINGER:  Your Honor, I wanted to respond first to the new idea proposed just today that noncitizens could

register by seeking an NTA.

A few points about that:  First of all, the government has never set up a process or publicized a process by which someone can go and demand an NTA.  An NTA, in fact, is a discretionary prosecutorial document.  It's a charging document to initiate removal proceedings.  So there's nothing that requires DHS to issue one.

In fact, there are other -- for example, some might be subject to expedited removal and not even be entitled to an NTA, or the agency might not think so.

But again, there just simply is not a process and it's certainly never been advertised to people that they can and should go and seek an NTA.  And in fact, the agency sometimes refuses to issue NTAs.  Occasionally people ask for it in order to be placed in removal proceedings to pursue discretionary relief that's only been available there.

So it's been viewed as an exercise of prosecutorial discretion.  It's just simply not a realistic mechanism for universal registration.  It's never been used that way.  And the IFR itself acknowledges that explicitly. It says there's no registration form for these people.  So frankly, I think it is a little disingenuous to propose that solution today in open court.  It's not even discussed in the rulemaking here.

Briefly, the I-598 and the I-485, which have the questions about uncharged criminal activity, those are discretionary benefits.  You voluntarily apply for them. There's an element of discretion whether you get to adjust your status, whether you're eligible for asylum.  People can choose or not choose to apply for this relief.  There's no criminal penalties for not submitting an I-485 or an I-598.

Here, we're talking about a form that is required of everybody with no benefit at all on the threat of federal prosecution.

And the last point I would just say is, your Honor's been talking about this in the context of a preliminary injunction.  I do just want to elevate that we also in the alternative seek a stay.  And consistent with longstanding court practice, a universal stay of an IFR here would be appropriate.

THE COURT:  And on that point, I mean, it sounds like something we all agree on is that basically the irreparable harm is not going to do -- doesn't do a lot of work here, at least as to organizational standing.

And so whether I see this as a stay or an injunction, I basically am doing the same analysis.  Right?

MS. WINGER:  Same analysis, yes.  Absolutely.  I mean, again, we do think we have shown irreparable harm for a host of ways for our members.  But as to our organization,

the fact that they have standing is really enough on its own to be irreparable harm, too.

THE COURT:  And those other -- you mentioned a couple other forms.  I-458?

MS. WINGER:  Sorry.  The I-485 is an application to adjust to lawful permanent resident status.  It's a discretionary benefit.  You apply basically to get a green card.  It's a green card application.  An I-598 is an asylum application.

THE COURT:  And you said those forms do not require you to disclose your criminal history?

MS. WINGER:  They do.

So -- I'm sorry.  I don't want to mispronounce your name, but the United States represented that there are forms that request information about uncharged criminal conduct like the form at issue here.  I'm just trying to distinguish between certainly in the Fifth Amendment context there's -- they're different beasts because you don't have to apply for asylum.  You don't have to apply to adjust your status.  You have to register.  And so the -- so it's compelling statements, unlike -- in a way that the 485 and the I-598 are not.

THE COURT:  I see.

You said a couple minutes ago that the rulemaking actually says that your members can't currently seek -- have

registration.  Is that right?

MS. WINGER:  That's right.

So it's at 11795 of the IFR.  And it says:  Aliens who entered without inspection and have not otherwise been encountered by DHS lack a designated registration form.

THE COURT:  Okay.  And your position is there's really no realistic option -- well, a month ago, there was no realistic option for those individuals to get a registration?

MS. WINGER:  Absolutely, your Honor.  And I think of course the question here is, could they be prosecuted for willful failure to register?  Right?

There was no -- there simply was -- nobody here until a month ago would have thought that they had any way to register and certainly couldn't be guilty of willful failure to do so as a result.

Also, the agency itself has acknowledged that the carry requirement only attaches to people who have registered.  In other words, you can't be prosecuted for failure to carry proof of registration if you have not registered.  And so necessarily, by expanding who can register, you're adding this new both requirement and criminal penalty for failure to carry.  And the IFR recognizes that, too.

THE COURT:  Okay.  And you were just talking about

a form to seek an application for a green card.  I take it that obviously, if you're successful in getting a green card, you've got your document; you're in compliance with the statute; but you don't get some other -- that wouldn't provide something else short of a green card that would nonetheless meet the terms of the statute?

MS. WINGER:  So the I-485 in the regulation is listed as a registration form.  So people who have, according to -- who have -- who are eligible for applying for a green card under the regulations have registered.

What they carry as proof is a lot less clear, because the I-458 is a multipage form.  That's one of the issues that Defendants don't really explain in their IFR.

But people who enter without inspection by and large are ineligible to adjust their status to lawful permanent resident, at least while they're still in the United States, unless they -- yeah.  There's some exceptions.  But not everybody can do that.

THE COURT:  And what would prevent them from applying, getting rejected, but nonetheless meeting the terms of this carry statute?

MS. WINGER:  Well, I guess they are -- they have to sign this sworn declaration that establishes their eligibility in order to submit it.  Again, there's never been any announcement that people should apply for relief

that they're ineligible for in order to be considered registered. It's simply not the system the government has set up.

Frankly, I think it risks forcing people to misrepresent. I mean --

THE COURT: So your point is there are things in the application -- to apply, you've got to say --

MS. WINGER: You have to check off the box. You've got to indicate who's the qualifying relative. I mean, the whole point of it is to establish eligibility for something for which people are not eligible for.

THE COURT: Got it. Got it. That makes sense.

All right. Thank you. Anything else, ma'am?

MS. WINGER: No, your Honor.

THE COURT: So --

MR. VENGUSWAMY: Your Honor, can I just -- one point?

THE COURT: Yes.

MR. VENGUSWAMY: I apologize, your Honor. Plaintiff correctly pointed out I think I misspoke and overstated it when I suggested that illegal aliens should or can report to a port of entry to get an NTA. I was merely trying to highlight the number of options under the regulations already existing. I certainly didn't mean to say that that is a thing that has been advertised or should

be done or, as you pointed out, it is discretionary.  So I apologize, your Honor, if I overstated that.

THE COURT:  I appreciate that.

So what is the option, then, for somebody right now, understanding the IFR is not out?

MR. VENGUSWAMY:  Your Honor, as Plaintiff correctly says -- and it's in the IFR -- there is not currently a universal form that would apply across the board for every illegal alien to comply with the registration and carry requirements at this -- at this point, pending the IFR.

THE COURT:  But is there any option for these members?

MR. VENGUSWAMY:  Your Honor, I think it's a case-by-case basis.  Again, there were 11 different forms. Some of them may be eligible for one and not others.  Some of them may not be eligible for any of the 11.  The IFR seeks to basically patch that hole in the existing set of forms.

But I just wanted to apologize and acknowledge that I did misspeak there.

THE COURT:  I appreciate the correction.  And this is why we have rebuttals.  Right?

All right.  Thanks, folks.  I appreciate your rapid briefing and helpful arguments here.  I'll certainly

try to get an opinion out to you in the next couple days.

Thanks, folks.  I'll take it under advisement.

(Proceedings concluded at 11:05 a.m.)

**CERTIFICATE**


I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.



Dated this 15th day of April, 2025.


/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269