# EXHIBIT A

# Transcript of Hearing

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    * * * * * * * * * * * * * * *    )
     COALITION FOR HUMANE IMMIGRANT   )    Civil Action
4    RIGHTS, et al.,                  )    No. 25-00943
                                      )
5                   Plaintiffs,       )
                                      )
6      vs.                            )
                                      )
7    U.S. DEPARTMENT OF HOMELAND      )    Washington, D.C.
     SECURITY, et al.,                )    April 8, 2025
8                                     )    10:03 a.m.
                    Defendants.       )
9    * * * * * * * * * * * * * * *    )

10

11

                    TRANSCRIPT OF MOTION HEARING
12          BEFORE THE HONORABLE TREVOR N. McFADDEN
                   UNITED STATES DISTRICT JUDGE
13

14
     APPEARANCES:
15
     FOR THE PLAINTIFFS:      EMMA C. WINGER, ESQ.
16                            LESLIE K. DELLON, ESQ.
                              MICHELLE LAPOINTE, ESQ.
17                            AMERICAN IMMIGRATION COUNCIL
                              2001 L Street, Northwest
18                            Suite 500
                              Washington, D.C. 20036
19
                              CODY WOFSY, ESQ.
20                            AMERICAN CIVIL LIBERTIES UNION
                              425 California Street
21                            Seventh Floor
                              San Francisco, California 94104
22
                              JENNIFER COBERLY, ESQ.
23                            AMERICAN IMMIGRATION LAWYERS
                                ASSOCIATION
24                            1331 G Street
                              Suite 300
25                            Washington, D.C. 20005

```
 1        APPEARANCES, CONT'D:

 2        FOR THE PLAINTIFFS:     ANTHONY ENRIQUEZ, ESQ.
                                  ROBERT F. KENNEDY HUMAN RIGHTS
 3                                88 Pine Street
                                  Suite 801
 4                                New York, New York 10005

 5
          FOR THE DEFENDANTS:     KARTIK N. VENGUSWAMY, ESQ.
 6                                U.S. ATTORNEY'S OFFICE FOR THE
                                    DISTRICT OF COLUMBIA
 7                                601 D Street, Northwest
                                  Washington, D.C. 20579
 8

 9        REPORTED BY:            LISA EDWARDS, RDR, CRR
                                  Official Court Reporter
10                                United States District Court for the
                                    District of Columbia
11                                333 Constitution Avenue, Northwest
                                  Room 6706
12                                Washington, D.C. 20001
                                  (202) 354-3269
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  This is Civil Action

 2    25-943, Coalition for Humane Immigrant Rights, et al.,

 3    versus U.S. Department of Homeland Security, et al.

 4              Counsel, please come forward to identify

 5    yourselves for the record, starting with the Plaintiff.

 6              MS. WINGER:  Good morning, your Honor.  Emma

 7    Winger on behalf of the Plaintiff.

 8              THE COURT:  Good morning, Ms. Winger.

 9              MR. VENGUSWAMY:  Good morning, your Honor.  Karlik

10    Venguswamy from the U.S. Attorney's Office on behalf of the

11    Defendants.

12              THE COURT:  Good morning, Mr. Venguswamy.

13              All right.  We're here for a motion hearing on the

14    Plaintiffs' motion for preliminary injunction.

15              Ms. Winger, I'll hear from you.

16              MS. WINGER:  Good morning, your Honor.  Emma

17    Winger on behalf of the Plaintiffs.

18              This case is about what process Defendants must

19    follow and what decision-making they must engage in before

20    they radically alter how non-citizen registration operates

21    in this country.

22              The Defendants do not dispute that the federal

23    government has never operated a universal registration and

24    carry requirement.  Across 14 different presidential

25    administrations, the government has adopted a tailored
```

1    approach to registration.  Except in the context of war or

2    armed invasion, armed assault, registration has operated

3    through existing immigration processes.

4         Defendants attempt to categorize the IFR as a

5    benign measure that merely adds one other method of

6    registration.

7         But frankly, that's just not true.  It ignores the

8    fact expressly recognized in the IFR and consistent with

9    longstanding policy that millions of people previously had

10    no mechanism to register and therefore no enforceable

11    obligation to register or carry proof of registration at all

12    times.

13         Defendants' effort to expand registration in this

14    way is clearly not an internal housekeeping measure that

15    justifies avoiding notice and comment, and it has likewise

16    been done in a manner that is arbitrary and capricious.  For

17    those reasons, Plaintiffs are likely to succeed on the

18    merits.

19         If I may, I'll turn to the notice and comment

20    argument first.

21         THE COURT:  I'll tell you, frankly, I thought the

22    government primarily focused on standing.  And as I look at

23    it, it feels to me like that's probably the area that I'm

24    least comfortable with on your argument.  So it might be

25    useful to focus there.

```
 1              MS. WINGER:  On standing?

 2              THE COURT:  Yes.

 3              MS. WINGER:  Yes.  Of course.

 4         Your Honor, we have plainly established

 5    associational standing here.  Our Plaintiffs through their

 6    declarations have identified with particularity multiple

 7    members who are subject to registration and who will suffer

 8    a harm as a result.  The members themselves therefore have

 9    standing.

10         And then we meet the second two prongs of the Hunt

11    test, both that the goal of this lawsuit to stop the IFR and

12    protect their members is germane to the missions of each of

13    our associational Plaintiffs and that there's no need for

14    individual participation here.  We have purely legal claims.

15    We're not seeking individualized damages.

16              THE COURT:  Ms. Winger, so associational standing,

17    first, I mean, we get a fair number of associational

18    standing cases in this courthouse.  And my recollection is

19    that they usually come with affidavits from the members.  Is

20    it appropriate for me to rely on what I take to be hearsay

21    from pseudonymous members to determine associational

22    standing?

23              MS. WINGER:  Yes, your Honor.  As the

24    pseudonymity --

25              THE COURT:  Sit down, please, ma'am.  Thank you.
```

1          MS. WINGER:  The issue of pseudonymity -- and

2    maybe I'll take those two separately.  But as to

3    pseudonymity, the declarations here specify in detail the

4    way in which each of these members satisfies the

5    requirements individually for standing.  And so the failure

6    to give a proper name doesn't undermine our ability to again

7    identify members.

8          We have submitted sworn declarations.  The

9    Defendants here have not challenged the accuracy of those

10   declarations.  They haven't disputed that our individual

11   members here have standing.  And at least certainly at this

12   stage of the case, those detailed declarations, sworn

13   declarations, meet the basic elements for associational

14   standing here.

15         THE COURT:  Yes.  I guess I'm focused on the

16   hearsay point.  Is it appropriate for me to rely on hearsay

17   to determine standing?

18         MS. WINGER:  At this stage of the game, your

19   Honor, yes.  You know, I think it is.  These are -- this is

20   reliable evidence.  The Court can weigh it.  And based on

21   it, based on again the fact that the declarants have

22   personal knowledge of the details of these particular

23   members, that in and of itself is sufficient here to find

24   standing in this case.

25         THE COURT:  I thought -- looking through the

 1    briefing, I felt like one of the things you focus on -- and

 2    it certainly struck me -- was the form requiring aliens to

 3    state not only whether they have a criminal history, but

 4    whether basically they've ever done anything wrong.

 5              MS. WINGER:  Yes.  Yes.

 6              THE COURT:  Am I right in thinking that's a

 7    primary focus, kind of trigger of this potential Fifth

 8    Amendment exposure?  Is that what you see as one of the

 9    primary problems or one of the primary hooks for your

10    members to have standing?

11              MS. WINGER:  That's right, your Honor.

12              Well, I mean, our primary -- I guess as an initial

13    matter, our primary hook for standing is that they are now

14    required to go through a process that previously they didn't

15    have and weren't required to do.  So that's one level of

16    standing.

17              An additional level of injury here is the Fifth

18    Amendment concerns that they are being asked directly and

19    required in fact by the form to confess to uncharged

20    criminal conduct, that the form itself implicates them

21    because it is primarily targeted at people who entered

22    without inspection; in other words, who violated 8 USC 1325.

23    That is an additional injury.

24              The form also asks them to describe all of their

25    activities in the country, which for many of these members,

1    they have been vocal, active advocates for CASA, for Make

2    the Road New York.  They would be -- they are under the

3    terms of the form required to --

4            THE COURT:  I'm sorry.  Are you saying the form

5    would require them to say whether or not they've gone to

6    protests?

7            MS. WINGER:  Your Honor, the question on the

8    form -- and there's no instruction, but the question on the

9    form specifically says -- I can read it here:  Since entry,

10   in what activities have you been engaged?

11           And for many of these members, including, for

12   example, Michael at Make the Road, he has been for ten years

13   an active member of Make the Road.  It is a part of his

14   activities.  And unless the government says otherwise, he's

15   been told to report on those activities.

16           THE COURT:  And so your understanding and your

17   guidance to your members would be, You've got to say

18   everything that you're a member of, like a member of this

19   church, a member of that bowling league, a member of this

20   organization?  Is that the legal guidance that you'd be

21   giving your clients based on this form?

22           MS. WINGER:  Well, I guess what I would say, your

23   Honor, is that 1306(c) makes it a crime to commit -- to

24   provide false information.  And for respondents who are

25   wishing to be careful and not -- the form itself indicates

1     that they need to produce -- to list at least all of the --

2     what you might call material activities, key activities.

3     Here, you know, what my legal advice might be would depend

4     on the particular circumstances of the person.  But the form

5     speaks for itself, at least in terms of the breadth of --

6     the information it's seeking to collect.

7              THE COURT:  Give me just one moment.

8              Understood.  So your position is kind of out of an

9     abundance of caution, your clients would need to indicate

10    that they're members of CHIRLA or something?

11             MS. WINGER:  I'm not even sure it's an abundance

12    of caution.  But my position is that that is the sort of

13    information that the form asks for.  Yes.

14             THE COURT:  And going back to the Fifth Amendment

15    point, have any of your pseudonymous members actually

16    admitted to committing crimes with which they would still

17    face liability -- for which they would still face liability

18    at that point?

19             MS. WINGER:  Within the time --

20             THE COURT:  The statute of limitations.

21             MS. WINGER:  The statute of limitations?  Some of

22    these members are newly -- new entrants.  For example,

23    Ursula, I believe, who is this 18-year-old member, who

24    entered at 17 and is applying for asylum and special

25    juvenile status --

1        THE COURT:  So you think she would face criminal

2    liability for entering as a juvenile?

3        MS. WINGER:  She might.  Yes, your Honor.

4        THE COURT:  It looked like -- I mean, the bulk of

5    them, you'd agree with me, entered decades ago, it seems

6    like, and would not face criminal liability for illegal

7    entry.  Do you agree with that?

8        MS. WINGER:  A number of them, yes, have been here

9    for a period of time.  That is true.

10        THE COURT:  And I didn't see any other crimes that

11    your pseudonymous members said they would have to divulge

12    under this form.  Do you agree with that?

13        MS. WINGER:  I agree with that.  Yes, your Honor.

14        THE COURT:  If I was to look at -- obviously, your

15    clients have listed a number of pseudonymous individuals.

16    Do you have a couple that I should be focused on in

17    particular?  I mean, maybe Ursula.  Anybody else you thought

18    is really kind of your strongest examples for standing?

19        MS. WINGER:  For harm?

20        THE COURT:  Yes, ma'am.

21        MS. WINGER:  Yeah.  Absolutely.  Well, let me --

22    there are two -- give me one second.

23        So two members of UFW, United Farm Workers, David

24    and Ana, both describe insurmountable obstacles to even

25    accessing the registration process because of language

1    barriers and inability to access technology.

2          The registration process the Defendants are

3    implementing here is an online-only, English language-only

4    process.  If they don't do it, they're subject to criminal

5    penalties.  If they do do it and they make a mistake,

6    they're still subject to criminal penalties.

7          Those people also have a cognizable injury, your

8    Honor.

9          There are in addition members like Ursula, but

10   also Guvelia and Tiana, who are pursuing statutorily

11   authorized benefits, applications, who are now required to

12   go through an additional registration fingerprinting and

13   carry requirement, a process that Defendants have expressly

14   said is for the purpose of pursuing mass deportation, a

15   process also that doesn't have the statutory protections,

16   for example, that the VAWA statute has in terms of the use

17   of information.

18         So these people who have -- are eligible for

19   relief have to go through an additional process that exposes

20   them to removal and also potential use of their private

21   information in a way that the VAWA application, for example,

22   does not.

23         And that's --

24         THE COURT:  Ms. Winger, is your point there

25   VAWA -- if you make statements under VAWA, it cannot be used

1    for deportation proceedings?

2              MS. WINGER:  Well, there are stricter privacy

3    limitations by statute than what's included in this

4    registration process.

5              THE COURT:  I take it there's no privacy

6    limitations in this one.  Is that correct?

7              MS. WINGER:  There's a broader grant of use by --

8    for sort of any federal -- by any federal agency.  I'm

9    sorry.  I don't have the exact statute here.  But it does

10   not -- it is not the same in scope as the protections that

11   are provided under VAWA.

12             THE COURT:  Okay.  I wanted to go back to your

13   primary injury for your members, which is just kind of

14   completing the form.  I mean, it looks to me like there's

15   certainly some prior case law that would be supportive to

16   you on that.  But I also thought *TransUnion* was a bit of a

17   sea change or certainly a raising of the bar, anyway, for

18   what would count as standing in cases like this and

19   suggested that we need to look to the common law if there is

20   not some sort of monetary or physical harm that, you know,

21   filling out a form -- isn't filling out a form a bit like

22   the congressionally created standing at *TransUnion* that the

23   Supreme Court said is insufficient?

24             MS. WINGER:  No, your Honor.

25             Here, our members have to submit a form.  Again, a

1    new requirement.  They submit a form.  They provide

2    fingerprints, biometrics.  They have to travel to a federal

3    office.  And then they also have to carry on their person at

4    all times proof of registration, all at the risk of federal

5    prosecution.

6          This is not a *de minimis* harm.  This is a real,

7    tangible harm that is distinct and new and an appreciable

8    burden on all of these members here.

9          THE COURT:  Okay.  So it sounds like it's that

10   combination together that would get you over the *TransUnion*

11   hump?

12         MS. WINGER:  Yes.  This is not about just a form,

13   your Honor.  Absolutely.

14         THE COURT:  Okay.  And am I correct in

15   understanding under the current system, you only need to

16   register if you have a legal immigration status?  Is that

17   correct?

18         MS. WINGER:  The mechanism that has existed up

19   until this point is that registration operated through the

20   immigration processes.  The agency delegated certain

21   immigration forms.  That was the way -- that was the only

22   way to register.  And so people that were eligible for those

23   particular pathways could register and those that weren't

24   could not and could not be forced to do things that are

25   impossible.

1       They might be subject to removal and to civil

2  consequences.  We don't dispute that.  But they weren't

3  subject to this criminal registration scheme that's now been

4  expanded to them.

5       THE COURT:  Got it.  Okay.

6       Anything else you wanted to say on standing for

7  the individual members before we chat about the

8  organizational standing?

9       MS. WINGER:  No, your Honor.  I think the record

10  is strong as to our individual members.

11      THE COURT:  So on the actual Plaintiffs here,

12  several of them have testified that they're going to have to

13  divert their resources and labor to meet the increased

14  demand from their members.

15      How has this impacted your clients' other

16  activities?

17      MS. WINGER:  Absolutely.  And again, because we

18  feel like we have a strong associational standing here, your

19  Honor need not address this.

20      But if you choose to, CHIRLA here is our only

21  Plaintiff that's asserting organizational standing.  And as

22  they articulate in their declaration, this registration

23  requirement, which in Defendants' own terms impacts two to

24  three million people, has already resulted in a drastic

25  increase in -- that has impacted both their hotlines, but

1   also their existing clients.

2        They've already begun the process of reviewing

3   hundreds of existing clients for when there's an obligation

4   to register, a process that involves FOIA, work that will --

5   and in addition, their program providing the legal services

6   to students is also likely to result in an increase

7   in inquiries in assistance and advice, all as a result of

8   this IFR, all compelled by their existing programs, their

9   existing work, which will make it more difficult for them to

10  take on new cases, new immigration legal services cases, and

11  therefore harm their core business function, and also

12  threaten their grant funding because they can't meet the

13  grant deliverables, the per-case deliverables that are

14  required under those grants.

15       Of course, the loss of funding is the classic

16  injury.

17       THE COURT:  So I guess I was a little confused by

18  that, because I thought this was going to drive more

19  business to CHIRLA so they'd be getting more cases.

20       MS. WINGER:  So right.  As they explain, because

21  registration does not provide an immigration benefit, it's

22  not the kind of legal services that their grants fund.

23  Their grants fund particular immigration benefit legal

24  services.

25       So the funding doesn't cover this new kind of

1    work, even though it's essential to their holistic

2    representation of their clients.  So while it will lead to

3    more work, including more complicated representation of

4    their existing clients, it will prevent them from taking on

5    the new kinds of cases that, you know, for lack of a better

6    word bring in the money.

7         THE COURT:  And why isn't this kind of the

8    self-harm that the Circuit has advised against in

9    organizational standing circumstances, that the Circuit has

10   warned against in other cases?  Why can't CHIRLA say, Our

11   mission is to handle these kind of traditional cases.  Yes,

12   there's this new thing out there, but that's not what we're

13   getting funding for and that's not what we're focused on?

14        MS. WINGER:  Two responses.  One is of course that

15   their mission is not narrowly focused just on providing

16   particular statutorily authorized forms of relief.  Part of

17   their mission is to represent their existing clients.

18        The registration process is going to impact those

19   clients on their other applications for relief.  As

20   discussed, your Honor, this application asks people to

21   provide quite a bit of personal information, information

22   that may overlap with their other forms of relief, may

23   impact that form of relief.  Serving existing clients is

24   part of their existing obligations.  And as a result, all of

25   those cases will take more time, which will limit their

1    capacity to take on new cases.

2         Their existing programs, for example, their

3    hotline, their student legal services programs, are designed

4    and intended to respond to inquiries that come in through

5    there and inquiries from the student population.  It's part

6    of the purpose of each of those programs.  And choosing to

7    exclude what is frankly going to have a huge impact on

8    almost all of the people that CHIRLA contacts would in and

9    of itself be a harm to these programs.  It diminishes their

10   value, their purpose.

11        THE COURT:  Maybe you can help me think through

12   this.  As you know, I mean, organizational standing is a

13   pretty tricky exercise.  And Judge Millett has kind of

14   warned that this Circuit's standing may well be drifting

15   from Article III foundations.

16        It looked to me like the Circuit has been pretty

17   careful about limiting organizational standing to

18   circumstances where some sort of government rule basically

19   prevents the organization from completing its mission.  Like

20   in the *PETA* case, I think you no longer are able to get

21   information from this government agency that the *PETA* had

22   relied on.

23        It doesn't feel to me like we're in that category

24   here.  It feels to me like this is just, you know,

25   organizations looking to further their mission and that the

1    government's -- a change in a government program means

2    there's going to be more or slightly different opportunities

3    for the organization to further that mission.

4         But I don't see the government preventing your

5    clients from carrying out their mission in the way that you

6    saw in *PETA* and the way that it seems to me that the Circuit

7    has limited organizational standing to at this point.

8         Am I wrong about that?  How should I be thinking

9    through this?

10        MS. WINGER:  Your Honor, we would disagree that

11   the standard is quite -- is as high as your Honor has

12   articulated it.  And we cite -- this Court has not held that

13   *Alliance for Hippocratic Oath* has overruled Circuit

14   precedent in this Circuit.

15        And we cite cases such as *Clinic* and *Northwest*

16   *Immigrant Rights Project*, where courts within this district

17   have found standing based on again facts very similar to

18   here.

19        But I would also point out --

20        THE COURT:  What's the best one?  I mean, what do

21   you feel like is your case that's closest to what we've got

22   here?

23        MS. WINGER:  I think both *Clinic* and *Northwest*

24   *Immigrant Rights* both involve harm to core legal services

25   programs.

1          THE COURT:  Okay.  Those were the two DDC cases?

2          MS. WINGER:  That's right.

3          But I would also say, your Honor, we are talking

4    about loss of grant funding.  And dollar amounts are clearly

5    standing, clearly sufficient for standing, even separate and

6    aside from harm to core business functions.

7          The last thing I will just reiterate, we have

8    associational standing here.  If your Honor has concerns

9    about receiving pseudonymous individual member declarations

10   after your Honor considers this, we can explore that with

11   our Plaintiffs.

12         We don't think that's necessary.  We think the

13   detailed declarations here are sufficient reliable evidence

14   that the Defendants have not disputed to support

15   associational standing.  And if your Honor finds

16   associational standing, there's no need of course to address

17   organizational standing.

18         THE COURT:  Sure.

19         One of the things I was trying to think through

20   here, you know, we're on a PI posture.  I typically think of

21   standing as being a relatively low burden.  Irreparable harm

22   is a much higher burden.

23         It felt to me, though, that in the organizational

24   context, maybe there's actually not much difference, that if

25   you can show organizational standing under the case law it's

1    kind of -- you've also shown irreparable harm.  Is that how

2    you read the case law?

3         MS. WINGER:  That's how I read the case law, too.

4    Yes, your Honor.  Harm to a core business function of an

5    organizational plaintiff is irreparable harm.

6         THE COURT:  Okay.  Anything else, Ms. Winger?

7         MS. WINGER:  No, your Honor.  Not at this time.

8    Thank you.

9         THE COURT:  Thank you.

10        Mr. Venguswamy?

11        MR. VENGUSWAMY:  Yes, your Honor.

12        Good morning, your Honor.

13        THE COURT:  Good morning, sir.

14        MR. VENGUSWAMY:  Your Honor, Karlik Venguswamy on

15   behalf of the United States and the federal Defendants.

16        Your Honor, this case, Plaintiffs are trying to

17   characterize this as a significant change, as a new

18   requirement, as causing substantive harm.

19        But I think, your Honor, we need to start looking

20   at the actual statute that underpins everything that's going

21   on in this case.  And there is two specific sections.  One

22   is 8 USC Section 1325, which makes it a federal offense to

23   enter the country without, you know, appearing at a port of

24   entry or otherwise complying with the registration

25   requirements.

1          And so what we have here is a specific subset of

2     aliens who have not complied with the registration -- the

3     proper immigration process.  They have entered the country

4     without complying with 8 USC 1325.

5          So already we're looking at not just every alien

6     in the United States; it's the ones who have not complied

7     with this rule -- sorry -- the statute and are already here

8     without that.

9          Second, you've got the set of sections, which is 8

10    USC Sections 1301 to 1306, which set forth the registration

11    requirements and the carrying requirements.  And there, let

12    me just start by noting Plaintiff said that Defendants do

13    not contest or I think do not oppose the idea that there has

14    never been a universal registration requirement.

15         Your Honor, when the registration requirement was

16    enacted, there was a universal registration requirement.

17    The statute was passed from the beginning as a universal

18    registration requirement.  It has slowly been reduced as DHS

19    and other agencies responsible with enforcing those statutes

20    have found other ways to work around it.  But it's certainly

21    not the case that there has never been a universal

22    registration requirement.

23         THE COURT:  I'll tell you, my impression here from

24    the briefing is that at least much of your registration

25    requirement, this IFR, seems pretty clearly to be envisioned

1    by the statute.

2           But it also seems to me that, as Plaintiffs say,

3    this is basically -- the government has not been enforcing

4    the statute for quite some time.  And maybe it should have

5    been, and maybe you're doing the right thing.  But this is a

6    pretty big switcheroo from what's been happening, and that

7    the case law and the APA would require something more than

8    what you've done to implement this rule.

9           Why aren't they right about that?

10          MR. VENGUSWAMY:  Respectfully, your Honor, they're

11   not right about that because of the fact that the APA --

12   that this rule is, in fact, a procedural rule.

13          You're absolutely right, your Honor:  The

14   government has not been enforcing particular sections of the

15   registration requirement.  And as you say, maybe it should

16   have been.

17          But the case law is clear that the prior lack of

18   enforcement cannot estop the government from now trying to

19   enforce it.

20          THE COURT:  And I don't think they're saying that

21   you can't; or at least I'm not.  I'm wondering, aren't there

22   hoops that you have to jump through, notice and comment,

23   explanation for why this is necessary, what have you, that

24   that has not happened here?

25          MR. VENGUSWAMY:  Your Honor, I think if this were

1     a different rule that was seeking to expand the burden upon

2     any individual immigrant or seeking to change the

3     substantive nature of the aliens' rights or their

4     responsibilities with respect to the immigration laws, your

5     Honor, I think that would be a different case.

6              Here, what we have is you have a statute that says

7     you have to register.  You have a statute that says you have

8     to carry proof of registration.  And then you have a CFR

9     which up until now has listed 11 different ways in which you

10    can comply with that.

11             There are 11 -- I think 11 or 12 forms in -- I

12    think it's 8 CFR 241, your Honor, that are set forth as,

13    Here are the ways in which the department or the agencies

14    have said you can comply with Sections 1301 to 1306.

15             All the IFR is doing is it's adding one more form

16    to that.  And Plaintiffs are in their reply sort of -- they

17    dismiss the ability of the agencies to do that.  But the

18    footnote that we set forth -- I think it's Footnote 3 on

19    Page 17 of our opposition -- you know, there are countless

20    instances in the past where the agencies have changed forms

21    or added forms as a purely procedural rule.  But the

22    addition of the form does not itself create any criminal

23    liability.  It does not create any burden.

24             All that's happening here is, here's one more way

25    with which an alien can comply with Section 1305, 1306 and

1    1325.

2            THE COURT:  But I mean, aren't Plaintiffs correct

3    that until this point most illegal aliens could not comply

4    with the statute and therefore were not required to comply

5    with the statute or didn't face criminal liability for it,

6    and now that they will?

7            MR. VENGUSWAMY:  No, your Honor.  I think under a

8    clear reading of the statutory -- the statutes applicable in

9    this case, every illegal alien should have reported to a

10   port of entry, asked for an NTA and registered with the port

11   of entry at that case.

12           Yes, that requires them to go to a port of entry

13   and register.  But that's what Section 1325 already requires

14   of them.  So --

15           THE COURT:  So is it your perspective that all of

16   these members already face criminal liability for failure to

17   go to a port of entry and get an NTA?

18           MR. VENGUSWAMY:  Your Honor, I believe they all

19   face -- leaving aside the statute-of-limitations question,

20   your Honor, which you raised earlier, I think they all face

21   criminal liability for entering the country without

22   inspection under --

23           THE COURT:  Sure.

24           MR. VENGUSWAMY:  -- 1325.

25           THE COURT:  But there's an ongoing violation.

1          MR. VENGUSWAMY:  Yes.  Under 1302, there is an

2    ongoing continual requirement to carry your -- to be

3    registered and carry your registration.  And I think they

4    all face that, independent of the existence of the IFR and

5    the form here, the G-325.

6          THE COURT:  Are you aware of any prosecutions for

7    that?

8          MR. VENGUSWAMY:  I'm not, your Honor.  But again,

9    the fact that the government has not in the past enforced

10   this statute does not estop the government from attempting

11   to do so now.

12         THE COURT:  But I mean, again, that's not what --

13   we're not talking about you enforcing the -- well, we're not

14   talking about you enforcing the criminal provision of the

15   statute here.  But I think under your theory, there's no --

16   there's nothing to stop you from right now bringing criminal

17   enforcement against any illegal aliens for failure to carry

18   registration.  And yet you're not doing that.  Right?

19         MR. VENGUSWAMY:  Your Honor, I believe that there

20   is no -- under the statute, Section 1302, there is nothing

21   stopping the government from pursuing statutory claims

22   against any illegal alien who is not registered, because

23   that is a separate violation of the code.

24         The fact that the government is not doing so now,

25   I think, has a combination to do with years of policy, which

1    the government is attempting to address in this IFR, as well

2    as it's an information issue again, which the government is

3    attempting to address through this IFR.

4           But at heart, at core, what we're looking at here

5    is the government is simply attempting to enforce an

6    already-existing, extant provision of the code, which has

7    been around since 1940-something, I think.

8           THE COURT:  And what's your best case for this

9    proposition that, you know, because we're enforcing a

10   statute that we just have failed to enforce -- and now I'm

11   kind of switching gears back to the IFR, to be clear -- but

12   because we're just enforcing this notice provision that

13   Congress always wanted us to enforce, this is just a

14   procedural rule that need not go through notice and comment?

15          MR. VENGUSWAMY:  Yes, your Honor.  I think the --

16   bear with me just one second, your Honor.  I apologize.

17          Your Honor, I think the *AFL-CIO* case is

18   particularly instructive in this instance because that

19   specifically dealt with rules of agency organization and

20   procedure as compared to substantive rights.  And in that

21   case, they specifically -- both in that case and in the

22   *James V. Herson versus Glickman* case, your Honor, as the

23   Court pointed out, as the D.C. Circuit pointed out,

24   merely -- you know, the fact that this agency is making a

25   decision about its procedural efficiency doesn't somehow

1    convert the decision into affecting substantive rights.

2    What we're looking at here is a way in which the agency is

3    attempting to be procedurally efficient in its attempts to

4    enforce Section 1302 and Section 1325.

5        So the analogy that comes to mind, your Honor, is

6    a previous administration might choose to focus its efforts

7    on certain violent crimes and not on certain substance --

8    you know, drug crimes.  A subsequent administration may

9    change its mind on that.

10       But they haven't decriminalized anything.  The

11   statute still says the substance is illegal.  You just --

12   different administrations have different things that they're

13   focusing on.

14       THE COURT:  Sure.  But I mean, that feels pretty

15   clearly -- is it *Chenery* grounds? -- on prosecutorial

16   discretion.

17       But here, we're talking about the APA and the

18   requirement for notice and comment rulemaking.

19       MR. VENGUSWAMY:  Yes.  Again, your Honor, if the

20   IFR created a new form of liability, if failure to

21   fulfill -- a failure to file this form, G-325, if that were

22   somehow itself a cause -- a source of liability or an

23   enforceable claim on an individual, your Honor, I think then

24   we could -- we would be in -- solidly in the notice and

25   comment section of the APA.

1          But as we pointed out in our brief, you don't have

2     to fill out the G-325.  There is no requirement on any

3     individual that they fill out this form.

4          This is just one more way in which an individual

5     can comply with Section 1302.  They can go to a port of

6     entry.  They can fill out one of the other 11 options that

7     are set forth in the CFR.

8          The failure to fill this form out does not itself

9     open the door to any additional liability or claim or

10    anything else.  It's just one more tool that an alien has to

11    follow the statutory requirements.

12          THE COURT:  I understand.

13          So what would be the consequences for one of the

14    Plaintiffs' members if they refused to fill out the question

15    about "Tell me all the bad things you've ever done"?  What

16    if they kind of invoked Fifth Amendment privileges there?

17          MR. VENGUSWAMY:  Your Honor, that's a good

18    question.

19          I think there's -- I think if they failed to

20    answer the question, "Tell me all of the bad things you've

21    ever done," your Honor, I think there's case law

22    specifically in the IRS context that indicates that you

23    could invoke a privilege in that way.

24          But the failure -- the desire to invoke a

25    privilege does not excuse the failure to comply with other

1    statutory requirements.

2          So in the IRS context, for example, drug dealers

3    still have to report their income.  They can be careful

4    about how they say it, but they still have to pay taxes on

5    it, in much of the same way you still have to comply with

6    the statutory requirement that you register and that you

7    carry registration around.

8          There may be, your Honor -- and there's -- I think

9    there's a separate question about the way in which you could

10   comply with that and still have your Fifth Amendment right

11   preserved.  I think there's -- in *United States versus*

12   *Sullivan*, which is an older case from 1927, a taxpayer used

13   the Fifth Amendment to basically say that he did not have to

14   file his taxes.  The Supreme Court roundly rejected that

15   proposition.

16         On the other hand, in *Garner versus United States*,

17   a little bit more recently, they found that a voluntary

18   disclosure of incriminating evidence on a form waived the

19   privilege.

20         So I think there's some ground there and, you

21   know, I think it's important to remember that this form is

22   also -- it's pending under the Paperwork Reduction Act, you

23   know.  The agency is still figuring out exactly how to --

24   the exact questions to put on this form.

25         But I will say that there are several other

1    instances where the same question was basically asked.  As

2    far as I know, those forms are not -- have not been

3    contested.  For example, the I-485, which is the application

4    to register permanent residence, has a yes/no checkbox

5    question:  Have you ever entered the United States without

6    being inspected?

7            Similarly, the I-821, which is for temporary

8    protected status, asks the same questions with respect to

9    address and current activities and mode of entry to the

10   United States.  Those are all already-existing forms that

11   aliens can and do fill out.  As far as I know, those have

12   not been contested or they've not been sort of raised in

13   this context.

14           THE COURT:  And would you agree with me that,

15   other than -- maybe it sounds like Ursula -- none of

16   Plaintiffs' members actually face Fifth Amendment liability

17   at least based on what we have in front of us for illegal

18   entry from decades ago?

19           MR. VENGUSWAMY:  Your Honor, to the best of my

20   reading, that appears to be the case.

21           I would -- I want to hedge a little bit because

22   I'm not in a position to sort of offer Fifth Amendment

23   immunity to anyone at this point.  But based upon my

24   reading, it certainly appears that everyone other than

25   Ursula is outside of the sort of 1325 rule.  There is a 1302

1    issue, but that's a separate ongoing requirement under

2    registration.  That's what we're trying to address here in

3    this IFR.

4              THE COURT:  And do you happen to know, do

5    juveniles face 1325 liability?

6              MR. VENGUSWAMY:  I don't, your Honor.  I can go

7    back and ask the agency.  I don't have that off the top of

8    my head.

9              THE COURT:  So why don't the members have standing

10   by virtue of being subject to the new regulatory

11   obligations, which would then give the Plaintiffs

12   associational standing?

13             MR. VENGUSWAMY:  Your Honor, for associational

14   standing, the members themselves have to have standing.  And

15   for an individual to have standing, they have to show that

16   they're facing a harm that is directly attributable to the

17   agency.

18             In this case, the harm that they're facing is

19   attributable to 8 USC 1302.  That harm to the extent it

20   exists is a failure to follow the United States Code that

21   they are already facing.  The only thing that this form does

22   is it gives them one more way in which they can not face

23   that harm.

24             So there's no new harm associated with this form

25   or the failure to fill this form out, because they're

1    already facing a harm under Section 1302.  So there is no

2    harm that these individual members are facing as a result of

3    the IFR, and therefore there is no associational standing

4    because the individual members are not facing any harm --

5              THE COURT:  Your briefing --

6              MR. VENGUSWAMY:  -- or new harm, I should say.

7              THE COURT:  -- talks about third-party standing.

8              I think it looks to me like Plaintiffs are correct

9    that that's not the right framework here and that we should

10   actually be thinking about associational standing, which has

11   its own intricate test.

12             Do you agree with me on that?

13             MR. VENGUSWAMY:  Your Honor, I think we wanted to

14   make sure that we were overly cautious in addressing every

15   possible way in which a Plaintiff might attempt to raise

16   standing in this instance.  I think third-party standing is

17   one more avenue in which I could see one of the named

18   Plaintiffs in this case attempting to get around the fact

19   that they do not have associational standing or

20   organizational standing.  But I think the associational

21   standing is the more conclusive analysis in this case.  I

22   think that deals, I think, more appropriately and more

23   conclusively with the issues of this case.

24             THE COURT:  And so just to kind of tease out

25   something that I think you've already said, the government's

1    position is this does not institute a new carry requirement,

2    that the members must now carry proof of registration, that

3    they already face that, that they faced that two months ago,

4    and this just gives them a new thing they could carry if

5    they wish.

6           Am I correct on that?

7           MR. VENGUSWAMY:  Yes, your Honor.  The -- they

8    could have just as easily gone to a port of entry, asked for

9    a notice to appear, which these already are listed under the

10   CFR as one of the ways that they could comply with Section

11   1302.  So they're already facing the carry requirement, the

12   registration requirement.  This is just one more document

13   that is an option for them.

14          THE COURT:  Wouldn't you agree with me, though,

15   that G-325R is asking for some things that are not required

16   by statute?  And, if so, why doesn't that make this a

17   legislative rule?

18          MR. VENGUSWAMY:  Your Honor, the fact that it's

19   asking for some additional documents outside of maybe what's

20   the first few -- your Honor, if you'd bear with me, I've got

21   my stuff at the table.

22          So, your Honor, as far as what the form asks for,

23   I think there's two answers there.  One is under Section

24   1304(a), which sets forth what the forms can contain.  It

25   asks for -- this is under the statute -- so 1304(a), the

1    date and place of entry, activity in which he has been and

2    intends to be engaged.  So "What activities are you engaged

3    in?" is statutorily considered already as an appropriate

4    question.

5            Then the length of time he expects to remain;

6    police and criminal record, if any, of such alien; and then

7    the catch-all, "such additional matters as may be

8    prescribed."  That's under the discretion of the secretary

9    and the attorney general.

10            So the mere fact that it isn't one of the four

11    enumerated categories of information under Section 1304(a)

12    doesn't automatically push this outside of the scope of a

13    procedural rule.

14            And then second, your Honor --

15            THE COURT:  What would make it a procedural rule?

16            MR. VENGUSWAMY:  What would make it -- I think it

17    is a procedure.

18            THE COURT:  I'm sorry; more than a procedural

19    rule?

20            MR. VENGUSWAMY:  Your Honor, I think if it was

21    attempting maybe to again elicit information that would

22    create some new burden or elicit some information that was

23    creating a new form of liability or exposure to liability

24    that's not already encompassed with Sections 1302 and 1304,

25    again, your Honor, that might be a different question that

1    we're not facing in this case.

2           This form, it's really just attempting to provide

3    an illegal alien -- an unregistered alien with one more way

4    of complying with the statute.

5           And as far as the information, again, your Honor,

6    there are other DHS forms, the I-821, which asks almost the

7    exact same questions as already in the G-325.

8           If anything, your Honor, I think the additional

9    questions here again go to the Paperwork Reduction Act.

10   These are questions that maybe would be on separate form

11   that, once you fill out this form, then you get the other

12   form.  It's a Paperwork Reduction Act question, not an APA

13   question.

14          THE COURT:  Your briefing really focuses on

15   standing.  Am I correct in thinking that your arguments on

16   standing would also go to irreparable harm?

17          MR. VENGUSWAMY:  Absolutely, your Honor.  If they

18   don't have standing, then they -- one way in which they

19   don't have standing in this case is they don't have

20   irreparable harm.  I think there's also -- you know, the

21   individual members don't have standing and there's a

22   traceability issue.

23          But certainly I think there is no irreparable harm

24   in this case because the form and the IFR aren't putting any

25   harm or burden on them that doesn't -- that they're not

1    already facing through the statutes.

2         THE COURT:  And do you read the organizational

3    standing cases the same way Ms. Winger and I do, that

4    basically if CHIRLA can show organizational standing,

5    they've also shown irreparable harm?  Or do you see that

6    irreparable harm as being a second, higher burden that

7    CHIRLA has to meet?

8         MR. VENGUSWAMY:  Your Honor, I think if they're

9    able to show the organizational standing with respect to the

10   effect on CHIRLA, I think that would go a long way towards

11   the irreparable harm prong of the preliminary injunction.  I

12   think they still face the success on the merits, which is a

13   different question.

14        But leaving aside the fact that I disagree that

15   they can show an organizational harm, I do believe, your

16   Honor, as you say, if they could show organizational harm, I

17   think that would at least get you most of the way towards

18   the irreparable harm prong of the PI.

19        THE COURT:  Okay.

20        MR. VENGUSWAMY:  Is there anything else, your

21   Honor?

22        THE COURT:  Nothing from me.  Thanks.

23        Ms. Winger, I'll give you the last word.

24        MS. WINGER:  Your Honor, I wanted to respond first

25   to the new idea proposed just today that noncitizens could

1    register by seeking an NTA.

2            A few points about that:  First of all, the

3    government has never set up a process or publicized a

4    process by which someone can go and demand an NTA.  An NTA,

5    in fact, is a discretionary prosecutorial document.  It's a

6    charging document to initiate removal proceedings.  So

7    there's nothing that requires DHS to issue one.

8            In fact, there are other -- for example, some

9    might be subject to expedited removal and not even be

10    entitled to an NTA, or the agency might not think so.

11            But again, there just simply is not a process and

12    it's certainly never been advertised to people that they can

13    and should go and seek an NTA.  And in fact, the agency

14    sometimes refuses to issue NTAs.  Occasionally people ask

15    for it in order to be placed in removal proceedings to

16    pursue discretionary relief that's only been available

17    there.

18            So it's been viewed as an exercise of

19    prosecutorial discretion.  It's just simply not a realistic

20    mechanism for universal registration.  It's never been used

21    that way.  And the IFR itself acknowledges that explicitly.

22    It says there's no registration form for these people.  So

23    frankly, I think it is a little disingenuous to propose that

24    solution today in open court.  It's not even discussed in

25    the rulemaking here.

1          Briefly, the I-598 and the I-485, which have the

2     questions about uncharged criminal activity, those are

3     discretionary benefits.  You voluntarily apply for them.

4     There's an element of discretion whether you get to adjust

5     your status, whether you're eligible for asylum.  People can

6     choose or not choose to apply for this relief.  There's no

7     criminal penalties for not submitting an I-485 or an I-598.

8          Here, we're talking about a form that is required

9     of everybody with no benefit at all on the threat of federal

10    prosecution.

11         And the last point I would just say is, your

12    Honor's been talking about this in the context of a

13    preliminary injunction.  I do just want to elevate that we

14    also in the alternative seek a stay.  And consistent with

15    longstanding court practice, a universal stay of an IFR here

16    would be appropriate.

17         THE COURT:  And on that point, I mean, it sounds

18    like something we all agree on is that basically the

19    irreparable harm is not going to do -- doesn't do a lot of

20    work here, at least as to organizational standing.

21         And so whether I see this as a stay or an

22    injunction, I basically am doing the same analysis.  Right?

23         MS. WINGER:  Same analysis, yes.  Absolutely.  I

24    mean, again, we do think we have shown irreparable harm for

25    a host of ways for our members.  But as to our organization,

1    the fact that they have standing is really enough on its own

2    to be irreparable harm, too.

3                THE COURT:  And those other -- you mentioned a

4    couple other forms.  I-458?

5                MS. WINGER:  Sorry.  The I-485 is an application

6    to adjust to lawful permanent resident status.  It's a

7    discretionary benefit.  You apply basically to get a green

8    card.  It's a green card application.  An I-598 is an asylum

9    application.

10               THE COURT:  And you said those forms do not

11   require you to disclose your criminal history?

12               MS. WINGER:  They do.

13               So -- I'm sorry.  I don't want to mispronounce

14   your name, but the United States represented that there are

15   forms that request information about uncharged criminal

16   conduct like the form at issue here.  I'm just trying to

17   distinguish between certainly in the Fifth Amendment context

18   there's -- they're different beasts because you don't have

19   to apply for asylum.  You don't have to apply to adjust your

20   status.  You have to register.  And so the -- so it's

21   compelling statements, unlike -- in a way that the 485 and

22   the I-598 are not.

23               THE COURT:  I see.

24               You said a couple minutes ago that the rulemaking

25   actually says that your members can't currently seek -- have

1    registration.  Is that right?

2            MS. WINGER:  That's right.

3            So it's at 11795 of the IFR.  And it says:  Aliens

4    who entered without inspection and have not otherwise been

5    encountered by DHS lack a designated registration form.

6            THE COURT:  Okay.  And your position is there's

7    really no realistic option -- well, a month ago, there was

8    no realistic option for those individuals to get a

9    registration?

10           MS. WINGER:  Absolutely, your Honor.  And I think

11   of course the question here is, could they be prosecuted for

12   willful failure to register?  Right?

13           There was no -- there simply was -- nobody here

14   until a month ago would have thought that they had any way

15   to register and certainly couldn't be guilty of willful

16   failure to do so as a result.

17           Also, the agency itself has acknowledged that the

18   carry requirement only attaches to people who have

19   registered.  In other words, you can't be prosecuted for

20   failure to carry proof of registration if you have not

21   registered.  And so necessarily, by expanding who can

22   register, you're adding this new both requirement and

23   criminal penalty for failure to carry.  And the IFR

24   recognizes that, too.

25           THE COURT:  Okay.  And you were just talking about

1    a form to seek an application for a green card.  I take it

2    that obviously, if you're successful in getting a green

3    card, you've got your document; you're in compliance with

4    the statute; but you don't get some other -- that wouldn't

5    provide something else short of a green card that would

6    nonetheless meet the terms of the statute?

7         MS. WINGER:  So the I-485 in the regulation is

8    listed as a registration form.  So people who have,

9    according to -- who have -- who are eligible for applying

10   for a green card under the regulations have registered.

11        What they carry as proof is a lot less clear,

12   because the I-458 is a multipage form.  That's one of the

13   issues that Defendants don't really explain in their IFR.

14        But people who enter without inspection by and

15   large are ineligible to adjust their status to lawful

16   permanent resident, at least while they're still in the

17   United States, unless they -- yeah.  There's some

18   exceptions.  But not everybody can do that.

19        THE COURT:  And what would prevent them from

20   applying, getting rejected, but nonetheless meeting the

21   terms of this carry statute?

22        MS. WINGER:  Well, I guess they are -- they have

23   to sign this sworn declaration that establishes their

24   eligibility in order to submit it.  Again, there's never

25   been any announcement that people should apply for relief

```
1    that they're ineligible for in order to be considered

2    registered.  It's simply not the system the government has

3    set up.

4              Frankly, I think it risks forcing people to

5    misrepresent.  I mean --

6              THE COURT:  So your point is there are things in

7    the application -- to apply, you've got to say --

8              MS. WINGER:  You have to check off the box.

9    You've got to indicate who's the qualifying relative.  I

10   mean, the whole point of it is to establish eligibility for

11   something for which people are not eligible for.

12             THE COURT:  Got it.  Got it.  That makes sense.

13             All right.  Thank you.  Anything else, ma'am?

14             MS. WINGER:  No, your Honor.

15             THE COURT:  So --

16             MR. VENGUSWAMY:  Your Honor, can I just -- one

17   point?

18             THE COURT:  Yes.

19             MR. VENGUSWAMY:  I apologize, your Honor.

20   Plaintiff correctly pointed out I think I misspoke and

21   overstated it when I suggested that illegal aliens should or

22   can report to a port of entry to get an NTA.  I was merely

23   trying to highlight the number of options under the

24   regulations already existing.  I certainly didn't mean to

25   say that that is a thing that has been advertised or should
```

1    be done or, as you pointed out, it is discretionary.  So I

2    apologize, your Honor, if I overstated that.

3                  THE COURT:  I appreciate that.

4                  So what is the option, then, for somebody right

5    now, understanding the IFR is not out?

6                  MR. VENGUSWAMY:  Your Honor, as Plaintiff

7    correctly says -- and it's in the IFR -- there is not

8    currently a universal form that would apply across the board

9    for every illegal alien to comply with the registration and

10   carry requirements at this -- at this point, pending the

11   IFR.

12                 THE COURT:  But is there any option for these

13   members?

14                 MR. VENGUSWAMY:  Your Honor, I think it's a

15   case-by-case basis.  Again, there were 11 different forms.

16   Some of them may be eligible for one and not others.  Some

17   of them may not be eligible for any of the 11.  The IFR

18   seeks to basically patch that hole in the existing set of

19   forms.

20                 But I just wanted to apologize and acknowledge

21   that I did misspeak there.

22                 THE COURT:  I appreciate the correction.  And this

23   is why we have rebuttals.  Right?

24                 All right.  Thanks, folks.  I appreciate your

25   rapid briefing and helpful arguments here.  I'll certainly

1    try to get an opinion out to you in the next couple days.

2              Thanks, folks.  I'll take it under advisement.

3              (Proceedings concluded at 11:05 a.m.)

1                          <u>**CERTIFICATE**</u>

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 15th day of April, 2025.

11

12               <u>/s/ Lisa Edwards, RDR, CRR</u>
                 Official Court Reporter
13               United States District Court for the
                   District of Columbia
14               333 Constitution Avenue, Northwest
                 Washington, D.C. 20001
15               (202) 354-3269

16

17

18

19

20

21

22

23

24

25