**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE
IMMIGRANT RIGHTS *et al.,*

      *Plaintiff*s,

           v.

U.S. DEPARTMENT OF
HOMELAND SECURITY, *et al.*

      *Defendants.*

Civil Action No. 1:25-cv-00943 (TNM)

**BRIEF OF IMMIGRATION REFORM LAW INSTITUTE AS *AMICUS CURIAE* IN
SUPPORT OF DEFENDANTS AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF**

CHRISTOPHER J. HAJEC
D.C. Bar No. 492551
MATT A. CRAPO
D.C. Bar No. 473355
GABRIEL CANAAN
D.C. Bar No. 90025172
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Ste 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org
mcrapo@irli.org
gcanaan@irli.org

Counsel for *Amicus Curiae*
Immigration Reform Law Institute

**DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *amicus curiae* Immigration

Reform Law Institute makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that

hold 10% or more of the party's stock: None.

3) The following entity has an interest in the outcome of this case:

Immigration Reform Law Institute, whose mission is:  to defend responsible immigration

policies in court, before administrative agencies, and before legislative bodies on behalf of the

American people; to serve as a watchdog to safeguard against abuses of power; and to educate

the American people about the threat of unchecked mass migration to themselves and their

communities.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF *AMICUS CURIAE* ...........................................................................................1

INTRODUCTION .........................................................................................................................1

ARGUMENT .................................................................................................................................3

    The balance of equities and public interest do not support injunctive relief ...........................3

        *a. A less efficient registration system is contrary to the public interest* ...........................4

        *b. The IFR does not harm plaintiffs as organizations* .........................................................6

        *c. The IFR does not irreparably harm individual aliens* .....................................................7

CONCLUSION .............................................................................................................................9

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arizona v. United States*,
    567 U.S. 387 (2012)..................................................................................................4

*Arizona Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ...................................................................................1

*Hartman v. Moore*,
    547 U.S. 250 (2006)..................................................................................................8

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
    468 F.3d 826 (D.C. Cir. 2006)..................................................................................8

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)..............................................................................................8, 9

*Matter of Silva-Trevino*,
    26 I. & N. Dec. 826 (B.I.A. 2016) ...........................................................................1

*Trump v. Hawaii*,
    585 U.S. 667 (2018)..................................................................................................1

*United States v. Texas*,
    599 U.S. 670 (2023)..................................................................................................1

*Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*,
    50 F.4th 164 (D.C. Cir. 2022) .................................................................................1

## STATUTES

Alien Registration Act of 1940,
    Pub. L. No. 76-670, 54 Stat. 670 .............................................................................3

Enhanced Border Security and Visa Entry Reform Act of 2002,
    Pub. L. No. 107-173, § 602, 116 Stat. 543...............................................................3

Illegal Immigration Reform and Immigrant Responsibility Act,
    Pub. L. No. 104-208, § 304, 110 Stat. 3009-546 (1996)..........................................3

Immigration and Nationality Act,
    Pub. L. No. 82-414, 66 Stat. 163 (1952)..................................................................3

Laken Riley Act,
    H.R. 7511, 118th Cong. (2025)....................................................................................4

Secure Fence Act of 2006,
    Pub. L. No. 109-367, § 2(b), 120 Stat. 2638.............................................................4

8 U.S.C. § 1229(a)(1)(F).............................................................................................3

8 U.S.C. § 1229a(b)(5)...............................................................................................3

8 U.S.C. § 1306..........................................................................................................7

8 U.S.C. § 1611(a)......................................................................................................5

8 U.S.C. § 1701 (note)................................................................................................4

## MISCELLANEOUS

Alien Registration Form and Evidence of Registration,
    90 Fed. Reg. 11793 (Mar. 12, 2025)..........................................................................7

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed amicus curiae briefs in a wide variety of cases, including *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

## INTRODUCTION

The United States is engulfed in a crisis of illegal immigration that undermines national sovereignty and public safety. From 2021 to 2024 the Biden administration facilitated mass illegal and extralegal entries into the United States through policies that paused removals and weakened immigration enforcement guidelines. The administration terminated the Migrant Protection Protocols ("Remain in Mexico"), halted border wall construction, reinstated "catch-and-release" at the border, loosened asylum requirements, and implemented mass parole programs. These measures undermined the statutory duty to secure the border and the constitutional obligation to enforce the nation's immigration laws.

The Migration Policy Institute estimates that 5.8 million total migrants were paroled or otherwise allowed entry to pursue asylum from the beginning of Biden's term until July 2024.

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

Migration Policy Institute, *Biden's Mixed Immigration Legacy* (Dec. 6, 2024),

https://www.migrationpolicy.org/article/biden-immigration-legacy. And a report by the House

Committee on Homeland Security Found that CBP recorded 10.8 million encounters nationwide

from 2021 to October 2024. U.S. House Committee on Homeland Security, *September 2024*

*Border Report* (Sept. 2024), https://www.migrationpolicy.org/article/biden-immigration-legacy.

*See also* What Democrats Must Learn from Biden's Disastrous Immigration Record, Vox (Jan.

17, 2025) https://www.vox.com/politics/395339/biden-border-immigration-record-legacy.

Estimates of the total number of illegal aliens range from 11 million to over 18 million. *See*

Jeffrey S. Passel & D'Vera Cohn, *What We Know About Unauthorized Immigrants Living in the*

*U.S.*, Pew Rsch. Ctr. (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-

we-know-about-unauthorized-immigrants-living-in-the-us/; *How Many Illegal Aliens Are in the*

*United States?* FAIR (Mar. 2025), https://www.fairus.org/issue/how-many-illegal-aliens-are-

united-states-2025-update. Despite the determined and successful measures taken by the new

administration in its first 100 days to remedy this situation,[2] millions of illegal aliens remain in

the country.

      Alien registration is central to effective immigration enforcement and has been a statutory

requirement since at least 1940, predating the enactment of the Immigration and Nationality Act

("INA"). The Interim Final Rule ("IFR") challenged in this case furthers the ability of the

Department of Homeland Security ("DHS") to achieve congressionally mandated objectives by

allowing any alien, regardless of status, to comply with the registration requirement by using

---

[2] *See* U.S. Dep't of Homeland Sec., 100 Days of Secretary Noem: Making America Safe
Again (May 5, 2025), https://www.dhs.gov/news/2025/05/05/100-days-secretary-noem-making-
america-safe-again (detailing the results of actions taken by the current administration in its first
100 days).

Form G-325R. This court should decline to issue a preliminary injunction, as enjoining the IFR would constitute an irreparable harm to the government by preventing DHS from carrying out its congressionally mandated responsibility to enforce immigration law. Enjoining the IFR would also be clearly contrary to the public interest and the balance of equities because it would undermine public safety and make immigration enforcement more difficult. No harm alleged by Plaintiffs can justify such outcomes.

## ARGUMENT

### The balance of equities and public interest do not support injunctive relief.

Registration requirements for aliens date back to the Alien Registration Act of 1940, Pub. L. No. 76-670, 54 Stat. 670, which was enacted to safeguard national security during World War II. To prevent espionage and sabotage, Congress saw the need for a reliable system to document and keep track of aliens who entered the country. Later, the INA, Pub. L. No. 82-414, 66 Stat. 163 (1952), formalized this system further, establishing a comprehensive framework for maintaining records of aliens. Alien registration helps the government identify and track aliens, monitor compliance with immigration laws, and maintain public safety.

In 1996, Congress reaffirmed the importance of alien registration with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which ensured that aliens who fail to register or update their addresses can face removal. *See* Pub. L. No. 104-208, § 304, 110 Stat. 3009-546 (codified at 8 U.S.C. §§ 1229(a)(1)(F), 1229a(b)(5)) (requiring aliens placed in removal proceedings to provide current address information and permitting removal in absentia if an alien fails to do so and thereafter fails to attend a removal hearing). Congress reinforced the need for a reliable, centralized registration system to improve tracking of aliens and to ensure that those present in the United States are lawfully present and identifiable in the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. No. 107-173, § 602, 116

Stat. 543 (directing the General Accounting Office to study the feasibility and utility of requiring

nonimmigrants to submit a current address and, where applicable, the name and address of an

employer every year). And in 2006, Congress directed the Secretary of Homeland Security to

achieve "operational control" of the borders, defined as preventing "all unlawful entries into the

United States, including entries by terrorists, other unlawful aliens, and instruments of

terrorism." Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(b), 120 Stat. 2638 (codified as a

note to 8 U.S.C. § 1701). Similarly, the 2025 Laken Riley Act mandates the detention of aliens

involved in specific crimes, including theft, burglary, and violent offenses (H.R. 7511, 118th

Cong. (2025)), and while the Act does not explicitly mandate registration, accurate and up-to-

date records are essential for identifying and tracking aliens who may be subject to detention

under its provisions. Alien registration is thus especially significant to those laws dealing with

public safety and national security.

DHS's discretion to administer statutory registration requirements is consistent with its

overall authority to manage the nation's immigration system, an authority that requires

adaptability to address changing conditions and policy priorities. *See*, *e.g.*, *Arizona v. United

States*, 567 U.S. 387, 396 (2012) (acknowledging the role of changing political and economic

circumstances). In this context, DHS's decision to amend the registration requirements through

the IFR reflects a permissible exercise of this delegated authority.

a. *A less efficient registration system is contrary to the public interest.*

The balance of equities and public interest favor allowing the IFR to remain in effect. The

IFR merely facilitates long-standing statutory alien registration requirements and is essential for

national security, law enforcement, and immigration enforcement. By introducing the digital

Form G-325R, the IFR modernizes the process, making registration more accessible for all aliens

regardless of status and more efficient for DHS. The rule does not impose new obligations but facilitates compliance with statutory requirements while addressing enforcement challenges caused by prior policies. Accurate registration data have always been vital to public safety, especially after 9/11, when gaps in alien registration hindered monitoring of potential security threats. *See* Immigration: Alien Registration, Cong. Rsch. Serv., RL31570 (Jan. 6, 2004), https://www.everycrsreport.com/reports/RL31570.html ("Since the September 11, 2001 terrorist attacks, many U.S. officials and others have expressed concerns that the U.S. government is unaware of the addresses and whereabouts of many foreign nationals in the country."). Implementing the IFR ensures DHS has current information on aliens, which will advance both security and enforcement efforts.

Federal law expressly permits only "qualified aliens" to receive public benefits, and accurate alien registration data can allow agencies to ensure the eligibility of beneficiaries. *See* 8 U.S.C. § 1611(a). For example, the Systematic Alien Verification for Entitlements (SAVE) Program operationalizes this restriction by allowing agencies to verify an applicant's immigration status against DHS records. *See* USCIS, SAVE Verification Process, https://www.uscis.gov/save/about-save/save-verification-process, (listing Alien Registration number as one means of identifying applicants). Without reliable registration data, agencies face increased risk of unlawful disbursements of public benefits. In 2024 alone, the U.S. Department of Agriculture reported $10.5 billion in improper SNAP payments, many of which were attributable to eligibility verification failures. *See* GAO Report, GAO-24-107461, Improper Payments: USDA's Oversight of the Supplemental Nutrition Assistance Program (2024), https://www.gao.gov/products/gao-24-107461.

Likewise, the House Budget Committee cited data estimating over $16.2 billion in Medicaid spending on emergency services for illegal aliens—an increase of 124% since the first Trump administration. See Press Release, House Budget Comm., *CBO: Medicaid Spending on Illegal Aliens Has Cost Taxpayers Over $16.2 Billion* (Oct. 2024), https://budget.house.gov/press-release/cbo-medicaid-spending-on-illegal-aliens-has-cost-taxpayers-over-162-billion-under-open-border-czar-harris. By providing a uniform, accessible method for alien registration, the IFR enhances the accuracy of DHS data and fortifies federal and state mechanisms designed to limit public benefits to qualified individuals.

      b.   *The IFR does not harm plaintiffs as organizations.*

Plaintiffs argue that, because of the significant burdens on both their organizational operations and the aliens they serve, the balance of equities weighs in favor of an injunction. They contend that the IFR will force them to divert limited resources away from their core advocacy and assistance programs, thereby reducing their capacity to fulfill their primary missions. Pls.' Mot. Inj. Pending Appeal at 13. They also suggest that the new registration requirements will significantly increase the need for legal assistance, overwhelming their ability to meet their clients' needs. *Id.* at 24.

The burdens alleged by Plaintiffs, such as diversion of resources, are insufficient to establish standing, which the district court correctly ruled that they lack. But even if they had standing, these harms are insufficient to meet their burden for an injunction pending appeal. It is not burdensome to give aliens an additional, more convenient option to comply with their pre-existing statutory duty to register. On the contrary, it is burdensome for both aliens and the government to continue using outdated, fragmented processes that impede efficient registration. Indeed, far from burdening aliens, the IFR actually serves their interests by making it easier for

them to demonstrate their compliance with immigration laws and to avoid legal consequences for failing to register. This in turn aids Plaintiffs as organizations, who can focus their resources on those aliens who comply with statutory registration requirements rather than those who willfully disregard the law.

      c.   *The IFR does not irreparably harm individual aliens.*

As noted, far from irreparably harming aliens, the IFR actually benefits them by providing a more accessible way to comply with existing immigration laws. The long-standing statutory obligation of aliens to register and update address information is unchanged by the IFR. Alien Registration Form and Evidence of Registration, 90 Fed. Reg. 11793, 11796 (Mar. 12, 2025).  ("The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the Act.") The IFR streamlines the process by introducing an online registration option—an update that reflects the realities of modern administration. The Proof of Alien Registration that aliens receive after completing the form reduces the risk of enforcement actions based on perceived noncompliance. *Id.* at 11795 (describing the process for acquiring the Proof of Alien Registration). *See also* 8 U.S.C. § 1306. Additionally, any "chilling effect" on aliens is owing not to the new IFR form but to some aliens' fear of deportation or criminal penalties due to their underlying unlawful immigration status and failure to comply with the statutory registration requirement. Therefore, Plaintiffs are mistaken in arguing that the IFR, rather than their own noncompliance with the law, "puts millions of [aliens] in the crosshairs." Pls. Mot. for Inj. Pending Appeal at 15. The aliens mentioned in Plaintiffs' brief, Triana and Guvelia, are supposedly harmed because the information they would be required to provide via registration would subject to them to immigration enforcement "while [they] are awaiting Congressionally authorized forms of immigration relief." Pl. Mot. at 16. But

a violation of the law committed while waiting for possible immigration relief is nonetheless a violation of the law. Accordingly, the harm these aliens might experience by unlawfully waiting here, rather than abroad, is self-inflicted. *See, e.g., Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (stating this circuit's consistent position that self-inflicted harm does not amount to a cognizable injury).

Plaintiffs' invocation of First Amendment harms is also unconvincing. They allege that their members will fear unlawful backlash due to forced disclosure of First Amendment activities, including immigration advocacy. Pls.' Mot. for Inj. Pending Appeal at 10; *see also* EXHIBIT H Declaration of MRNY Member "Guvelia," ¶8 (discussing fear of deportation because of never-specified immigration advocacy or criticism of President Trump). But Plaintiffs' illegally-present members, if arrested on probable cause of being in the country unlawfully, and issued removal orders based on sufficient evidence of their unlawful presence, would be unable to show such unlawful retaliation. *See, a fortiori, Hartman v. Moore*, 547 U.S. 250 (2006) (holding that a *Bivens* plaintiff cannot succeed in a claim of retaliatory criminal prosecution in violation of the First Amendment without alleging and proving that the charges were unsupported by probable cause). And, indeed, the Supreme Court has held that, in the deportation context, the interest in avoiding selective treatment "is less compelling than in criminal prosecutions." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999). As the Court further observed:

> Even when deportation is sought because of some act the alien has committed, in principle the alien is not being punished for that act (criminal charges may be available for that separate purpose) but is merely being held to the terms under which he was admitted. And in all cases, deportation is necessary in order to bring to an end *an ongoing violation* of United States law. The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing.

*Id.* (emphasis in original). Accordingly, Plaintiffs wholly fail to show imminent irreparable harm from unlawful retaliation against their members' asserted First Amendment activity.

In sum, enjoining the IFR would not only disregard the congressional intent behind alien registration and undermine DHS's ability to carry out its statutory mandate, but would also make it more difficult for many aliens to comply with their statutory registration obligations. The public interest is not served by making compliance more difficult or by preventing DHS from introducing more modern registration methods. The balance of equities clearly weighs in favor of the IFR because it both facilitates compliance for certain aliens and strengthens the government's ability to maintain public safety through accurate registration records.

## CONCLUSION

For the foregoing reasons injunctive relief should be denied and the IFR upheld.

Dated: May 23, 2025                                  Respectfully submitted,

                                                    /s/ Christopher J. Hajec
                                                    CHRISTOPHER J. HAJEC
                                                    D.C. Bar No. 492551
                                                    MATT A. CRAPO
                                                    D.C. Bar No. 473355
                                                    GABRIEL CANAAN
                                                    D.C. Bar No. 90025172
                                                    Immigration Reform Law Institute
                                                    25 Massachusetts Ave., NW, Ste 335
                                                    Washington, DC 20001
                                                    (202) 232-5590
                                                    chajec@irli.org
                                                    mcrapo@irli.org
                                                    gcanaan@irli.org

                                                    Counsel for *Amicus Curiae*
                                                    Immigration Reform Law Institute

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 27(d)(2) because it contains 2,460 words, as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

Dated: May 23, 2025                    Respectfully submitted,

                                       /s/ Christopher J. Hajec